**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ERIN CAVALIER, | * | |
| Plaintiff, | * | |
| v. | * | Case No. 1:16-cv-2009 |
| THE CATHOLIC UNIVERSITY OF AMERICA, | * | |
| | * | |
| Defendant. | | |
| | ****** | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Erin Cavalier ("Cavalier," or "Plaintiff"), a 2016 graduate of the Catholic University of America ("CUA," or "Defendant"), brings this Complaint for damages against CUA for violations of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688, negligence, and negligent and intentional infliction of emotional distress. This suit arises out of CUA's deliberately indifferent response to Cavalier's rape while Cavalier was a student on CUA's campus. In support of this Complaint, Cavalier alleges the following:

**Introduction**

1.      This case is about CUA's mistreatment of Cavalier and mishandling of the investigation and aftermath of Cavalier's report of a sexual assault.

2.      In the early morning hours of December 15, 2012, Cavalier reported to CUA that CUA football player John Doe had raped her in her dorm room. She again reported her rape to the Department of Education's Office for Civil Rights ("OCR") on December 19, 2013. As a result of Cavalier's report, OCR opened an investigation into CUA's compliance with Title IX, which continues to this day.

3.      CUA responded to Cavalier's two reports of rape by conducting a wholly

inadequate, untimely, and biased investigation, refusing to protect Cavalier from further

harassment by her rapist, and retaliating against her.  CUA's deliberately indifferent, negligent,

and retaliatory actions included:

    a.   From day one, CUA blamed Cavalier for her own rape.  On the night of the rape, when Cavalier asked to be taken to the hospital, Cavalier was interrogated about whether she wanted to go the hospital because she really had been raped or because she was afraid she might be pregnant.  At another time, CUA's Department of Public Safety ("DPS") officers implied to Cavalier that she must have consented to the sex because she was a "career alcoholic" at the age of 18.[1]

    b.   On February 18, 2013, CUA Captain Kim Gregory, the employee CUA charged with investigating Cavalier's report, recommended closing the investigation upon concluding that "[Cavalier's] consent was based upon the usage of a condom," despite Cavalier's consistent position that she had been incapable of giving consent due to severe intoxication, and despite the fact that neither Capt. Gregory nor any other CUA or law enforcement official had preserved any evidence of a condom.[2]

    c.   On March 13, 2013, CUA closed its investigation into Cavalier's assault without ever considering evidence that Cavalier lacked the capacity to consent.

    d.   Due, in part, to its initial, unreasonable decision to prematurely close the investigation, CUA took 298 days — from the date of the rape on December 15, 2012, to October 9, 2013 — to hold a disciplinary hearing and wrongly conclude, for the second time, that Doe did not assault Cavalier.  OCR recommends that this process take 60 days.

    e.   Although CUA took 292 days to hold a disciplinary hearing, it afforded Cavalier only a 48-hour notice of the hearing date.  As a result, Cavalier's parents, who live in California, could not attend the hearing.  Doe's parents attended the hearing.

    f.   During the hearing, CUA forced Cavalier to follow an "unwritten rule" forbidding her from calling non-CUA witnesses to testify.  This precluded Cavalier from calling her potentially most important witness — a victim's advocate who observed Cavalier's severe intoxication at the hospital after the rape.

    g.   At the conclusion of its long-delayed disciplinary hearing, CUA decided that

---

[1] Ex. 10 at 2–3.
[2] Ex. 2 at 8.

Cavalier was "not incapable of giving consent,"[3] despite Cavalier's blood alcohol level of .216 g/dL on the night of the rape and accounts from numerous witnesses — including Doe — describing Cavalier as severely intoxicated.

h.  For four years, CUA refused to enforce its no-contact order against Doe. During Cavalier's first year at CUA (2012–2013), Doe violated the no-contact order approximately once every two weeks.  During her second year at CUA (2013–2014), Doe violated the no-contact order approximately twice a week. During her third (2014–2015) and fourth years (2015–2016), Doe violated the no-contact order approximately once a month.  On multiple occasions over the four years, Cavalier told CUA Dean of Students Jonathan Sawyer and Associate Dean of Students Omar Torres that her rapist continually confronted her both on and off campus.  CUA did nothing to stop the traumatic confrontations between Cavalier and her rapist.

i.  In fact, CUA facilitated Doe's continued harassment of Cavalier by housing him 200 feet from her, despite Cavalier's objections.

j.  CUA discouraged Cavalier from her sexual assault survivor advocacy work.

k.  CUA named Capt. Gregory, who did the most to deny Cavalier her Title IX rights, as the second-in-charge of all CUA Title IX enforcement in May 2016, just days before Cavalier graduated from CUA.

4.   CUA's actions facilitated, contributed to, and maintained a hostile educational environment for Cavalier that persisted from the day of her rape to the day of her graduation and that denied her access to the educational opportunities and benefits to which she was entitled.

5.   CUA's response to Cavalier's rape also contravened its own policies, which require it to recognize sexual intercourse with an incapacitated individual as a form of sexual assault, take sexual assault seriously, protect survivors from further harassment, and remedy any hostile educational environment created as a result of sexual harassment.

6.   Cavalier fought a four-year campaign to remedy her rape and the hostile environment at CUA for herself and all sexual assault survivors on CUA's campus.  At every turn, CUA's deliberate indifference and retaliatory actions took an emotional, psychological, and

---

[3]  Ex. 6 at 1.

financial toll on her.

7.      Doe has never been held accountable for his rape of Cavalier.  This Complaint

seeks to hold CUA accountable for its deliberate indifference to Cavalier's rape, its negligent

failure to follow its own policies and to remedy the hostile educational environment created by

Doe's rape and harassment of Cavalier, and its craven retaliation and negligent and intentional

infliction of emotional distress against one of its own.

## Parties

8.      Cavalier is a resident of the Northern District of California.  She matriculated as a

first-year student at CUA on August 27, 2012.  At all times relevant to this Complaint, Cavalier

was enrolled as an undergraduate at CUA.  She graduated from CUA on May 14, 2016.

9.      CUA is a private institution of higher learning for undergraduate and graduate

studies located in the District of Columbia.  CUA receives federal financial assistance and is

subject to Title IX.

## Jurisdiction

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because a

federal question is at issue.

11.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332 based on

diversity of citizenship.  The amount in controversy exceeds $75,000.  The Parties are citizens of

California and the District of Columbia.

12.     This Court has supplemental jurisdiction over the District of Columbia tort causes

of action under 28 U.S.C. § 1367.

## Venue

13.     Under 28 U.S.C. § 1391(b), venue is proper in this District because the Defendant

resides in this judicial District, a substantial part of the events giving rise to this action occurred

in this District, and the Court can assert personal jurisdiction over the Defendant in this District.

### Background Facts Relevant To All Counts

#### THE DEPARTMENT OF EDUCATION'S 2011 DEAR COLLEAGUE LETTER REGARDING SEXUAL ASSAULT

14.     OCR is the federal agency primarily responsible for the enforcement and

interpretation of Title IX.

15.     On April 4, 2011, OCR issued a "Dear Colleague Letter" ("DCL") to educational

institutions, including CUA.[4]  The DCL is a "significant guidance document" that assists

educational institutions with following and implementing Title IX.[5]  Schools that fail to follow

the DCL may forfeit their federal funding.[6]

16.     The DCL includes guidance on peer-on-peer sexual assault.  As the DCL informs

schools, even a single incident of sexual assault can create a hostile environment that renders a

school liable under Title IX.[7]

17.     The Title IX guidelines for educational institutions to follow when responding to

student-on-student sexual harassment include:

  a.  A school must be "prompt, thorough, and impartial" in any inquiry into sexual assault.[8]

  b.  An investigation of a sexual assault complaint must be "adequate, reliable,

---

[4]  Ltr. from Russlynn Ali, Assistant Sec'y for Civil Rights, OCR (Apr. 11, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "DCL"). Schools are to read the DCL in conjunction with OCR's "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," which OCR issued in 2001.  *See* DCL at 2.
[5]  DCL at 1 n.1.
[6]  DCL at 16.
[7]  DCL at 3.
[8]  DCL at 5.

and impartial."[9]

    c.   A school must disclose "any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties" in the investigation and hearing processes.[10]

    d.   Most investigations of sexual assault should take "approximately 60 calendar days following receipt of the complaint."[11]

    e.   A school must promptly "take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. . . . When taking steps to separate the complainant and the alleged perpetrator, a school should minimize the burden on the complainant."[12]

    f.   The "use of alcohol or drugs never makes the victim at fault for sexual violence."[13]

    g.   Schools have a "responsibility to provide a safe and nondiscriminatory environment for all students."[14]

    h.   Schools must provide students with grievance procedures that are "easily understood."[15]

18.      CUA was aware of and bound by these guidelines at all times relevant to this Complaint.

### THE DEPARTMENT OF EDUCATION'S 2014 QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE

19.      On April 29, 2014, OCR issued its "Questions and Answers on Title IX and Sexual Violence of 2014" ("Q&A"), in order to "further clarify the legal requirements and guidance articulated in the DCL."[16]

---

[9] DCL at 9.

[10] DCL at 12.

[11] DCL at 12.

[12] DCL at 15.

[13] DCL at 15.

[14] DCL at 5.

[15] DCL at 9.

[16] *See* U.S. Dep't of Educ., OCR, *Questions and Answers on Title IX and Sexual Violence* ii (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (hereinafter "Q&A").

20.     Schools are required to follow the Q&A at risk of losing their federal funding.

21.     According to the Q&A, "sexual violence" refers to a sexual act perpetrated against a person's will or where that person is incapable of giving consent due to intoxication.[17]

22.     The Q&A reinforces that a school's delayed or inappropriate response to a reported rape can result in a hostile educational environment which violates Title IX.[18]

23.     The Q&A reinforces that schools must implement Title IX grievance procedures that include an impartial investigation and prompt responses.[19]

24.     Other guidelines prescribed by the Q&A include:

    a.  A school must take interim steps to protect the complainant before the resolution of a sexual assault investigation.[20]

    b.  All personnel involved in a Title IX investigation "must have training or experience in handling complaints of sexual violence and the school's grievance procedures."[21]

    c.  Hearings should be conducted in a manner that "does not inflict additional trauma on the complainant."[22]

    d.  A school must remedy any hostile environment created by its delayed or inappropriate response to allegations of sexual violence.[23]

    e.  The "responsible employees" for enforcing Title IX must be trained on "the potential for revictimization by responders and its effect on students" and "appropriate methods for responding to a student who may have experienced sexual violence, including the use of non-judgmental language."[24]

    f.  A school must train its responsible employees on "consent and the role drugs or alcohol can play in the ability to consent."[25]

---

[17]  Q&A at 1.
[18]  Q&A at 2.
[19]  Q&A at 12.
[20]  Q&A at 3.
[21]  Q&A at 25.
[22]  Q&A at 31.
[23]  Q&A at 34 n.31.
[24]  Q&A at 38.
[25]  Q&A at 40.

    g.    Schools must explain to students that "use of alcohol or drugs never makes the survivor at fault for sexual violence."[26]

    h.    "[I]f an individual brings concerns about possible [Title IX] problems to a school's attention . . . it is unlawful for the school to retaliate against that individual for doing so."[27]

25.    The DCL and Q&A were primary sources of guidance for CUA's own sexual assault and Title IX policies during all times relevant to this Complaint.

26.    In response to a complaint Cavalier filed with OCR, through her advocate, on December 19, 2013,[28] OCR initiated an investigation into CUA's compliance with Title IX.

## CUA'S SEXUAL ASSAULT POLICIES

27.    Since 2004, CUA has implemented no fewer than 10 policies regarding sexual assault and filing a grievance.  These policies are not "easily understood," as OCR requires.[29] Nevertheless, CUA has known since at least 2004 how to properly enforce Title IX.

28.    From 2004 to 2012, CUA's Sexual Assault Policies explicitly defined sexual assault to include situations where the victim was incapacitated and the assailant should have recognized the victim's incapacitation.  Thus, the 2004, 2005, and 2007 Sexual Assault Policies stated, "Sexual assault includes having sexual contact with a person while knowing or having reason to know that the person was incapacitated by drugs, including alcohol, or by other means."[30]

29.    The 2008 and 2009 Sexual Assault Policies linked the concept of intoxication to the victim's lack of free will.  They stated, "Having sexual contact with a person . . . [who is]

---

[26]  Q&A at 42.
[27]  Q&A at 42.
[30]  Ex. 10.
[29]  DCL at 9.
[30]  *Policies: Student Life: Sexual Assault*, CUA (archived July 7, 2004), http://policies.cua.edu/ archives/studentlife/sexassault1.cfm; *Policies: Student Life: Sexual Assault*, CUA (archived Oct. 10, 2005), http://policies.cua.edu/archives/studentlife/sexassault2.cfm; *Policies*, CUA (archived July 31, 2007), http://policies.cua.edu/archives/studentlife/sexassault3.cfm.

incapacitated . . . is considered against free will."[31]

30.     However, CUA's 2012 Sexual Assault Policy[32] removed the express mention of incapacitation from the definition of "sexual assault."  Instead, it defined sexual assault as "sexual contact without meaningful, explicit, ongoing consent."[33]  However, it also stated that sexual assault included making a person have sex through force, threats, coercion, under duress, or against "her free will."[34]

31.     De-emphasizing the role of incapacitation in its sexual assault policy not only broke from all previous and subsequent CUA Sexual Assault Policies, but threatened to make CUA's definition of sexual assault inconsistent with the legal definition of criminal sexual assault in the District of Columbia in 2012 and now.[35]

32.     On August 22, 2013 — one day after Cavalier and her representatives met with CUA Title IX Coordinator Lisa Wood, CUA General Counsel Lawrence Morris, and other CUA representatives to discuss CUA's deliberately indifferent and negligent response to her rape, CUA changed its Sexual Assault Policy to again expressly include incapacitation.[36]

---

[31] *Policies: Student Life: Sexual Assault*, CUA (archived Aug. 8, 2008), http://policies.cua.edu/ archives/studentlife/sexassult4.cfm; *Policies*, CUA (archived July 27, 2009), http://policies.cua.edu/archives/studentlife/sexassault5.cfm.

[32] CUA's 2012 Sexual Assault Policy was in effect at the time of the December 15, 2012, rape. *See Policies: Sexual Assault*, CUA (archived Sept. 4, 2012), http://policies.cua.edu/archives/ studentlife/sexassault6.cfm.

[33] This was also the definition of "sexual assault" provided in the CUA Code of Student Conduct at the time of Cavalier's rape.  *Policies: Code of Student Conduct*, CUA (archived Sept. 4, 2012), http://policies.cua.edu/archives/studentlife/conduct10.cfm.

[34] *Policies: Sexual Assault*, CUA (archived Sept. 4, 2012), http://policies.cua.edu/archives/ studentlife/sexassault6.cfm.

[35] "The distinguishing characteristic of these offenses [in the District of Columbia], which we refer to generally as sexual assaults, is the commission of a sexual act or contact against the victim's will or *without the victim's consent*, typically by means of force or threats or *by taking advantage of the victim's incapacitation* or impairment."  *Davis v. United States*, 873 A.2d 1101, 1104 (D.C. 2005) (emphasis added).

[36] *See Policies*, CUA (archived Aug. 22, 2013), http://policies.cua.edu/archives/studentlife/ sexassault8.cfm.

33.     Nevertheless, the five CUA Sexual Assault Policies before 2012 and all four Sexual Assault Policies after 2012 expressly included the concept of incapacitation.  In the Sexual Assault Policies immediately preceding the 2012 policy, CUA linked incapacitation to the victim's lack of free will, which remained in the definition of sexual assault in 2012.  Despite the changes in its policies that rendered them difficult to understand, especially to students, CUA knew that Cavalier's incapacitation mattered to the sexual assault investigation in 2012.

## Allegations

### SEXUAL ASSAULT — DECEMBER 15, 2012

34.     At approximately 1:00 a.m. on December 15, 2012, John Doe, a football player at CUA, raped Erin Cavalier, then an 18-year-old first-year student, when he engaged in sexual intercourse with her knowing she was intoxicated and incapable of giving consent.

35.     Doe knew Cavalier was intoxicated to the point of being incapable of giving consent because Cavalier had passed out in front of him at a party they had attended that night. When the party ended, Cavalier asked him to walk her to her dormitory, where he raped her.

36.     Prior to the rape, Doe and Cavalier were minimally acquainted as CUA athletes. Cavalier was on the CUA lacrosse team.

37.     Around 11:00 pm on December 14, 2012, Doe and Cavalier crossed paths at a party at Flather Hall, a dormitory on CUA's campus.  Before arriving at the party, Cavalier had been drinking with a female friend in Ryan Hall, her dormitory.  Doe saw Cavalier at the Flather Hall dorm party heavily inebriated, he saw her continue to drink alcohol at the party, and he saw Cavalier pass out at the party as a result of her excessive drinking.

38.     Although Doe also drank alcohol at the party, he maintained control of his actions.

39.     When the party ended, Doe walked a stumbling, unsteady, and unclear Cavalier to her dorm room.

40.     Cavalier does not remember how she got back to Ryan Hall.  She remembers only finding Doe on top of her engaging in sexual intercourse with her.

41.     At the time Doe engaged in sexual intercourse with her, Cavalier was visibly incapacitated and incapable of consenting due to severe alcohol intoxication.  Doe knew Cavalier could not and had not consented to sex.[37]

42.     Cavalier does not remember Doe leaving her room.

43.     At approximately 2:00 a.m., a resident assistant from Ryan Hall called CUA Area Coordinator Nicole Giglia and alerted her that a student at Ryan Hall may have been sexually assaulted.  Giglia called DPS Lieutenant Dicks and met him at Ryan Hall.  According to a December 15, 2012, email from Giglia to Dean Sawyer, among others, Giglia reported that Cavalier, while crying in her room, stated that she had been "raped tonight."  Cavalier also candidly admitted that "the details of the night were blurry" due to her drinking.[38]

44.     Cavalier was then interviewed in her room by Lt. Dicks.

45.     At some point, the D.C. Metropolitan Police Department ("MPD") and Emergency Medical Services Department ("EMS") were contacted.

46.     Officer A.D. Moore of the MPD arrived on the scene first and was briefed by Lt. Dicks.  Giglia observed Officer Moore roll his eyes and state, "I'm not touching this, I'm calling the Sex Crime Unit."  Nevertheless, when the paramedics arrived and Giglia went to retrieve Cavalier, Officer Moore followed her and pushed passed her into Cavalier's room, where Cavalier was sitting with two friends.  Officer Moore asked to interview Cavalier with only Lt.

---

[37] *See generally* Exs. 2, 4, 7.
[38] Ex. 11 at 1.

Dicks in the room.  Cavalier agreed, and Officer Moore shut the door.  From outside the room, Giglia heard Officer Moore ask Cavalier, "Do you want to see the SANE nurse because you believe you were sexually assaulted or do you just want to go because you think you could get pregnant?"[39]

47.     After Officer Moore left the room, emergency medical technicians ("EMTs") Olani Griffith and Shanetra Brown transported Cavalier to the hospital.  EMT Griffith signed a report in which she made "findings" of "ALCOHOL USE (SUSPECTED); SEXUAL ASSAULT."  EMT Griffith wrote in her report that "[P]t. stated that she had been drinking alcohol in her dorm room with an acquaintance and he proceeded to rape her without a condom."[40]

48.     At approximately 8:28 a.m., or about eight hours after the rape, the EMTs and a hospital nurse measured Cavalier's blood alcohol level at 97 mg/dL (0.097 g/dL).[41]  With retrograde extrapolation, Cavalier's blood alcohol level would have been 216 mg/dL (0.216 g/dL), or almost three times the legal limit of 80 mg/dL (0.08 g/dL) at the time of the rape.

**CUA'S DELIBERATELY INDIFFERENT AND NEGLIGENT RESPONSE TO CAVALIER'S RAPE**

***CUA Conducted a Clearly Inadequate and Unreliable Investigation Plagued by Lengthy Delays and Partiality, Resulting in a Wrongful and Unreasonable Decision Against Cavalier***

49.     OCR advises educational institutions that a sexual assault investigation should take 60 days from the receipt of a complaint to a determination of responsibility and appropriate remedies.[42]

50.     OCR also requires the investigation of a sexual assault complaint to be "adequate,

---

[39]  Ex. 11 at 1.  A SANE nurse is a "sexual assault nurse examiner" or a medical professional trained in conducting sexual assault examinations of rape victims.
[40]  Ex. 8 at 1.
[41]  Ex. 8 at 2.
[42]  DCL at 12.

reliable, and impartial."[43]

51.     CUA's own Title IX Policy states that "[s]ex discrimination . . . includes sexual harassment and sexual assault or violence.  The Catholic University of America will not tolerate such discrimination."  CUA "*will respond* to reported violations of Title IX *by protecting the victim* and our community, conducting *prompt* and thorough investigations and providing support."[44]

52.     Contrary to its own and OCR policy, CUA's investigation of Cavalier's rape took 298 days from the time Cavalier reported the assault on December 15, 2012, to the date of CUA's decision not to hold Doe accountable on October 9, 2013 — nearly five times the length of an investigation that complies with Title IX.  Nor did the investigation result in any disciplinary action against Doe, despite his clear violation of CUA policy and D.C. law.

53.     From the start, CUA's investigation was plagued by undue delay.  The delay was exacerbated by CUA's decision to prematurely terminate its investigation without a hearing, in disregard of the strong evidence that Cavalier was incapable of consenting to the sex with Doe and before CUA had interviewed key witnesses or obtained crucial evidence — most critically, Cavalier's toxicology report from the night of her rape.  In the end, Cavalier received a hearing, but CUA found Doe not responsible.  These and other actions taken by CUA render its investigation and eventual decision clearly unreasonable in light of the known facts and circumstances.

54.     **DAY 30:  CUA First Informs Cavalier of the Support Services, Policies, and Disciplinary Procedures Available to Her.**  On December 17, 2012, CUA's Assistant Dean of

---

[43] DCL at 9.

[44] *Title IX*, CUA (last updated Sept. 20, 2016), http://title9.cua.edu/default.cfm#consent (emphases added).  Upon information and belief, CUA's Title IX Policy referenced in this Complaint was the same Policy in effect on December 15, 2012.

Students Rachel Wainer emailed Cavalier and offered her assistance.  Cavalier accepted the offer

via email on December 20, 2012.  Dean Wainer failed to respond until January 14, 2013, when

Cavalier again reached out for her help.[45]  On January 14, 2013 — 30 days after the assault —

Dean Wainer provided Cavalier with information about the support services, policies, and

disciplinary procedures available to her.

55.     At some point thereafter, CUA appointed DPS Captain Kim Gregory, Investigator

Charles Callis, and Lt. Dicks to lead the fact-finding phase of its investigation.

56.     **DAY 32:  CUA First Interviews Witnesses.**  CUA failed to interview any

witnesses beyond Doe and Cavalier for the first 32 days after Cavalier made her report.  On

January 16, 2013, it conducted its first interviews with students who saw Cavalier and Doe at

Flather Hall the night of the rape.[46]

57.     **DAY 67:  CUA Interviews More Witnesses.**  After the first set of interviews,

DPS inexplicably waited over a month before interviewing two more student witnesses on

February 20, 2013.[47]

58.     To date, Cavalier does not know whether DPS interviewed every student witness

at the Flather Hall party.

59.     CUA prohibited Cavalier from interviewing witnesses to corroborate her rape.[48]

60.     **DAY 95:  CUA Prematurely Closes Its Investigation Without a Hearing.**  On

March 20, 2013, CUA informed Cavalier in a letter from Associate Vice President for Student

Life and Dean of Students Jonathan C. Sawyer that its investigation was closed and that it had

"determined that evidence does not exist to substantiate moving forward with student

---

[45] *See* Ex. 1.
[46] *See* Ex. 2 at 4.
[47] *See* Ex. 2 at 6–7.
[48] *See* Ex. 5.

disciplinary action."[49]

61.     CUA's refusal to continue its investigation and conduct a disciplinary hearing was clearly unreasonable in light of facts and circumstances known to CUA and in light of evidence and CUA policy that Dean Sawyer refused to consider at the time of his decision.

62.     Dean Sawyer purported to base his decision an investigative report submitted by Capt. Gregory.  That report contained significant evidence that Cavalier was incapable of consenting to sex on December 15, 2012, as the result of severe intoxication, and that Doe knew it.

63.     Doe himself admitted that Cavalier was "drunk" when he took her back to Ryan Hall.[50]

64.     The report described interviews with eight CUA-student witnesses and one other student witness.[51]  These witnesses stated consistently that Cavalier was visibly heavily intoxicated the night of the rape.

65.     Four witnesses described seeing Cavalier drunk or smelling alcohol on her when they saw her on the evening of December 14 or in the early morning on December 15, 2012.[52]  One witness and friend of Doe described Cavalier as so intoxicated that she was "staggering when she left" the party.[53]  Doe's roommate reported that "Erin and [Doe] seemed drunker" than everyone else at the Flather Hall party.[54]  Another witness reported that "Erin was very drunk

---

[49] Ex. 3.
[50] Ex. 2 at 3.
[51] The Plaintiff has not been able to determine, and CUA has refused to clarify, whether the ninth witness was a CUA student.
[52] Ex. 2 at 5.
[53] Ex. 2 at 4.
[54] Ex. 2 at 6.

and falling asleep on the bed" at the party.[55]

66.     Another witness did not mention Cavalier specifically, but confirmed that the women at the Flather Hall party "appeared to be drunk."[56]  One witness confirmed that Cavalier stated shortly after the rape that she had been drinking.[57]

67.     The remaining two witnesses did not see Cavalier at or after the party at Flather Hall and made no statement about her condition at or near the time of the rape.[58]

68.     Capt. Gregory's report also confirmed that Cavalier described herself as drunk to the point of memory loss and incapacitation immediately after the rape and throughout the investigation.  A student witness who spoke to Cavalier several hours after the rape described Cavalier as "hysterical and crying."  The witness reported that Cavalier did "not remember how she got back to the room" from Flather Hall, that Cavalier's memory was "fuzzy," and that Cavalier did not "remember everything that happened."[59]  Cavalier herself stated to Capt. Gregory that she did not remember walking back to her dormitory or signing Doe in, or Doe leaving her room.  She remembered finding herself "unclothed from the waist down" with Doe "on top of her."[60]

69.     Finally, the report confirmed that Cavalier described the sexual intercourse as rape immediately after the event.  A witness who found Cavalier crying on the floor in the Ryan Hall bathroom at 1:30 a.m. on December 15, 2012, recounted that Cavalier stated, "I think I've just been raped."[61]

---

[55]  Ex. 2 at 6.
[56]  Ex. 2 at 6.
[57]  Ex. 2 at 5.
[58]  *See* Ex. 2 at 4–5, 6.
[59]  Ex. 2 at 4.
[60]  Ex. 2 at 3.
[61]  Ex. 2 at 5.

70.     As important as the evidence that CUA purportedly considered and disregarded is the evidence it knew was critical to its determination, but refused to collect.  DPS had access to and Dean Sawyer was aware of at least five other witnesses who could have provided crucial testimony on Cavalier's intoxicated state:  CUA Area Coordinator Giglia, EMTs Griffith and Brown, the nurse who treated Cavalier at the hospital, and the CUA employee who saw Cavalier or Doe sign in to Cavalier's dormitory in the early morning on December 15, 2012.  Yet, CUA closed its investigation never having interviewed any of these witnesses.

71.     Most egregiously, despite Cavalier's consistent, stated position that she was too intoxicated to consent to sexual intercourse, CUA closed its investigation without requesting or consulting Cavalier's toxicology report.

72.     The investigative report purportedly used by Dean Sawyer to arrive at his decision unreasonably concluded that Cavalier was not raped because, the report concluded, Doe used a condom during the sexual intercourse.[62]  Although Cavalier insisted throughout the investigation that she was too intoxicated to consent to sex, CUA entirely ignored this line of inquiry in its investigation, report, and initial decision to terminate the matter, in violation of longstanding CUA policy.

73.     **DAY 249:  CUA Reverses Itself and Grants Cavalier's Request for a Hearing.**  On August 21, 2013, over eight months after she reported her rape, Cavalier and

---

[62]  Ex. 2 at 8.  The conclusion that Doe used a condom was based entirely on hearsay.  Although Officer Moore of the MPD, whose had made clear his disdain for Cavalier, allegedly observed a condom in Cavalier's trashcan after the rape, Ex. 2 at 2, neither he nor any other person, including officials from CUA on the scene the morning of the rape, preserved the condom as evidence.  This was clearly unreasonable in light of the allegations of rape, as was a decision based off this inconclusive evidence in the absence of any hearing.

members of her support network[63] met with CUA General Counsel Larry Morris, Dean Sawyer,

and CUA Title IX Coordinator Lisa Wood to press for a hearing.  At this meeting, Dean Sawyer

and Morris informed Cavalier that, in light of Cavalier's toxicology report, CUA would reverse

its decision and hold a disciplinary hearing.[64]  CUA did not explain its refusal to consider this

evidence five months earlier.

74.     **DAY 255:  CUA Finally Issues a Written, but Inadequate, No-Contact Order**

**Against John Doe.**  On or about August 27, 2013, Cavalier received a letter documenting that a

no-contact order was in place between her and Doe.[65]  CUA had previously represented to her

that a no-contact order was in place, but it had refused to provide written confirmation.

75.     In violation of the DCL, the no-contact order also forbid Cavalier from contacting

Doe.[66]

76.     **DAY 292:  CUA Holds a Hearing.**  CUA finally held a hearing on Cavalier's

report on October 3, 2013.  CUA notified Cavalier of the hearing date only two days prior, on

October 1, 2013.  As a result of this 48-hour notice, Cavalier's parents, who live in California,

could not attend the hearing.  Doe's parents attended the hearing.

77.     **DAY 298:  CUA Wrongfully and Unreasonably Determines — Again — That**

**Cavalier Was Never Raped.**  On October 9, 2013, CUA issued its final decision that Doe was

not "responsible" for Cavalier's rape.

78.     The October 3, 2013, hearing did not cure CUA's inadequate, unreliable, partial,

and deliberately indifferent investigation of Cavalier's complaint.

---

[63]  Cavalier's support network included her father, Mark Cavalier, her CUA lacrosse coach
Meghan McDonough, lawyer Matthew Orenstein from the Network for Victim Recovery D.C.
("NVRDC"), Rachel Kohler, a Georgetown Law Fellow with NVRDC, and her counsel.
[64]  *See* Ex. 5.
[65]  *See* Ex. 5.
[66]  DCL at 15.

79.     Although it re-opened its investigation into Cavalier's rape, CUA never interviewed the five key witnesses it had ignored during the first investigation.

80.     The October 3 hearing could not cure CUA's clearly unreasonable failure to preserve other, vital evidence.  CUA failed to preserved or in any way document the condom allegedly used by Doe during the rape.  Instead, CUA revealed its partiality by uncritically favoring Doe's self-serving statement that he "engaged in consensual sex; that he used a condom, which broke and that he put the broken condom in the trash,"[67] and Officer Moore's unverified statement that he observed a condom in Cavalier's trash.

81.     CUA failed to preserve the video of Cavalier and Doe walking from Flather Hall to Ryan Hall and entering Ryan Hall, which would have provided vital evidence of Cavalier's level of obvious impairment.

82.     CUA failed to preserve Cavalier's dorm room, the crime scene.  Giglia stated that law enforcement looked at the room when Cavalier left.  However, CUA has never produced any documentation, including photographs or forensic evidence that might have helped determine what happened in the room.

83.     CUA never sought out Cavalier's toxicology report.  Instead, Cavalier brought the toxicology report to CUA and demanded CUA consider this evidence in its investigation.

84.     The October 3 hearing also could not cure the conflicts of interest and biases that pervaded the investigation and the hearing itself.

85.     Two decision-makers at CUA, Capt. Gregory and Dean Sawyer, had conflicts of interests which undermined the impartiality of the process.

86.     Capt. Gregory concluded twice that Cavalier had consented to sex and that no

---

[70]  Ex. 2 at 4.

hearing was required.[68]  She therefore had a conflict of interest as Cavalier pressed for a hearing,

as granting Cavalier's request would have called into question Capt. Gregory's judgment and the

adequacy of her investigation, and a finding in favor of Cavalier at any hearing would have

further undermined her competence.

87.     Capt. Gregory's bias against a hearing became apparent on April 23, 2013, when,

after reviewing Cavalier's toxicology report, she submitted an Addendum Report.  In the report,

Capt. Gregory noted that, rather than re-consider her opinion regarding the rape in light of this

evidence, she took the opportunity to scold Cavalier for failing to report that she was

"incapacitated or unconscious during the sexual encounter or the events leading up to and/or

after the sexual encounter."[69]  Capt. Gregory informed Cavalier that witnesses contradicted her

position that she was too intoxicated to consent.  Capt. Gregory concluded that "there is no

evidence" that Cavalier was too intoxicated to give consent and again recommended the

investigation be closed.[70]

88.     Capt. Gregory's actions and report were clearly unreasonable, and any reliance on

this report by any other CUA official was clearly unreasonable, in light of facts and

circumstances Capt. Gregory and CUA knew.  First and foremost, Cavalier had maintained

throughout the investigation, and before CUA initially denied her complaint on March 20, 2013,

that she was too intoxicated to consent.  Capt. Gregory's statement to the contrary was false.

Capt. Gregory also ignored that Cavalier had reported that she was too drunk to remember much

of the sexual assault.  Capt. Gregory's single-minded focus on witnesses who purportedly stated

that Cavalier was "coherent" the evening of December 14 to the morning of December 15, 2012,

---

[68] *See* Ex. 2 at 8; Ex. 4 at 2.
[69] Ex. 4 at 2.
[70] Ex. 4 at 3.

was, frankly, bizarre in light of her earlier report, which included statements by witnesses that Cavalier was at times passed out, drunker than everyone else around her, and staggering when Doe walked her home.  And Capt. Gregory's conclusion that "no evidence" supported Cavalier's incapacity to consent was belied by Cavalier's extraordinarily high blood alcohol level.

89.     Capt. Gregory's bias was again on display when she interviewed Lindsey Silverberg of the Network for Victim Recovery of D.C. on September 27, 2013.  Silverberg reported to Capt. Gregory that she met Cavalier at the hospital on December 15, 2012, to act as Cavalier's victim advocate.  Silverberg reported that Cavalier was "clearly intoxicated; that she slurred her words; and had trouble staying awake during conversation."  Silverberg, like other witnesses, reported that Cavalier stated that she had "blacked out walking from the dorm and during the assault."[71]

90.     Capt. Gregory not only ignored this evidence, which contradicted her conclusion that Cavalier was capable of consenting and had consented to sex, but she misleadingly interrogated Silverberg by asking "why she was the only person who mentioned/reported that Erin displayed signs of being intoxicated."[72]  Capt. Gregory knew that at least four witnesses had described Cavalier as intoxicated — in some cases severely so — or smelling of alcohol on the night of her rape.[73]

91.     In light of Capt. Gregory's conflict of interest and obvious bias, it was clearly inappropriate for CUA to allow her to continue to occupy a central role in the process of investigating Cavalier's rape after Cavalier protested the March 20, 2013, closing of her case (which Capt. Gregory had recommended).

---

[71] Ex. 7 at 1–2.
[72] Ex. 7 at 2.
[77] *See* Ex. 2.

92.     Dean Sawyer, the primary decision-maker in CUA's Title IX process, had a similar conflict of interest.  On March 20, 2013, he prematurely and unreasonably concluded that no rape had occurred.  He wrote to Cavalier that "DPS staff conducted a thorough and impartial investigation" and that "evidence does not exist to substantiate moving forward with student disciplinary action."[74]  Like Capt. Gregory, he, too, then had an interest in continuing to deny Cavalier a hearing and in ensuring that Doe would not be held responsible in any hearing that occurred.

93.     True to this partiality, Cavalier was forced to advocate forcefully for five months before Dean Sawyer relented and granted a hearing on Cavalier's report of rape.

94.     However, the hearing process — controlled by Sawyer — was tilted towards Sawyer's original finding that Cavalier had not been raped.  Despite taking nearly ten months to convene a hearing, and in spite of the fact that they knew she was from California, Dean Sawyer and Associate Dean Torres gave Cavalier just a 48-hour notice of the time and date of the hearing.  Cavalier's parents therefore could not attend the hearing and show their support for their daughter, while Doe's parents could.

95.     CUA also denied Cavalier the right to call witnesses, such as Silverberg, who were not associated with CUA.  Associate Dean Torres informed Cavalier that CUA had a wholly unreasonable, "unwritten rule" that precluded parties from calling anyone unaffiliated with CUA to testify.  This significantly hampered Cavalier in her presentation of her case.

96.     CUA also refused to disclose Capt. Gregory's notes from her investigation and forced Cavalier to rely only on Capt. Gregory's biased reports.  This, too, significantly hamstrung Cavalier's presentation of her case.

---

[74] Ex. 3.

97.     Dean Sawyer, upon information and belief, also selected all four members of the Hearing Board.  To date, Cavalier still has no idea what training and background qualified the Hearing Board members, except that Dean Sawyer's office approved them.

98.     Dean Sawyer also controlled the Appeals Committee, which denied Cavalier's appeal of the unfair hearing.  Dean Sawyer sent Cavalier the October 21, 2013 letter denying Cavalier's appeal.[75]

99.     Even though Dean Sawyer had a clear conflict of interest after denying Cavalier's complaint on March 20, 2013, CUA inappropriately allowed him to continue to control the re-opened investigation and hearing into Cavalier's rape.  It is no surprise that the hearing process confirmed Dean Sawyer's earlier conclusion that Cavalier had not been raped.[76]

100.    Finally, in finding Doe not responsible for the rape, CUA unreasonably ignored the testimony of witnesses and evidence from Cavalier's medical records that she was severely and visibly incapacitated by alcohol on the night of December 14 and into the morning of December 15, 2012.

101.    Most unreasonably, CUA ignored Cavalier's toxicology report, which showed that Cavalier, an 18-year-old girl, had a blood alcohol level nearly *three times* the legal limit at the time of the rape.

102.    On May 1, 2016, just days before Cavalier's graduation, CUA announced its total indifference to the enforcement of Title IX on its campus, and to Cavalier's report of sexual assault, by promoting Capt. Gregory to the position of Deputy Title IX Coordinator.  Capt. Gregory led the charge to deny Cavalier her Title IX rights and, as CUA well knows, is plainly unfit for the job.

---

[75] Ex. 9.
[76] Ex. 6 at 1.

103.     CUA's persistent delays in investigating Cavalier's report; its initial, premature dismissal of her complaint in disregard of known facts and without examining all available evidence or considering her intoxication; its failure to seek out and preserve evidence; its continued employment of decision-makers with obvious conflicts of interest and announced biases in the investigation and hearing process and its reliance on their work; its deployment of an unfair hearing process; its conclusion that Cavalier was not raped; and its promotion of Capt. Gregory were clearly unreasonable, deliberately indifferent, and in dereliction of its own policies and duties to Cavalier.

### CUA Re-Victimized Cavalier Throughout Its Investigation

104.     OCR requires a school's "responsible employees" to be trained on "the potential for re-victimization by responders and its effect on the students" as well as "appropriate methods for responding to a student who may have experienced sexual violence, including the use of non-judgmental language."[77] CUA failed to follow this policy.

105.     CUA worked with the MPD to investigate the rape.  The MPD officer who arrived on the scene, Officer Morris, expressed clear disdain for Cavalier and her report, rolling his eyes and stating to CUA officials, "I'm not touching this, I'm calling the Sex Crime Unit."[78]

106.     Nevertheless, immediately after the rape, CUA officials on the scene allowed Officer Moore to isolate Cavalier from her friends and interrogate her.  CUA officials were present, but did nothing, when Officer Moore asked Cavalier, "Do you want to see the SANE nurse because you believe that you were sexually assaulted or do you just want to go because you think you could get pregnant?"[79]  CUA officials allowed Officer Moore's interrogation to

---

[77] Q&A at 38.
[78] Ex. 11 at 1.
[79] Ex. 11 at 1.

proceed instead of allowing Cavalier to receive treatment from paramedics.

107.    On April 2, 2013, CUA officials once again re-victimized Cavalier during her interview regarding her blood toxicology report.  Capt. Gregory and Investigator Callis made clear that they did not believe Cavalier and that they blamed her for her rape.  The CUA investigators told Cavalier that despite her high blood alcohol level, "career alcoholics" can develop a high tolerance for alcohol.  They insinuated that the 19-year old Cavalier somehow had developed a natural resistance or tolerance to the intoxicating effects of alcohol.[80]  They also falsely stated to Cavalier that she had never previously urged that she was too incapacitated to consent and that her story was contradicted by other witnesses.

108.    CUA's acts demeaning Cavalier and blaming her for her rape not only violate OCR guidance, but CUA policy.  CUA's Sexual Assault Policy in place at the time of the rape "recognize[d] the moral, legal, physical and psychological seriousness of all sexual assaults, including that commonly designated as acquaintance rape between persons who already know one another, however casually."[81]

109.    CUA students who report sexual assault "have the right to have any and all reported sexual assaults treated with seriousness and to be treated justly and with dignity throughout the process.  Students will not be pressured to suppress a sexual assault report.  Students will not be made to think that they are somehow responsible for the commission of the crime against them; or that the victim was contributory [sic] negligent by assuming the risk of being assaulted by reason of circumstances, dress or behavior."[82]

---

[80]  Ex. 10 at 2–3.
[81]  *Policies: Sexual Assault*, CUA (archived Sept. 4, 2012), http://policies.cua.edu/archives/studentlife/sexassault6.cfm.
[82]  *Policies: Sexual Assault*, CUA (archived Sept. 4, 2012), http://policies.cua.edu/archives/studentlife/sexassault6.cfm.

110.     Throughout its investigation, CUA dismissed the trauma Cavalier had

experienced, blamed her for her rape, and denied her the just and dignified treatment to which

she was entitled.

### CUA Delayed Implementing and then Refused to Enforce a No-Contact Order Between Doe and Cavalier, Subjecting Cavalier to Further Harassment from her Rapist

111.     Cavalier reported her rape immediately after it occurred.  For months, she pressed

CUA to implement a no-contact order to protect her from her rapist.  Cavalier received no

documentation of such an order for *eight months*, until August 27, 2013.  Until then, Cavalier

had little assurance that a no-contact order was in place (though CUA verbally represented to her

that it was).  The lack of a clear no-contact order increased Cavalier's fear and anxiety of

constantly seeing her rapist on campus and having no real way to stop the unwanted encounters.

112.     Unfortunately, the no-contact order did little to stop Doe's harassing behavior,

and CUA refused to further intervene.

113.     For example, on October 4, 2013, just one day after the disciplinary hearing, Doe

appeared at an off-campus lacrosse house party where he knew Cavalier, a lacrosse player,

would probably be present.

114.     When Cavalier saw Doe, she felt in immediate danger of her safety.

115.     Cavalier asked the homeowner to have Doe leave.  Doe refused to leave.  Instead,

he began an argument, and a physical altercation ensued, upon information and belief, between

Doe and Cavalier's friends.

116.     Cavalier left the house party.  She subsequently told Dean Sawyer about this

violation.  CUA did not change its approach and did nothing, which did not stop Doe from later

violations of the no-contact order.

117.     The October 4, 2013, incident was only the most egregious in Doe's persistent

violations of the no-contact order and harassment of Doe, which CUA did nothing to prevent or

remedy.  For example:

     a.   Sometime in January or February 2013, Doe had his friends approach Cavalier, who was sitting alone at CUA's Edward J. Pryzbyla Center (CUA's student union).  They called Cavalier a "slut" and a "whore."[83]

     b.   Sometime after February 2013, but before October 4, 2013, Doe appeared at another lacrosse party, knowing Cavalier would be there.  Cavalier informed CUA of this incident.  CUA did nothing to prevent or remedy this harassment.

     c.   Sometime in February 2014, Doe harassed and intimidated Cavalier at an off-campus house party, telling Cavalier that the house was "his territory" and she "need[ed] to leave."

118.    During Cavalier's first year at CUA (2012–2013) after the assault, Doe violated

the no-contact order approximately once every two weeks.

119.    During Cavalier's second year at CUA (2013–2014), Doe violated the no-contact

order approximately twice a week.

120.    During Cavalier's third (2014–2015) and fourth years (2015–2016), Doe violated

the no-contact approximately order once a month.

121.    Cavalier informed Dean Sawyer and Associate Dean Torres at least six times over

the course of her four years at CUA that her rapist continually confronted her both on and off

campus.  CUA never changed its approach to enforcing the no-contact order, despite its

knowledge that its actions, if any, were ineffective.

122.    In fact, CUA facilitated these confrontations by housing Doe 200 feet from

Cavalier in Fall 2013, in the face of Cavalier's objections and when other housing was available.

---

[83]  CUA was aware that Doe's friends were harassing Cavalier.  Capt. Gregory stated in her report that a friend of Doe told Cavalier that she was "messed up" for filing a report against Doe. Ex. 2 at 4.

**CUA's Deliberate Indifference and Negligence Maintained, Facilitated, and Contributed to a Hostile Educational Environment for Cavalier that Denied Her Access to CUA's Educational Opportunities and Benefits**

123.     When Doe raped Cavalier, he immediately turned CUA into a hostile educational environment for her, where she no longer felt safe, respected, or valued.  CUA's response to the rape not only allowed that environment to persist, but actively facilitated and contributed to it, causing Cavalier severe emotional, psychological, and mental distress and denying her access to CUA's educational opportunities and benefits.

124.     At every turn, CUA's response trivialized Cavalier's rape.  CUA's persistent delays and stonewalling caused her to feel depressed, anxious, and upset.  Cavalier's battle to make CUA take her rape seriously and give her a hearing exhausted her and distracted her from her coursework and her role on the CUA lacrosse team.

125.     CUA's re-victimizing actions also took a large toll on Cavalier.  Cavalier was made to feel that she was not to be trusted, that she had done something wrong for reporting her rape, that the rape was her fault because she was a "career alcoholic," and that she was not worth taking seriously.

126.     Most importantly, Doe's actions and CUA's deliberately indifferent response caused Cavalier to feel unsafe at her home, CUA's campus.  By raping her and subsequently violating the no-contact owner, Doe communicated to Cavalier that he could do what he wanted to her with impunity, and by failing to discipline him in any way, CUA encouraged that message.  When Doe was housed 200 feet from Cavalier's dormitory, she changed her route to classes to avoid the chance of an encounter.  She asked friends to accompany her around campus so that she would not encounter Doe alone.  Every day, she felt acutely her vulnerability and CUA's refusal to protect her.

**CUA RETALIATED AGAINST CAVALIER BECAUSE SHE EXERCISED HER TITLE IX RIGHTS**

127.    On December 15, 2012, Cavalier exercised her rights under Title IX by reporting her rape to CUA.  She continued to exercise her rights by advocating for a prompt, adequate, reliable, and impartial investigation into her rape.  On December 19, 2013, again Cavalier exercised her rights under Title IX by reporting CUA's deliberately indifferent response to her rape to OCR.

128.    As described above, CUA retaliated against Cavalier in response to her December 15, 2012, report by refusing to remedy and at times participating in and facilitating the hostile educational environment occasioned by her rape.  CUA engaged in an untimely, inadequate, unreliable, and partial investigation, hearing, and appellate process; shamed and re-victimized Cavalier; turned a blind eye to continued harassment by her rapist; and shockingly housed him only 200 feet from her dormitory, enabling his easy access to her.

129.    CUA took these actions because Cavalier engaged in protected Title IX activity by reporting her rape and advocating that her rapist face disciplinary proceedings.

130.    When Cavalier exercised her Title IX rights by filing an official complaint with OCR on December 19, 2013, OCR placed CUA under investigation.  Since that time, Cavalier has continued to advocate for her Title IX rights and the rights of other sexual assault survivors. In response, CUA has continued its retaliation against Cavalier.

131.    Since her sophomore year, Cavalier's advocacy has included working with the media to give voice to sexual assault survivors and bring awareness to issues of sexual violence and the enforcement of Title IX.[84]  She has planned and run "Take Back the Night" events to

---

[84] *See*, *e.g.*, Nick Anderson, "Catholic U. Student Recounts Her Struggles After Reporting A Sex Assault," *Wash. Post*, June 29, 2014,

raise awareness of sexual violence and Title IX and support sexual assault survivors.  She also pushed CUA to screen *The Hunting Ground*, a critically acclaimed documentary on sexual assault and Title IX.

132.    Cavalier has not worked alone.  She joined Peer Educators Empowering Respectful Students ("PEERS") — CUA's only peer education group that educates students on alcohol and drug use, mental health awareness, sexual assault awareness, and ethical decision making — to continue her Title IX advocacy.  PEERS recruits many of its members at a CUA event called "Emerging Leaders Night."

133.    CUA has retaliated against Cavalier by attempting to limit her advocacy activities because of her complaint to OCR and her forceful assertion of her own rights.  CUA sought to limit Take Back the Night events planned by Cavalier.  CUA refused to show *The Hunting Ground*.  In 2015, after Cavalier joined PEERS, CUA uninvited PEERS from attending the Emerging Leaders Night.

134.    Finally, CUA promoted Capt. Gregory to Deputy Title IX Coordinator just days before Cavalier's graduation, knowing the painful blow this would deal to Cavalier.  Such action not only violates Title IX, but sadly devalues the principles of humility, grace, and empathy which set CUA apart from other universities.

135.    For the reasons stated above, CUA's retaliation caused Cavalier severe emotional pain and suffering.  She again felt acutely the injustice that only she, and not Doe, was being punished for her rape.

---

https://www.washingtonpost.com/local/education/catholic-u-student-recounts-her-struggles-after-reporting-a-sex-assault/2014/06/29/9ed3b4f0-e694-11e3-afc6-a1dd9407abcf_story.html.

## Causes of Action

## COUNT 1

## (Violations of Title IX, 20 U.S.C. § 1681(a) — Deliberate Indifference to Reported Rape)

136.   Cavalier re-alleges and incorporates the allegations set forth above.

137.   Defendant CUA is a recipient of federal funds.

138.   Defendant CUA, through employees with authority to take corrective action, had actual knowledge of Doe's rape of Cavalier on December 15, 2012, and of Doe's subsequent harassment of Cavalier.

139.   Doe's actions against Cavalier constituted severe, pervasive, and objectively hostile harassment on account of her sex.

140.   Defendant CUA responded with deliberate indifference to Cavalier's rape.  Its deliberately indifferent actions and inactions include, but are not limited to:

    a.  Its frequent and unnecessary delays in the process of investigating Cavalier's complaint, which contributed to the degradation in the quality of available evidence (including witnesses' memories) and the persistence of a hostile educational environment for Cavalier;

    b.  Its refusal to adequately investigate the rape, including its refusal to interview key witnesses, preserve the available physical evidence, and collect and consider important documentary evidence;

    c.  Its refusal for months to consider and investigate whether Cavalier was incapacitated by alcohol intoxication at the time of her rape;

    d.  Its refusal to remove employees with manifest biases and conflicts of interest from positions of authority over the investigation and its continued reliance on work product from these employees;

    e.  Its refusal to give Cavalier fair notice of the disciplinary hearing; to allow Cavalier to call key witnesses at the disciplinary hearing; and to otherwise conduct the hearing in a fair and impartial manner;

    f.  Its re-victimization of Cavalier by blaming and shaming Cavalier and conveying to Cavalier that her version of events was not credible, in the face

of significant evidence to the contrary;

g.  Its refusal to timely institute and thereafter enforce a no-contact order between Doe and Cavalier;

h.  Its housing of Doe 200 feet from Cavalier's dorm; and

i.  Its refusal to meaningfully and appropriately discipline Doe for the rape of Cavalier.

141.   Defendant CUA's actions allowed a hostile educational environment to persist and facilitated and contributed to that environment.

142.   The hostile educational environment at CUA effectively deprived Cavalier of educational opportunities and benefits provided by CUA.

## COUNT 2

### (Violations of Title IX, 20 U.S.C. § 1681(a) — Retaliation)

143.   Cavalier re-alleges and incorporates the allegations set forth above.

144.   Cavalier engaged in protected activity when she reported her rape to Defendant CUA on December 15, 2012, advocated for Defendant CUA to take meaningful and appropriate action in response to her rape, and then reported Defendant CUA's Title IX violations to OCR on December 19, 2013.

145.   Defendant CUA knew about Cavalier's protected activity.

146.   Because of Cavalier's protected activity, Defendant CUA took adverse actions against her, including, but not limited to:

a.  Facilitating and contributing to the hostile educational environment for Cavalier;

b.  Making Capt. Gregory the Deputy Title IX Coordinator just days before Cavalier graduated from CUA;

c.  Refusing to enforce the no-contact order against Doe;

d.  Housing Doe 200 feet from Cavalier;

e.  Shaming and degrading Cavalier, including calling her a "career alcoholic," acquiescing to Officer Moore's harassing comments implying that she only wanted to go to the hospital because she feared pregnancy, and falsely informing her that her version of events was discredited by other witnesses;

f.  Delaying the resolution of Cavalier's complaint for 298 days;

g.  Conducting an investigation and hearing distorted by conflicts of interest and unreasonable decision-making; and

h.  Impeding Cavalier's sexual assault advocacy efforts, including Take Back the Night and her work with PEERS.

## COUNT 3

### (Negligence)

147.    Cavalier re-alleges and incorporates the allegations set forth above.

148.    Defendant CUA had a duty to take reasonable measures to protect Cavalier from sexual harassment, including sexual assault and a hostile educational environment at CUA. Defendant CUA had a duty to resolve sexual assault complaints promptly, fairly, reliably, and impartially.  Its duties also included the duty to properly warn, train, and educate CUA students, employees, and staff about how to avoid sexual harassment, including educating members of the CUA community on what actions constituted sexual harassment.

149.    A special relationship existed between Defendant CUA and Cavalier, who was entrusted to CUA's care from 2012 to 2016.  Defendant CUA voluntarily accepted the care of Cavalier and owed her a duty of care as a result.

150.    Through the CUA Code of Student Conduct, CUA Sexual Assault Policies, CUA Title IX Policy, OCR's 2011 DCL, OCR's 2014 Q&A, Title IX itself, and CUA's no-contact order between Cavalier and Doe, CUA accepted a duty to protect Cavalier from sexual assault and to adjudicate and resolve complaints of student-on-student sexual harassment, including sexual assault, in a prompt, adequate, reliable, impartial, and fair manner.

151.    CUA's policies recognize that student-on-student sexual harassment on campus, including sexual assault, is foreseeable.

152.    CUA's agents, servants, and employees reasonably knew that on December 15, 2012, Cavalier reported that she had been raped by Doe.

153.    CUA's agents, servants, and employees, acting within the course and scope of their employment at all times relevant to this Complaint, breached their duty of care to Cavalier

by, among other things, conducting an untimely, inadequate, unfair, unreliable, and partial investigation of Cavalier's sexual assault complaint, failing to enforce the no-contact order between Cavalier and Doe, unreasonably resolving Cavalier's complaint, and deviating significantly from the standard of care outlined by CUA's policies, OCR's policies, and Title IX.

154.    Defendant CUA's breaches of the standard of care directly and proximately caused Cavalier's injuries, but not limited to, severe emotional, psychological, and mental distress.

155.    Defendant CUA's intentional and negligent acts and omissions amount to negligence, negligent failure to warn, train and/or educate, and negligence *per se*.

## COUNT 4

### (Negligent Infliction of Emotional Distress)

156.    Cavalier re-alleges and incorporates the allegations set forth above.

157.    Defendant CUA had a special relationship with Cavalier and/or had undertaken an obligation to Cavalier that necessarily implicated Cavalier's emotional well-being.  Specifically, Defendant CUA had a duty to promptly, adequately, reliably, fairly, and impartially investigate and resolve Cavalier's complaint of rape, and to protect Cavalier from Doe by enforcing a no-contact order between Cavalier and Doe.

158.    There was an especially likely risk that Defendant CUA's negligent actions and inactions would cause serious emotional distress to Cavalier.  Defendant CUA's failure to promptly, adequately, reliably, fairly, and impartially investigate and resolve Cavalier's complaint was likely to cause Cavalier to continue to feel unsafe, demeaned, and harassed, and to subject her to further abuse from her rapist by sending the message that rape would not be taken seriously.

159.   Defendant CUA's failure to enforce the no-contact order was likely to cause serious emotional distress to Cavalier by subjecting her to continued contact, harassment, and intimidation by the man who raped her.

160.   Defendant CUA's negligent actions and inactions regarding the investigation and resolution of Cavalier's complaint and its failure to enforce the no-contact order between Cavalier and Doe, in fact, directly and proximately caused severe emotional, psychological, and mental distress to Cavalier.

## COUNT 5

### (Intentional Infliction of Emotional Distress)

161.   Cavalier re-alleges and incorporates the allegations set forth above.

162.   Defendant CUA engaged in extreme and outrageous conduct, including but not limited to the following:

    a.   Refusing to enforce the no-contact order between Doe and Cavalier, despite knowing that Doe and his friends continually violated the no-contact order and confronted, harassed, and intimated Cavalier;

    b.   Housing Doe 200 feet from Cavalier;

    c.   Refusing to properly investigate Cavalier's rape, including refusing to interview key witnesses, preserve available physical evidence, and collect and consider important documentary evidence;

    d.   Blaming and shaming Cavalier, and refusing to meaningfully investigate Cavalier's version of events or consider her incapacitation in its investigation;

    e.   Conducting an unfair investigation hearing distorted by conflicts of interests and unreasonable decision-making;

    f.   Taking 298 days to conclude its investigation into Cavalier's complaint; and

    g.   Refusing to meaningfully and appropriately discipline Doe.

163.   Defendant CUA's actions were intentionally and/or recklessly directly and

proximately caused Cavalier severe emotional, psychological, and mental distress.

***

WHEREFORE, Plaintiff Cavalier demands judgment against the Defendant CUA for compensatory and punitive damages in excess of $75,000, including:

- Damages for reimbursement for all of Plaintiff's tuition and related expenses;

- Damages for Plaintiff's expenses incurred as a consequence of the sexual assault;

- Damages for deprivation of equal access to Defendant CUA's educational benefits and opportunities;

- Damages for past, present, and future emotional pain and suffering; ongoing and severe mental anguish; loss of past, present, and future enjoyment of life; and past and present lost earnings and earning capacity;

- Punitive damages for Defendant CUA's intentional creation of a hostile educational environment, intentional retaliation, and intentional infliction of emotional distress;

- Pre-judgment and post-judgment interest;

- Legal fees and costs; and

- Any other damages deemed just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Cavalier respectfully demands a trial by jury under Rule 38 of the Federal Rules of Civil Procedure.

## TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | E-mail exchange between Rachel Wainer & Erin Cavalier (Dec. 17, 2012–Jan. 14, 2013) |
| 2 | Investigative Report from Capt. Kim Gregory & Investigator Charles Callis to Thomasine Johnson (Feb. 18, 2013) [redacted] |
| 3 | Letter from Dean Jonathan Sawyer to Erin Cavalier (Mar. 20, 2013) |
| 4 | Addendum Report from Capt. Kim Gregory & Investigator Charles Callis to Thomasine Johnson (Apr. 23, 2013) [redacted] |
| 5 | Letter from Associate Dean Omar Torres to Erin Cavalier (Aug. 27, 2013) [redacted] |
| 6 | Letter from Dean Jonathan Sawyer to Erin Cavalier (Oct. 9, 2013) [redacted] |
| 7 | Addendum Report from Capt. Kim Gregory & Investigator Charles Callis to Thomasine Johnson (Sept. 27, 2013) [redacted] |
| 8 | EMT & Toxicology Report (Dec. 15, 2012) [redacted] |
| 9 | Letter from Dean Jonathan Sawyer to Erin Cavalier (Oct. 21, 2013) [redacted] |
| 10 | Letter from Matt Ornstein & Rachel Kohler to DOE (Dec. 19, 2013) |
| 11 | E-mail from Nicole Giglia to Dean Jonathan Sawyer et al. (Dec. 15, 2012) [redacted] |

Respectfully submitted,


_____/s/_____
Kobie Flowers (Bar No. 991403)
BROWN GOLDSTEIN & LEVY, LLP
1750 K Street, NW
Suite 200
Washington, DC 20006
Tel: (202) 742-5969
Fax: (202) 742-5948
kflowers@browngold.com

Abigail Graber (*pro hac vice pending*)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Tel:  (410) 962-1030
Fax:  (410) 385-0869
agraber@browngold.com

Dated:        October 7, 2016             *Counsel for Plaintiff Erin Cavalier*