**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ERIN CAVALIER, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 16-2009 (RDM) |
| THE CATHOLIC UNIVERSITY OF AMERICA, | * | |
| | * | |
| Defendant. | | |

**\*\*\*\*\*\***

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Kobie Flowers (Bar No. 991403)
BROWN GOLDSTEIN & LEVY, LLP
1750 K Street, NW, Suite 200
Washington, DC 20006
Tel: (202) 742-5969
Fax: (202) 742-5948
kflowers@browngold.com

Abigail Graber (*via pro hac vice*)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel:  (410) 962-1030
Fax:  (410) 385-0869
agraber@browngold.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ..................................................................................................... 1

COUNTER-STATEMENT OF FACTS ..................................................................... 2

    I.    The Assault ............................................................................................. 2

    II.    The Aftermath of the Assault .................................................................. 3

LEGAL STANDARD ................................................................................................ 7

ARGUMENT ............................................................................................................ 8

    I.    Erin Cavalier Has Alleged Facts Sufficient to Support Her Claim
         That CUA's Response to Her Rape Violated Title IX ........................... 8

         A.    Legal Standard ........................................................................... 8

         B.    John Doe's Rape and Continuing Harassment of Erin
               Cavalier Were So Severe, Pervasive, and Objectively
               Offensive That They Deprived Cavalier of Access to the
               Educational Opportunities and Benefits Provided By CUA ........ 8

         C.    CUA Had Actual Knowledge of John Doe's Sexual
               Harassment of Erin Cavalier ..................................................... 13

         D.    CUA Was Deliberately Indifferent to the Rape and
               Continuing Harassment of Erin Cavalier ................................... 13

    II.    Erin Cavalier's Allegations That CUA Failed to Protect Her From
         Sexual Harassment and Intentionally Interfered With Her
          Advocacy Efforts Because of Her Complaint of Sex
          Discrimination Raise a Retaliation Claim Under Title IX ................... 25

    III.    Because Students May Bring Claims Against Universities
         Sounding in Tort, Including Claims That the University Breached
         Its Duty to Respond Reasonably to Sexual Harassment, Erin
         Cavalier Has Adequately Alleged a Negligence Claim Against
         CUA ................................................................................................ 29

    IV.    Erin Cavalier's Claim Meets the Elements for Negligent Infliction
         of Emotional Distress ....................................................................... 33

    V.    Erin Cavalier's Claim Meets the Elements for Intentional Infliction
         of Emotional Distress ....................................................................... 35

VI.     Erin Cavalier Filed Suit Within the Statute of Limitations................................... 37

  A.     Title IX Claims .......................................................................................... 37

  B.     Common Law Claims ................................................................................. 42

CONCLUSION............................................................................................................................ 43

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amin v. Nyack Sch. of Adult & Distance Educ.*,
  710 F. Supp. 2d 80 (D.D.C. 2010). .................................................................. 33

*Ash v. Tyson Foods, Inc.*,
  546 U.S. 454 (2006) ........................................................................................... 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 7

*B.R. ex rel. Rempson v. District of Columbia*,
  524 F. Supp. 2d 35 (D.D.C. 2007) ...................................................................... 7

*Basch v. George Wash. Univ.*,
  370 A.2d 1364 (D.C. 1977) ............................................................................... 32

*\*Beard v. Edmondson & Gallagher*,
  790 A.2d 541 (D.C. 2002) ................................................................................. 42

*Beasley v. Ala. State Univ.*,
  966 F. Supp. 1117 (M.D. Ala. 1997) ................................................................. 38

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 7

*Bollman v. Ciesla*,
  No. 2:14-CV-02001, 2014 WL 1765003 (W.D. Ark. May 2, 2014) ................. 41

*Bollman v. Greenwood Sch. Dist.*,
  626 F. App'x 657 (8th Cir. 2015) ...................................................................... 42

*Brodeur v. Claremont Sch. Dist.*,
  626 F. Supp. 2d 195 (D.N.H. 2009) ..................................................... 10, 14, 18, 23

*Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*,
  163 F.3d 749 (2d Cir. 1998) .............................................................................. 17

*Bruning v. Carroll Cmty. Sch. Dist.*,
  486 F. Supp. 2d 892 (N.D. Iowa 2007) ............................................................. 18

*\*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ................................................................... 26, 27, 28, 29

*Burnett v. Am. Fed'n of Gov't Emps.*,
  102 F. Supp. 3d 183 (D.D.C. 2015) .............................................................. 35, 36

*Authorities upon which we chiefly rely are marked with asterisks.

iv

*Butters v. James Madison Univ.*,
   No. 5:15-CV-00015, 2016 WL 5317695 (W.D. Va. Sept. 22, 2016) ........................ 15, 18

*Carter v. District of Columbia*,
   795 F.2d 116 (D.C. Cir. 1986) ...................................................................... 35

*Choharis v. State Farm Fire & Casualty Co.*,
   961 A.2d. 1080 (D.C. 2008) ......................................................................... 32

*Cooke-Seals v. District of Columbia*,
   973 F. Supp. 184 (D.D.C. 1997) ................................................................... 39

*Dasisa v. Univ. of D.C.*,
   No. 06-7106, 2006 WL 3798886 (D.C. Cir. Oct. 3, 2006) .................................... 37

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) ........................................................................... 8, 13, 39

*DeKine v. District of Columbia*,
   422 A.2d 981 (D.C. 1980) ........................................................................... 42

*Dibbern v. Univ. of Mich.*,
   No. 12-15632, 2013 WL 6068808 (E.D. Mich. Nov. 18, 2013) ............................... 41

*Doe ex rel. Doe v. Derby Bd. of Educ.*,
   451 F. Supp. 2d 438 (D. Conn. 2006) ................................................. 11, 12, 14, 22

*Doe v. E. Haven Bd. of Educ.*,
   200 F. App'x 46 (2d Cir. 2006) ..................................................................... 9, 17

*Doe v. Forest Hills Sch. Dist.*,
   No. 1:13-CV-428, 2015 WL 9906260 (W.D. Mich. Mar. 31, 2015) ............. 14, 16, 17, 22

*Doe v. Oyster River Coop. Sch. Dist.*,
   992 F. Supp. 467 (D.N.H. 1997) ..................................................................... 11

*Doe v. Sch. Admin. Dist. No. 19*,
   66 F. Supp. 2d 57 (D. Me. 1999) .................................................................... 12

*Doe v. Sch. Bd. of Broward Cty.*,
   604 F.3d 1248 (11th Cir. 2010) ................................................................. 14, 24

*Doe v. University of the South*,
   No. 4:09-cv-62, 2011 WL 1258104 (E.D. Tenn. Mar. 31, 2011) .......................... 30, 31

*Donohue v. Baker*,
   976 F. Supp. 136 (N.D.N.Y. 1997) ................................................................. 21

*Drejza v. Vaccaro,
    650 A.2d 1308 (D.C. 1994) ............................................................... 34, 35

*Earle v. District of Columbia,
    707 F.3d 299 (D.C. Cir. 2012) .......................................................... 37, 38, 39

*Emeldi v. Univ. of Or.,
    698 F.3d 715 (9th Cir. 2012) ............................................................ 25, 26, 27

Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.,
    169 F. Supp. 3d 320 (N.D.N.Y. 2016) ................................................. 41

Facchetti v. Bridgewater Coll.,
    175 F. Supp. 3d 627 (W.D. Va. 2016) ................................................. 22

Ferris v. Delta Air Lines, Inc.,
    277 F.3d 128 (2d Cir. 2001) ............................................................... 12

Fitzgerald v. Barnstable Sch. Comm.,
    555 U.S. 246 (2009) .......................................................................... 17

Fowkes v. Pa. R.R.,
    264 F.2d 397 (3d Cir. 1959) .............................................................. 39

Frazer v. Temple Univ.,
    25 F. Supp. 3d 598 (E.D. Pa. 2014) ................................................... 11

Furek v. Univ. of Del.,
    594 A.2d 506 (Del. 1991) .................................................................. 30

Gebser v. Lago Vista Indep. Sch. Dist.,
    524 U.S. 274 (1998) .......................................................................... 13, 18

Gerald v. Locksley,
    849 F. Supp. 2d 1190 (D.N.M. 2011) ................................................. 12

Haynesworth v. D.H. Stevens Co.,
    645 A.2d 1095 (D.C. 1994) ............................................................... 30

Hayut v. State Univ. of N.Y.,
    352 F.3d 733 (2d Cir. 2003) .............................................................. 9, 10, 17

*Hedgepeth v. Whitman Walker Clinic,
    22 A.3d 789 (D.C. 2011) ................................................................... 29, 33, 34

Howard Univ. v. Best,
    484 A.2d 958 (D.C. 1984) ................................................................. 36

*Jackson v. Birmingham Bd. of Educ.,
    544 U.S. 167 (2005)............................................................................ 25

Jennings v. Univ. of N.C.,
    482 F.3d 686 (4th Cir. 2007) ............................................................ 19

Karasek v. Regents of the Univ. of Cal.,
    No. 15-cv-03717-WHO, 2016 WL 4036104 (N.D. Cal. July 28, 2016) ................... 18, 24

King v. Kidd,
    640 A.2d 656 (D.C. 1993) ................................................................. 35, 36

Lapka v. Chertoff,
    517 F.3d 974 (7th Cir. 2008) ............................................................ 11, 12

Larijani v. Georgetown Univ.,
    791 A.2d 41 (D.C. 2002) ....................................................................... 35

Lesesne v. District of Columbia,
    146 F. Supp. 3d 190 (D.D.C. 2015) ........................................................... 34

Loumiet v. United States,
    968 F. Supp. 2d 142 (D.D.C. 2013) ...................................................... 39, 41

Manago v. District of Columbia,
    934 A.2d 925 (D.C. 2007) ..................................................................... 32

Miles v. Washington,
    No. CIV-08-166-JHP, 2009 WL 259722 (E.D. Okla. Feb. 2, 2009) ....................... 26, 37

Miller v. Kutztown Univ.,
    No. CIV.A. 13-3993, 2013 WL 6506321 (E.D. Pa. Dec. 11, 2013) .......................... 25

Mosby-Nickens v. Howard Univ.,
    864 F. Supp. 2d 93 (D.D.C. 2012) ............................................................ 32

Murrell v. Sch. Dist. No. 1,
    186 F.3d 1238 (10th Cir. 1999) ............................................................... 8

*Nat'l R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002)................................................................. 38, 39, 41

Oden v. Northern Marianas College,
    440 F.3d 1085 (9th Cir. 2006) .......................................................... passim

Ollier v. Sweetwater Union High Sch. Dist.,
    768 F.3d 843 (9th Cir. 2014) ................................................................ 27

*Page v. United States*,
    729 F.2d 818 (D.C. Cir. 1984) ............................................................... 39, 41

*Pahssen v. Merrill Cmty. Sch. Dist.*,
    668 F.3d 356 (6th Cir. 2012) ...................................................................... 16

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
    633 F.3d 81 (2d Cir. 2011).......................................................................... 42

*Power ex rel. Power v. Gilbert Pub. Schs.*,
    454 Fed. App'x 556 (9th Cir. 2011) ........................................................... 16

*Ray v. Antioch Unified Sch. Dist.*,
    107 F. Supp. 2d 1165 (N.D. Cal. 2000) ...................................................... 10

*Ricci v. DeStefano*,
    557 U.S. 557 (2009)..................................................................................... 23

*Rochon v. FBI*,
    691 F. Supp. 1548 (D.D.C. 1988) ............................................................... 41

*S.K. v. N. Allegheny Sch. Dist.*,
    168 F. Supp. 3d 786 (W.D. Pa. 2016)......................................................... 29

*S.S. v. Alexander*,
    177 P.3d 724 (Wash Ct. App. 2008) ..................................................... passim

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*,
    647 F.3d 156 (5th Cir. 2011) ...................................................................... 14

*Seamons v. Snow*,
    84 F.3d 1226 (10th Cir. 1996) .................................................................... 20

*Seiwert v. Spencer-Owen Cmty. Sch. Corp.*,
    497 F. Supp. 2d 942 (S.D. Ind. 2007) ................................................... 19, 23

*Taylor v. FDIC*,
    132 F.3d 753 (D.C. Cir. 1997) .................................................................... 39

*Terry v. Young Harris College*,
    106 F. Supp. 3d 1280 (N.D. Ga. 2015) ....................................................... 20

*Topol v. Trustees of the Univ. of Pa.*,
    160 F.R.D. 474 (E.D. Pa. 1995)................................................................... 29

*Tubbs v. Stony Brook Univ.*,
    No. 15 Civ. 0517 (NSR) (S.D.N.Y. Mar. 4, 2016) ............................. 12, 17, 21

*University of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013) ............................................................................................ 25

*Valente v. Univ. of Dayton*,
    438 Fed. App'x 381 (6th Cir. 2011) ...................................................................... 32

*\*Vance v. Spencer Cty. Pub. Sch. Dist.*,
    231 F.3d 253 (6th Cir. 2000) ........................................................ 8, 9, 22, 23

*Vega v. Sacred Heart Univ., Inc.*,
    836 F. Supp. 2d 58 (D. Conn. 2011) .................................................................... 30

*Ward v. D.C. Dep't of Youth Rehab. Servs.*,
    768 F. Supp. 2d 117 (D.D.C. 2011) ....................................................................... 7

*Whelan v. Abell*,
    953 F.2d 663 (D.C. Cir. 1992) ............................................................................. 40

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
    477 F.3d 1282 (11th Cir. 2007) ............................................................................ 17

*Yoona Ha v. Northwestern University*,
    No. 14 C 895, 2014 WL 5893292 (N.D. Ill. 2014) ............................................ 12

*Yu v. Vassar College*,
    97 F. Supp. 3d 448 (S.D.N.Y. 2015) ............................................................. 21, 24

**Other Authorities**

Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual
    Violence* (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-
    201404-title-ix.pdf. ........................................................................................... 34

**Statutes**

*\*20 U.S.C. § 1681 .................................................................................................. passim

42 U.S.C. § 1983 .............................................................................................. 38, 41

42 U.S.C. § 2000e ..................................................................................... 23, 25, 28

D.C. Code § 12–301 ....................................................................................... 37, 42

Pursuant to Local Civil Rule 7(b) and this Court's October 17, 2016 Standing Order, Erin Cavalier ("Cavalier," or "Plaintiff") timely files this Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss.  In support of her Opposition, Cavalier provides the following:

## Introduction

On December 15, 2012, the Catholic University of America ("CUA," or "Defendant") was given an opportunity to take sexual assault on its campus seriously.  CUA squandered that opportunity.  It targeted its own student, Erin Cavalier — a rape survivor — for discrimination, retaliation, and degradation.

In the early morning hours of December 15, 2012, Erin Cavalier reported that John Doe ("Doe"), another CUA student, had raped her in her dorm room.  Instead of taking her report of sexual assault seriously, CUA ignored Cavalier, prematurely closed its investigation, and harassed her with officials who questioned her credibility to her face and informed her that she might be a "career alcoholic."  Worse, it refused to protect her from her rapist — in fact, it housed him near to her dormitory.  When CUA finally provided Cavalier with a hearing, nearly ten months after the rape, it found Doe not responsible in the face of the evidence that Cavalier was too intoxicated to consent at the time of the rape.

Now, CUA asks this Court to stay out of its "private, internal administrative, investigative and disciplinary process."  Mot. Dismiss at 7.  But Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), no longer allows a university to remain deliberately indifferent to rape, maintain a hostile environment for a rape survivor, and then close its doors to scrutiny.  In its actions throughout Cavalier's time as a student, and even now in its Motion, CUA ignored Cavalier when she explained, time and time again, that she was

too intoxicated to consent to sex with Doe.  CUA engaged in classic victim blaming when it made clear that it believes Cavalier is responsible for her own rape, despite a blood alcohol level three times the legal limit at the time of the rape.  *See* Mot. Dismiss at 2 ("Ms. Cavalier had the presence of mind to insist that Mr. Doe use a condom and provided him with a condom from her drawer when he told her he did not have one."); *id.* at 23 ("By her own account, Ms. Cavalier met Mr. Doe in a room in another dormitory, drank with him, *asked* him to walk her back to her dormitory, *signed* him in at the front desk, *invited* him up to her room and *engaged* in what even she concedes was at least some consensual sexual activity with him." (emphasis in original)).

CUA also makes clear that its priority was to protect Doe — and to protect itself from suit by Doe.  Mot. Dismiss at 3, 13–14.  But the law protects Cavalier.  For that reason, CUA's Motion to Dismiss must be denied.

<u>**Counter-Statement of Facts**</u>

## I.      The Assault

In the early morning on December 15, 2012, John Doe, a football player at CUA, raped Erin Cavalier, then an 18-year-old, first-year student, in her dormitory room on CUA's campus. Compl. ¶¶ 34–35.  At the time of the rape, and of any sexual activity preceding the rape itself, Cavalier was too intoxicated to consent, and Doe was aware of that fact.  *Id.*  Cavalier does not remember returning to her room with Doe — she remembers only finding Doe on top of her, engaging in sexual intercourse with her.  *Id.* ¶ 40.

Within a few hours of the rape, Cavalier was taken to the hospital by emergency medical technicians, one of whom signed a report in which she made "findings" of "ALCOHOL USE (SUSPECTED); SEXUAL ASSAULT."  *Id.* ¶ 47.  About eight hours after the rape, Cavalier's blood alcohol level was measured at 97 mg/dL (0.097 g/dL); it would have been at 216 mg/dL

(0.216 g/dL), or almost three times the legal limit of 80 mg/dL (0.08 g/dL), at the time of the rape. *Id.* ¶ 48.

## II.     The Aftermath of the Assault

CUA was alerted to the rape almost immediately, when a resident assistant from Cavalier's dormitory called CUA Area Coordinator Nicole Giglia to inform her that a student may have been sexually assaulted. *Id.* ¶ 43. Ms. Giglia arrived at Cavalier's dormitory, accompanied by Lieutenant Marvin Dicks from CUA's Department of Public Safety ("DPS"). *Id.* Officer A.D. Moore of the Metropolitan Police Department then arrived. Ms. Giglia observed Officer Moore roll his eyes and state, "I'm not touching this, I'm calling the Sex Crime Unit." *Id.* ¶ 46. Nevertheless, Ms. Giglia permitted Officer Moore to interrogate Cavalier, with Lieutenant Dicks present, before Cavalier was taken to the hospital. During that interrogation, Officer Moore asked Cavalier, "Do you want to see the SANE nurse because you believe you were sexually assaulted or do you just want to go because you think you could get pregnant?" *Id.*

Officer Moore's remark set the tone for CUA's investigation. From the start, CUA never took Cavalier's report seriously. Its investigation was plagued by inexplicable delay; CUA prematurely closed the investigation after concluding that Cavalier was not raped because, it determined, Doe wore a condom; when CUA finally granted Cavalier a hearing, it did nothing to alleviate the conflicts of interest that compromised the fairness of the proceedings; and CUA officials themselves questioned Cavalier's credibility and minimized her rape to her face.

Although CUA initially reached out to Cavalier through Assistant Dean of Students Rachel Wainer on December 17, 2012, Dean Wainer ignored Cavalier's response on December 20, 2012. *Id.* ¶ 54. Instead, Cavalier was forced to again press for a response on January 14,

2013, and — 30 days after the rape — Dean Wainer provided her with information about the support services, policies, and disciplinary procedures available to her. *Id.* CUA subsequently appointed DPS Captain Kim Gregory, Investigator Charles Callis, and Lieutenant Marvin Dicks to lead the fact-finding phase of its investigation. *Id.* ¶ 55.

CUA interviewed its first witnesses 32 days after Cavalier reported her rape, then waited another month before interviewing others. *Id.* ¶¶ 56–57. CUA refused to confirm a no-contact order between Cavalier and Doe for 255 days after the rape. *Id.* ¶ 74. CUA did not hold a disciplinary hearing on Cavalier's claim for 292 days — nearly 10 months — after Cavalier's report. *Id.* ¶ 76.

This delay was caused, in part, by CUA's premature closing of its investigation on March 20, 2013, after Capt. Gregory submitted a report in which she concluded that Cavalier was not raped. Compl. Ex. 2. Associate Vice President for Student Life and Dean of Students Jonathan C. Sawyer informed Cavalier that CUA would not be moving forward with any further action. *Id.* ¶ 60.

In reaching their conclusions, Capt. Gregory and Dean Sawyer either ignored or refused to consider evidence that Cavalier was too intoxicated to consent to sex with Doe, as Cavalier had urged throughout the investigation. *Id.* ¶¶ 62–68, 71–72. CUA never interviewed crucial witnesses and never requested Cavalier's hospital records or toxicology report. *Id.* ¶ 70–71. Instead, Capt. Gregory arrived at her conclusions based on her determination that Doe had used a condom during the rape. *Id.* Ex. 2, at 7–8. In focusing single-mindedly on that issue, Capt. Gregory's report relied entirely on statements made by Cavalier immediately after the rape, at a time when she was still severely intoxicated, confused, and traumatized. *Id.* Ex. 2, at 2. Capt. Gregory interviewed Cavalier again on January 16, 2013. *Id.* Ex. 2, at 2. At that time, Cavalier

reported that she had very little memory of the events of December 15, 2012. She did not report consenting to any sexual activity, condom or no. *Id.* Ex. 2, at 2–3. Capt. Gregory simply omitted from her report Cavalier's statements that she was too intoxicated to consent to sex. *See id.* ¶ 72. Nevertheless, the report itself contained witness accounts that Cavalier was severely intoxicated. *Id.* Ex. 2. In sum, both Capt. Gregory and Dean Sawyer ignored the inconvenient truth — evidence that Cavalier was too intoxicated to consent to sex.

When, after months of advocacy by Cavalier, CUA decided to hold a hearing, *id.* ¶¶ 73, 93, it gave Cavalier only two days of notice of the hearing date, *id.* ¶ 76. As a result, Cavalier's parents, who live in California, could not attend the hearing, while Doe's parents could. *Id.* The hearing itself was compromised by conflicts of interest, CUA's failure to preserve critical evidence, and arbitrary and unwritten procedural rules that prejudiced Cavalier's presentation of her case. *Id.* ¶¶ 78–99. On October 9, 2013, CUA issued its final decision finding that Doe was not responsible for Cavalier's rape. *Id.* ¶ 77.

During its investigation, CUA officials were openly dismissive of Cavalier's claims, communicating to her that she was not credible and that she was to blame for the rape. After Cavalier persuaded CUA to reopen its investigation to consider her toxicology report, Capt. Gregory re-interviewed Cavalier. Instead of seeking more facts from her, she took the opportunity to scold Cavalier for failing to report that she was incapacitated when Doe assaulted her — despite the fact that Cavalier had told her just that, and despite the fact that Capt. Gregory acknowledged in her first report that Cavalier had little memory of the night due to her excessive drinking. *Id.* ¶¶ 68, 87. Capt. Gregory informed Cavalier, falsely, that the witness statements did not support her description of the night of her rape. *Id.* ¶ 87. Finally, CUA's investigators

told Cavalier that as a "career alcoholic," she may have developed a high tolerance for alcohol — and thus that she was to blame for the rape.  *Id.* ¶ 107.

CUA officials also never took seriously Cavalier's emotional trauma, particularly the trauma of being forced to remain on campus with Doe and risk encounters with him.  Such encounters became common throughout Cavalier's remaining time at CUA.  Cavalier pressed CUA for a no-contact order for months to protect her from Doe, but received no confirmation of such an order for *eight months* after she reported her rape.  *Id.* ¶ 111.  Both before and after the order was in place, Cavalier suffered repeated harassment from Doe and his friends.  *Id.* ¶¶ 112–20.  Cavalier reported the harassment to CUA.  *Id.* ¶ 121.  CUA never enforced the no-contact order.  *Id.*  In fact, it facilitated this harassment by housing Doe in close proximity to Cavalier's dorm.  *Id.* ¶ 122.

Finally, CUA officials retaliated against Cavalier for pressing for her right to a fair investigation and hearing, and for filing a complaint with the Department of Education's Office for Civil Rights.  *Id.* ¶ 127.  CUA not only trivialized her rape, refused to conduct a fair and timely investigation, and facilitated harassment by her rapist, but also interfered with Cavalier's attempts to advocate on behalf of other survivors of sexual assault.  *Id.* ¶¶ 128–33.

As a result of CUA's actions and inaction, for most of her time at university, Cavalier feared for her safety in her own home.  *Id.* ¶ 126.  She felt depressed, anxious, and upset, and was distracted from her coursework and her role on CUA's lacrosse team.  *Id.* ¶ 124.  She was forced to change her route around campus to avoid Doe and to rely on friends to avoid being alone.  *Id.* ¶ 126.  Finally, she was made to feel that she was not worth taking seriously and that she had done something wrong for reporting her rape.  *Id.* ¶ 125.

**Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he court must treat the complaint's factual allegations — including mixed questions of law and fact — as true and draw all reasonable inferences therefrom in the plaintiff's favor." *B.R. ex rel. Rempson v. District of Columbia*, 524 F. Supp. 2d 35, 39 (D.D.C. 2007). A complaint need not contain "detailed factual allegations" so long as the allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The court may also "consider . . . documents attached as exhibits or incorporated by reference in the complaint." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (citation omitted). However, that does not mean, as CUA appears to believe, that the court must accept statements within those documents as true. In this case, CUA improperly relies on statements from Exhibit 2 attached to Cavalier's Complaint, the February 18, 2013, investigative report of Capt. Kim Gregory, as factual allegations incorporated into the Complaint. *See, e.g.*, Mot. Dismiss at 2, 23. That report contains Capt. Gregory's observations and incorrect conclusions — not statements of fact. Cavalier accepts the authenticity of the report, but she plainly has disputed its contents. *E.g.*, Compl. ¶¶ 72, 88. At this stage of the proceedings, the Court is bound by the facts alleged by Cavalier, not by Capt. Gregory.

**<u>Argument</u>**

I.    **Erin Cavalier Has Alleged Facts Sufficient to Support Her Claim That CUA's Response to Her Rape Violated Title IX**

    A.    **Legal Standard**

A university that receives federal funding violates Title IX when it is "deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 647 (1999). This Circuit has not yet determined precisely the elements of a cause of action under Title IX based on allegations of a university's deliberate indifference to student-on-student harassment. However, courts applying *Davis* have held that a plaintiff adequately alleges a violation of Title IX when she demonstrates the following three elements:

    1.    the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,

    2.    the funding recipient had actual knowledge of the sexual harassment, and

    3.    the funding recipient was deliberately indifferent to the harassment.

*Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 258–59 (6th Cir. 2000) (citation omitted); *accord, e.g.*, *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999); *S.S. v. Alexander*, 177 P.3d 724, 736 (Wash Ct. App. 2008) (crediting *Vance* as "[o]ne of the . . . most often cited[] formulations" of a Title IX cause of action). The allegations in Cavalier's Complaint meet each element, and thus, the Defendant's Motion must be denied.

    B.    **John Doe's Rape and Continuing Harassment of Erin Cavalier Were So Severe, Pervasive, and Objectively Offensive That They Deprived Cavalier of Access to the Educational Opportunities and Benefits Provided By CUA**

Doe's conduct was sufficiently "severe, pervasive, and objectively offensive" to have "deprive[d] [Cavalier] of access to the educational opportunities or benefits provided by the

school." *Vance*, 231 F.3d at 258.  So long as Cavalier alleged facts showing that "the harassment 'simply created a disparately hostile educational environment relative to her peers,' the issue of whether the harassment deprived [her] of educational opportunities and benefits is one for the trier of fact." *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d Cir. 2003)).

Doe raped Cavalier in her dorm room on CUA's campus in the early morning hours of December 15, 2012.  Compl. ¶¶ 34, 39–40.  At the time, both Cavalier and Doe were students enrolled at CUA.  *Id.* ¶ 34.  For the next three-and-a-half years, until she graduated on May 14, 2016, *id.* ¶ 8, Cavalier endured continuing harassment from Doe and his friends.  Doe's friends called Cavalier a "slut" and "whore."  *Id.* ¶ 117(a).  Doe frequently violated the no-contact order in place between himself and Cavalier, including an incident just one day after the disciplinary hearing in which he forced himself into a party where he knew Cavalier was likely to present and became belligerent when asked to leave.  *Id.* ¶¶ 113–15.  He violated the no-contact order approximately once every two weeks during the 2012–2013 school year, approximately twice a week during the 2013–2014 school year, and approximately once a month during the 2014–2015 and 2015–2016 school years.  *Id.* ¶¶ 118–20.

Cavalier has alleged a disparately hostile environment that deprived her of opportunities and benefits offered by CUA.  Following the rape, she suffered severe emotional and psychological distress.  *Id.* ¶ 123.  She felt unsafe on CUA's campus, to the point that she was forced to change her routine and enlist friends to accompany her around campus in order to avoid contact with Doe.  *Id.* ¶ 126.  Her feelings of vulnerability and her distress were compounded by CUA's dismissive treatment of the rape, including comments by CUA officials in charge of the investigation that challenged her credibility and blamed her for the rape.  *Id.* ¶¶ 124–25.

Cavalier's attention to her coursework suffered, as did her position on CUA's lacrosse team. *Id.* ¶ 124.

These allegations demonstrate that, as a result of her rape and sexual harassment, Cavalier's time at CUA was spent in an environment disparately hostile to that experienced by her peers. *See Hayut*, 352 F.3d at 748 (holding that testimony by the plaintiff that "she was unable to concentrate on her studies[,] . . . she felt humiliation and emotional distress, did not want to attend classes, and was unable to sleep" was enough to show interference with her education); *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 215 (D.N.H. 2009) (denying summary judgment to a school district where "the complaint expressly alleges that [the perpetrator's] harassment 'interfer[ed] with [the plaintiff's] education'" (alteration in original)); *Alexander*, 177 P.3d at 743–45 ("[W]here the student-plaintiff submitted proof that sexual harassment caused her fear and emotional distress that had 'concrete, negative effects on [the student's] ability to receive an education,' she had been denied 'equal access' to that education." (alteration in original) (quoting *Ray v. Antioch Unified Sch. Dist.*, 107 F. Supp. 2d 1165, 1171 (N.D. Cal. 2000))).

CUA's contention that Doe's attempts to contact Cavalier were not sufficiently severe to trigger CUA's responsibilities under Title IX is baseless. CUA assumes, without basis in the Complaint, that Doe's offensive contact occurred only off campus. Mot. Dismiss at 14. But Cavalier alleged continuing harassment by Doe throughout her time at CUA, without limiting her claims to off-campus events, and she is entitled to the reasonable inference that this included on-campus contact.[1] Nor is CUA absolved of the responsibility to consider the off-campus harassment of Cavalier by Doe, especially at events organized by CUA athletic teams. *See*

---

[1] Cavalier additionally did cite a specific incidence of harassment incited by Doe at CUA's student union. Compl. ¶ 117(a).

Compl. ¶¶ 113–15 (discussing an incident at an off-campus CUA lacrosse house party).  Such

harassment is "probative" of the hostile educational environment Cavalier endured at CUA

because it "bolster[s] [Cavalier's] claim concerning the severity and offensiveness" of the on-

campus environment.  *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 442, 445 (D.

Conn. 2006).

Moreover, CUA's focus on the violations of the no-contact order in isolation ignores the

impetus for the hostile educational environment — the rape itself.  Doe's breaches of the no-

contact order must be considered in the context of his rape of Cavalier.  It is, frankly, appalling

that CUA would compare Doe's behavior to that of a "jilted boyfriend."  Mot. Dismiss at 15

(quoting *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 614 (E.D. Pa. 2014)).  Forcing Cavalier to

endure frequent contact with the man who raped her created a severe, pervasive, and objectively

offensive hostile environment for her.  In *Lapka v. Chertoff*, 517 F.3d 974 (7th Cir. 2008), for

example, the court considered the adequacy of the plaintiff's hostile work environment claim

based on allegations that a co-worker had raped her while she was too intoxicated to consent and

that the co-worker and his brother subsequently visited her workplace.  Even though there were

no allegations that the plaintiff had actually encountered the perpetrator or his brother after the

rape, the Seventh Circuit recognized that "[t]he continued presence of a rapist in the victim's

workplace can render the workplace objectively hostile because the rapist's presence exacerbates

and reinforces the severe fear and anxiety suffered by the victim."  *Id.* at 984.[2]  Cavalier's

experience at her university, where she was continually confronted by her rapist, was no

different.  For just that reason, courts have recognized that allowing a rapist to remain on campus

---

[2] Courts often look to Title VII of the Civil Rights Act of 1964 for guidance when applying Title
IX.  *E.g.*, *Doe v. Oyster River Coop. Sch. Dist.*, 992 F. Supp. 467, 474–76 (D.N.H. 1997).

with his victim can create a hostile educational environment.  *See, e.g.*, *Derby*, 451 F. Supp. 2d at 444.[3]

Finally, to establish discrimination severe enough to deprive Cavalier of CUA's educational opportunities and benefits, she need have alleged only a single incident of rape.  *See Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999) ("Within the context of Title IX, a student's claim of hostile environment can arise from a single incident.").  Just as courts "have no doubt a single incident of rape can satisfy the first prong of employer liability under a hostile work environment theory," *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001); *see also Lapka*, 517 F.3d at 983–84 (holding that the plaintiff's rape satisfied her burden to show a hostile work environment); *Gerald v. Locksley*, 849 F. Supp. 2d 1190, 1232 (D.N.M. 2011) ("Rape and other forms of severe sexual assault are the archetypical examples of single incidents which can establish a hostile work environment."), courts have allowed plaintiffs to maintain Title IX suits against schools based on the schools' deliberate indifference to a single rape, *e.g.*, *Tubbs v. Stony Brook Univ.*, No. 15 Civ. 0517 (NSR), slip op. at 12–13 (S.D.N.Y. Mar. 4, 2016);[4] *Alexander*, 177 P.3d at 740–41.  Here, by alleging the serial violations of the no-contact order, Cavalier does more than just allege a single sexual assault.  Thus, Cavalier's

---

[3] In fact, the court in *Yoona Ha v. Northwestern University*, No. 14 C 895, 2014 WL 5893292 (N.D. Ill. 2014), which CUA cites in support of its contention that Doe's violations of the no-contact order did not contribute to a hostile educational environment for Cavalier, Mot. Dismiss at 14, acknowledged that the university in that case "would have been required to take further steps to avoid liability" if it had learned that the accused rapist had violated the no-contact order. 2014 WL 5893292, at *2.  The student, however, did not allege that her rapist had ever contacted her, or even been in the same space as her, only that she caught "an occasional glimpse of him on the campus." *Id.*  Nor did the plaintiff in *Oden v. Northern Marianas College*, 440 F.3d 1085 (9th Cir. 2006), upon which CUA also relies, Mot. Dismiss at 15, assert that the defendant had failed to enforce the no-contact order against her harasser or allege that any such failure constituted deliberate indifference; the *Oden* court did not consider that question.  440 F.3d at 1089.
[4] *Tubbs v. Stony Brook University*, No. 15 Civ. 0517 (NSR) (S.D.N.Y. Mar. 4, 2016), is not available on Westlaw, and so the slip opinion is attached as Exhibit A to Plaintiff's Opposition.

Complaint adequately alleged that John Doe's actions, and those of CUA, created a hostile

educational environment for her within the meaning of Title IX, and this Court must deny the

Defendant's Motion.

C.      **CUA Had Actual Knowledge of John Doe's Sexual Harassment of Erin Cavalier**

CUA does not and cannot contest that Cavalier's Complaint alleges facts showing that it

was aware of Doe's rape of Cavalier and Doe's frequent violations of the no-contact order.  In

order for a Title IX funding recipient[5] to be liable for its deliberate indifference to sexual

harassment, an official with "authority to address the alleged discrimination and to institute

corrective measures on the recipient's behalf" must have "actual knowledge of discrimination in

the recipient's programs." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Investigators from CUA were made aware of the rape directly after it happened, Compl. ¶ 43,

and the events of December 15, 2012, were relayed to Dean Sawyer in an e-mail at 5:05 a.m. that

same day, *id.* Ex. 11.  Dean Sawyer directed the course of the investigation and ultimately

decided whether Doe would be disciplined.  *See id.* Exs. 3, 6.  Cavalier also persistently told

Dean Sawyer and Associate Dean of Students Omar Torres about Doe's violations of the no-

contact order.  *Id.* ¶¶ 116, 121.  Cavalier thus has established CUA's knowledge of the hostile

sexual environment she experienced on campus.

D.      **CUA Was Deliberately Indifferent to the Rape and Continuing Harassment of Erin Cavalier**

As CUA agrees, a university is deliberately indifferent within the meaning of Title IX

when its response to sexual harassment is "clearly unreasonable in light of the known

circumstances." *Davis*, 526 U.S. at 648; *see* Mot. Dismiss at 2.  Although in some cases courts

---

[5] CUA does not contest that it is a funding recipient under Title IX.

have determined deliberate indifference as a matter of law, "deliberate indifference will often be

a fact-based question, for which bright line rules are ill-suited." *Derby*, 451 F. Supp. 2d at 447;

*see Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 WL 9906260, at *9 (W.D. Mich. Mar.

31, 2015). Cavalier does not claim, as CUA seems to believe, that CUA's investigation of her

rape report needed to be "flawless." Mot. Dismiss at 10 (quoting *Sanches v. Carrollton-Farmers*

*Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011)).[6] But nor is it enough that CUA

conducted *some* investigation, no matter the severity of its deficiencies. *E.g.*, *Doe v. Sch. Bd. of*

*Broward Cty.*, 604 F.3d 1248, 1259–60, 1263 (11th Cir. 2010). "A school's investigation,

though promptly commenced . . . may be carried out so inartfully as to render it clearly

unreasonable." *Brodeur*, 626 F. Supp. 2d at 210 (alteration in original) (citation omitted).

Cavalier's allegations that CUA refused to promptly and adequately investigate her rape report;

disregarded key evidence, particularly evidence supporting her consistent position that she was

too intoxicated to consent; conducted a biased, unfair, and dilatory investigatory and hearing

process; re-victimized her by shaming her for the rape; and refused to timely institute or enforce

a no-contact order, considered separately and together, raise the claim that CUA acted clearly

unreasonably in light of the facts and allegations known to its officials.

A reasonable juror could find that CUA acted in a clearly unreasonable manner when it

dragged its heels at every stage of the process, and particularly when it prematurely closed its

---

[6] As with many of the cases upon which CUA relies, the facts in *Sanches* were entirely different from those at issue here. There, the Fifth Circuit held that a school principal was not deliberately indifferent for failing to contact the school district's Title IX coordinator or superintendent upon receiving the plaintiff's sexual harassment complaint (which alleged name-calling and other minor harassment between two rival cheerleaders), because the principal undertook the same investigative actions the Title IX coordinator would have required, followed up by reasonable disciplinary actions. *Sanches*, 647 F.3d at 168–70. Here, not only did CUA delay its investigation into much more serious allegations, refuse to consider relevant evidence, and otherwise conduct its investigation unreasonably, but it took no reasonable remedial action to allow Cavalier to feel safe on its campus.

investigation without considering whether Cavalier's level of intoxication rendered her unable to

consent.  As Cavalier alleged in her Complaint, CUA ignored her when she reached out for

information within days of the rape and only met with her a month later, after she reached out

again to set up a meeting with Dean Wainer.  Compl. ¶ 54.  CUA interviewed its first witnesses

over a month after Cavalier's rape, *id.* ¶ 56, then inexplicably delayed interviewing the

remaining witnesses for another month, *id.* ¶ 57.  As time passed, memories faded.[7]

       But most unreasonably, for months CUA ignored Cavalier's consistent position that she

was too intoxicated to consent to intercourse.  *Id.* ¶¶ 71–72.  Capt. Gregory's investigative report

reveals that Ms. Gregory focused entirely on the largely irrelevant question of whether Doe had

used a condom during the intercourse.  *Id.* Ex. 2, at 7–8.  Having concluded that he did, she

decided that no rape had occurred, *id.*, a decision on which Dean Sawyer signed off, *id.* Ex. 3.

CUA officials simply ignored Cavalier when she insisted that her capacity to consent was at

issue in the case, and they ignored the evidence supporting Cavalier — namely that Cavalier was

so intoxicated that she had very little memory of the rape and the events leading up to the rape,

and that students immediately before the rape had observed that she was severely intoxicated.

*Id.* ¶¶ 62–68; *see Butters v. James Madison Univ.*, No. 5:15-CV-00015, 2016 WL 5317695, at

*10 (W.D. Va. Sept. 22, 2016) (noting that the plaintiff's lack of consent to sexual contact

"could be ascertained" when she reported that she "was so intoxicated she did not even

remember the incident," despite a videotape showing the plaintiff standing and talking with the

---

[7] The fact that CUA was on winter break immediately after Cavalier's rape does not excuse CUA officials' decision to ignore her trauma or allow crucial evidence to slip away.  Cavalier reached out to CUA during the break, but did not hear back.  Compl. ¶ 54.  CUA could have, at the very least, communicated Cavalier's rights to her by phone or e-mail and sought statements from witnesses the same way.  Over the winter break, CUA could have preserved the physical evidence (*e.g.*, the campus videotape of Doe taking Cavalier to her dorm or the physical evidence of the assault in Cavalier's dorm room).

accused).  Moreover, at no point before closing its investigation did CUA seek out Cavalier's medical records, which it knew to exist, *id.* ¶¶ 46–47 (describing paramedics transporting Cavalier to the hospital while CUA officials were on the scene after the rape); *id.* ¶ 71, or even ask Cavalier to provide those records, to confirm her blood alcohol level on December 15, 2012. *See Forest Hills Sch. Dist.*, 2015 WL 9906260, at *10 (holding that a jury could find the defendant deliberately indifferent when it did not seek out the plaintiff's rape kit).

To its deep discredit, CUA reveals in its Motion that it *still* does not understand that a person can be too intoxicated to consent to sex.  Contrary to Cavalier's allegations, and the evidence from witnesses and her medical records that support those allegations, CUA insists that Cavalier "*engaged* in what even she concedes was at least some consensual sexual activity with [Doe]."  Mot. Dismiss at 23.  Capt. Gregory's view of the facts, which CUA parrots in its Motion, is not that of Cavalier, which the Court is required to accept at this stage in the proceedings.  Cavalier has alleged that she was too intoxicated to consent to *any* sexual activity with Doe on December 15, 2012.  Compl. ¶¶ 34–35, 40.  CUA's refusal to consider, or even recognize, that position was (and is) clearly unreasonable, especially in light of its own policies, which recognize that a person can be too incapacitated by alcohol to consent, *id.* ¶¶ 28–33, and apparently as CUA itself eventually recognized when it reversed its decision and reopened the investigation, *id.* ¶ 73.

While universities are insulated from liability under Title IX when their investigations are "timely and thorough[]," *Power ex rel. Power v. Gilbert Pub. Schs.*, 454 Fed. App'x 556, 558 (9th Cir. 2011); *see also Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 364 (6th Cir. 2012), "[a]n institution's failure to *properly* investigate a claim of discrimination is frequently seen as an indication of deliberate indifference."  *Alexander*, 177 P.3d at 738 (emphasis added)

(collecting cases).  A jury reasonably could find that CUA's investigation was untimely and the hearing it eventually provided unreasonably delayed.  In *Tubbs*, for example, the court held that a jury could find the university deliberately indifferent when it "took over 3 months to complete an investigation and hold a disciplinary hearing."  Slip op. at 13.  In *Doe v. East Haven Board of Education*, the court held that deliberate indifference was for the jury when school officials waited five weeks before taking "concrete action" in response to the plaintiffs' sexual harassment report.  200 F. App'x at 49; *see also, e.g.*, *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296–97 (11th Cir. 2007) (holding that, regardless of the outcome, the university "failed to provide an adequate response" when it "waited almost eleven months to take corrective action"); *Hayut*, 352 F.3d at 751 ("Deliberate indifference may be found . . . when remedial action only follows after 'a lengthy and unjustified delay'" (quoting *Bruneau ex rel. Schofield v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 761 (2d Cir. 1998), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009)); *Forest Hills Sch. Dist.*, 2015 WL 9906260, at *10 (holding that deliberate indifference was for the jury when the school "did not close the matter until nearly a year after the assault").  Here, CUA delayed starting its investigation for four weeks, delayed implementing a no-contact order for eight months, and delayed a final hearing for ten months.

    Indeed, CUA's claim that unreasonable delay cannot support a finding of deliberate indifference, Mot. Dismiss at 10, is belied by its own citations.  In *Oden*, the college immediately and thoroughly investigated the plaintiff's complaint and took immediate action to separate the plaintiff from her harasser.  440 F.3d at 1089.  The hearing on the plaintiff's complaint was delayed while the plaintiff sought legal representation, and because the plaintiff had moved.  *Id.* On those facts, the court determined only that the record did not support deliberate indifference

— but it emphasized that it "need not and d[id] not decide that a delay *never* can constitute deliberate indifference." *Id.*[8] CUA's other citations similarly do not involve investigations that were clearly unreasonably delayed or closed, and in fact the offending students in those cases received significant discipline.[9]

A jury also reasonably could find that Capt. Gregory and Dean Sawyer's refusal to consider evidence of Cavalier's lack of capacity was clearly unreasonable. Knowing that Cavalier's capacity was at issue, CUA officials made "an official decision . . . not to remedy the violation," *Gebser*, 524 U.S. at 290, or even to consider whether intercourse with a severely intoxicated person was a violation. Allegations that a university knowingly ignored critical information state a claim of deliberate indifference. *See, e.g.*, *Brodeur*, 626 F. Supp. 2d at 210 (holding that the defendant could be deliberately indifferent when it ignored findings from a previous investigation of the accused); *Bruning v. Carroll Cmty. Sch. Dist.*, 486 F. Supp. 2d 892, 915–16 (N.D. Iowa 2007) (holding that the issue of deliberate indifference was for the jury when the school failed to "determine the exact nature" of the sexual harassment).

---

[8] The Ninth Circuit in *Oden* also applied the wrong standard. To be deliberately indifferent, a university need not "deliberate[ly] attempt to sabotage [the] Plaintiff's complaint," as the Ninth Circuit appeared to believe, 440 F.3d at 1089, so long as its actions were clearly unreasonable.

[9] *See Butters*, 2016 WL 5317695, at *7, *12, *15; *Karasek v. Regents of the Univ. of Cal.*, No. 15-cv-03717-WHO, 2016 WL 4036104, at *13, *16 (N.D. Cal. July 28, 2016). In *Karasek*, the university had stayed one of the investigations at issue pending the resolution of criminal charges against the accused. The court found that this decision was not unreasonable, because the university took measures in the interim to ensure the plaintiff's safety, including suspending the accused and restricting his movement on campus. *Id.* at *16. No such measures in place for months following Cavalier's reported rape. In *Butters*, the investigation was delayed because the student requested anonymity and did not file a formal complaint for several months; while university officials considered pursuing the investigation independently, they reasonably determined that they could not do so without evidence from the plaintiff, and so informed her. 2016 WL 5317695, at *5–6, *9, *12. The court found that "JMU's lack of indifference is further highlighted by its swift response once [the plaintiff] did file her complaint." *Id.* at *12.

CUA officials also reacted to Cavalier's rape report in a clearly unreasonable manner when they allowed Cavalier to be harassed by a police officer the night of the rape, shamed Cavalier for drinking, and blamed Cavalier for their own errors during the investigation. Courts have found that plaintiffs adequately pled deliberate indifference when they alleged that officials in charge of investigating sexual harassment shamed survivors, minimized their trauma, or communicated to them that they were not to be believed. *See Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007) (allowing the jury to decide deliberate indifference when the defendant dismissed harassing threats, telling the victim that "some threats aren't as serious as others"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 700 (4th Cir. 2007) (same, when university counsel told the plaintiff that her harasser "was a 'great guy' and that she should work out her problems directly with him"); *Alexander*, 177 P.3d at 731, 739–40 (same, when university ombudsman asked the plaintiff if she was "making everything up").

In this case, directly after the rape, CUA officials watched silently while Officer Moore isolated Cavalier, stood in the way of paramedics attempting to provide medical attention, and interrogated her, "Do you want to see the SANE nurse because you believe that you were sexually assaulted or do you just want to go because you think you could get pregnant?" Compl. ¶ 106. This comment plainly communicated to Cavalier that her rape report was not credible. When Capt. Gregory re-interviewed Cavalier for her April 23, 2013, Report, Compl. Ex. 4 — after Cavalier had persuaded CUA to reopen its investigation to consider her toxicology report — Capt. Gregory again communicated to Cavalier that she was not credible, chastising her for supposedly failing to bring her incapacitation to Ms. Gregory's attention during the original investigation and telling her, falsely, that the witness statements contradicted her position. *Id.* ¶ 87. Not only did Capt. Gregory call Cavalier a liar in all but name, but she and her colleague

Investigator Callis also dismissed Cavalier as a "career alcoholic." *Id.* ¶ 107.  Where, as here, a university "minimiz[es] . . . the discriminatory import of sexual harassment or assault," a rational fact-finder could conclude that the school was deliberately indifferent.  *Alexander*, 177 P.3d at 739.

CUA's argument that these comments to Cavalier are irrelevant because they "cannot reasonably be interpreted as either sexual in nature or gender motivated" misses the point.  Mot. Dismiss at 11–12.  At the very least, a dispute of fact exists over whether baselessly questioning the credibility of a rape survivor and dismissing her report because she was intoxicated are gender neutral acts.  Phrases or words that are not facially discriminatory may become so, depending on multiple factors, "including context, inflection, tone of voice, and local custom." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding that a white manager's use of the term "boy" in addressing an African-American employee may give rise to an inference of discriminatory animus even absent the use of modifiers such as "white" or "black").  And regardless of whether the comments themselves constitute sexual harassment, they support Cavalier's claim that the university was deliberately indifferent to Doe's sexual harassment.  *See Alexander*, 177 P.3d at 740 (holding that, "in the absence of a proper investigation[,] questioning [the plaintiff's] truthfulness when she expressed dissatisfaction with the results of the mediation" indicated deliberate indifference).[10]

---

[10] The cases upon which CUA relies are not to the contrary.  *Seamons v. Snow*, 84 F.3d 1226, 1232–33 (10th Cir. 1996), pre-dates the Supreme Court's decision in *Davis* and does not address the issue of deliberate indifference at all.  In *Terry v. Young Harris College*, 106 F. Supp. 3d 1280, 1298–99 (N.D. Ga. 2015), the court found that administration officials had no actual notice of the sexual nature of the hazing reported by the plaintiffs; it did not find that the hazing itself was not discrimination.  That case gives no guidance as to what kinds of degrading or trivializing comments by administration officials to a survivor of sexual assault might themselves constitute part of the hostile educational environment or evince deliberate indifference to sexual assault.

Cavalier also has sufficiently alleged that the hearing process was so unfair as to be clearly unreasonable, particularly when considered in conjunction with the deficiencies in CUA's investigation up to that point.  CUA's continued reliance on Capt. Gregory to control the collection of evidence was clearly unreasonable in light of Capt. Gregory's obvious biases and conflict of interest.  Compl. ¶¶ 86–91.  So, too, was Dean Sawyer's continued influence over the investigation and hearing process in light of his interest in seeing his previous decision to close the investigation vindicated.  *Id.* ¶ 92.  Although the hearing was delayed for months, Cavalier received notice only two days before the actual date; as a result, her parents, who live in California, could not attend the hearing and demonstrate their support, while Doe's parents could.  *Id.* ¶ 94; *see Tubbs*, slip op. at 13–14 (holding that a reasonable jury could conclude that it was clearly unreasonable for the defendant to refuse to allow the plaintiff's therapist to attend her hearing to provide emotional support).[11]  Procedural restrictions on the hearing process prevented Cavalier from calling crucial witnesses, including Lindsey Silverberg, who could have testified to Cavalier's intoxication hours after the rape, and the paramedics who treated Cavalier immediately after the rape and reported that she had been sexually assaulted.  *Id.* ¶¶ 47, 89, 95.  Cavalier also was denied access to Capt. Gregory's notes and therefore was unable to effectively pose questions to witnesses or counter the conclusions Capt. Gregory presented to CUA decision-makers.  *Id.* ¶ 96.

---

[11] CUA relies on *Yu v. Vassar College*, 97 F. Supp. 3d 448 (S.D.N.Y. 2015), and *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997), to support its argument that the truncated notice of the hearing date was not deliberately indifferent.  Mot. Dismiss at 13.  In *Yu*, there was no evidence that the short notice period prejudiced the plaintiff, the student accused of rape, over his accuser.  *Yu*, 97 F. Supp. 3d at 464.  And the court in *Donohue*, on which *Yu* relied, did not reach the question of whether the notice in that case was adequate, because "the plaintiff and his parents agreed, if not demanded, that the hearing be held on November 1, 1994," and the plaintiff therefore had waived any objections to the timing of the hearing.  976 F. Supp. at 146.

In urging this Court to find its process reasonable and dismiss Cavalier's Complaint, CUA again misunderstands the nature of Cavalier's claim.  Cavalier does not argue that she is entitled to a particular remedy, as CUA asserts.  Mot. Dismiss at 12.  She contends only that she was entitled to a process that was not clearly unfair and a resolution that was not clearly unreasonable.[12]  "Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances."  *Vance*, 231 F.3d at 260–61; *see also Forest Hills Sch. Dist.*, 2015 WL 9906260, at *9 ("Merely investigating and doing nothing more is not a reasonable response."); *cf. Oden*, 440 F.3d at 1089 (observing that the accused "was punished significantly for his improper actions" and stating that "[w]e need not and do not hold that a response that is inadequate *never* can amount to deliberate indifference; we hold only that the College's response in this case sufficed to avoid violation of Title IX").  Moreover, while CUA's failure to follow its own policies, or guidance from the Department of Education, does not conclusively establish a Title IX violation, Mot. Dismiss at 12, it is evidence of deliberate indifference, *Forest Hills Sch. Dist.*, 2015 WL 9906260, at *10.

Finally, CUA was deliberately indifferent when it failed to institute, then refused to enforce, a no-contact order between Cavalier and Doe, and when it housed Doe a short distance from Cavalier's dorm, forcing her to alter her route to classes to avoid contact with him.  A school may be found deliberately indifferent when it makes "no . . . efforts to reduce [the plaintiff's] vulnerability to traumatic interactions with her attacker or to otherwise reach out to her to offer protection."  *Derby*, 451 F. Supp. 2d at 448.  CUA did not put in place a written no-

---

[12] Defendant's citation to *Facchetti v. Bridgewater College*, 175 F. Supp. 3d 627 (W.D. Va. 2016), is thus inapposite.  Mot. Dismiss at 12.  In *Facchetti*, the plaintiff did not contest that the college "quickly interviewed [the accused], held a hearing, and took disciplinary action against him."  175 F. Supp. 3d at 637.

contact order between Doe and Cavalier until August 27, 2013, eight months after the rape.

Compl. ¶ 111.  The no-contact order it eventually instituted was inadequate, because it placed

restrictions on Cavalier as well as Doe.  "[T]reating the abuser and the abused equally has been

seen as being deliberately indifferent to the discriminatory acts."  *Alexander*, 177 P.3d at 739;

*see Seiwert*, 497 F. Supp. 2d at 954.

Cavalier notified Dean Sawyer and Associate Dean Torres several times that Doe had

violated the no-contact order, but CUA apparently took no effective corrective action, and the

violations continued.

> [W]here a school district has knowledge that its remedial action is inadequate and
> ineffective, it is required to take reasonable action in light of those circumstances
> to eliminate the behavior.  Where a school district has actual knowledge that its
> efforts to remediate are ineffective, and it continues to use those same methods to
> no avail, such district has failed to act reasonably in light of the known
> circumstances.

*Vance*, 231 F.3d at 261; *see also, e.g.*, *Brodeur*, 626 F. Supp. 2d at 209 (holding that the jury

could find the defendant deliberately indifferent when its corrective actions proved ineffective).

CUA protests that it could do nothing more, both in terms of instituting and enforcing a

no-contact order, and in terms of its investigatory process, without violating Doe's rights.

Indeed, it implies that fear of suit from Doe contributed to its actions, and inaction, with regard

to Cavalier's complaint.  *See* Mot. Dismiss at 3 ("Ms. Cavalier chose to sue the University, as

perhaps Mr. Doe would have done if the hearing board's decision had gone the other way.").

But institutions may not discriminate against one group in order to avoid an anticipated lawsuit

from another.  *Cf. Ricci v. DeStefano*, 557 U.S. 557, 580–82 (2009) (holding that employers may

not engage in disparate treatment under Title VII in a "good-faith effort to comply" with its

disparate impact provisions).

In any case, CUA's concerns ring hollow in light of the precedent upon which it itself relies. Those cases reveal that it is common, and accepted, for universities to take action to immediately protect a survivor of sexual assault before the school completes its investigation. Thus, the universities in *Oden* and *Karasek* were found *not* deliberately indifferent in part *because* they immediately prohibited the accused from contacting the plaintiff; indeed, the university in *Karasek* temporarily suspended the accused student upon receiving the plaintiff's complaint. *Karasek*, 2016 WL 4036104, at *5, *16; *Oden*, 440 F.3d at 1089; *see also Sch. Bd. of Broward Cty.*, 604 F.3d at 1262 ("[W]e have repeatedly recognized that a school district's reasonable response to sexual harassment may include corrective action such as monitoring and admonishing an accused teacher or student despite the inconclusive nature of the school's investigation into the misconduct."). Precedent cited by CUA also has upheld decisions by schools to discipline students for sexual misconduct on facts similar to those asserted by Cavalier. In *Yu*, for example, a male student challenged his expulsion from Vassar College after he was found responsible for sexual misconduct. The court upheld the student's expulsion for sexual intercourse with a female student while she was too intoxicated to consent — even in the face of Facebook messages from the female student suggesting that the sex had been consensual. 97 F. Supp. 3d at 455–56, 485.

CUA has never explained how a reasonable process — one that was not inexplicably delayed, one that considered Cavalier's intoxication, one in which CUA officials did not shame and blame Cavalier, and one in which Cavalier was given a fair hearing — could have violated Doe's rights. Nor would a different outcome have violated those rights. In the end, CUA simply chose to trade Cavalier's rights for Doe's. Title IX does not allow it to do so. Thus, this Court

must deny Defendant's Motion and allow Count 1 (Title IX — Deliberate Indifference to Reported Rape) to proceed.

## II. Erin Cavalier's Allegations That CUA Failed to Protect Her From Sexual Harassment and Intentionally Interfered With Her Advocacy Efforts Because of Her Complaint of Sex Discrimination Raise a Retaliation Claim Under Title IX

CUA is also liable for its retaliatory acts against Cavalier, including its refusal to properly investigate her complaint and protect her from Doe and its interference with her advocacy work on behalf of survivors of sexual assault. Retaliation against a person because she "speaks out about sex discrimination" is intentional sex discrimination within the meaning of Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179 (2005); *see id.* at 174. While neither the Supreme Court nor the D.C. Circuit have elaborated on the elements of a retaliation cause of action under Title IX, courts in other circuits have looked to Title VII of the Civil Rights Act of 1964 and held that a plaintiff "make[s] out a prima facie case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012).[13] CUA does not contest that Cavalier engaged in protected activity by reporting her rape to CUA officials and pressing for redress and by filing a complaint against CUA with the Department of Education's Office for Civil Rights. Compl. ¶¶ 129–30, 133. Cavalier has

---

[13] While courts have looked to the law applying Title VII when evaluating retaliation claims under Title IX, there are important limitations to the comparison. Most notably, in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), the Supreme Court held that causation under Title VII could be shown only if an employee's protected activity was the but-for cause of the retaliatory acts. In so ruling, however, the Court explicitly distinguished "the default rules that apply only when Congress writes a broad and undifferentiated statute," citing Title IX as an example. *Id.* at 2531; *see Miller v. Kutztown Univ.*, No. CIV.A. 13-3993, 2013 WL 6506321, at *3 (E.D. Pa. Dec. 11, 2013) (declining to apply *Nassar* to a Title IX retaliation claim).

alleged facts sufficient to support her claim that CUA took adverse actions against her because of these activities.

To show the necessary adverse action, Cavalier was required to allege action that "a reasonable [person] would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Emeldi*, 698 F.3d at 726 (first and third alterations in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). This inquiry is highly context dependent. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances," including "surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Burlington Northern*, 548 U.S. at 69 (citation omitted).

Cavalier has alleged that CUA responded to her rape report by refusing to conduct an adequate investigation, trivializing her rape, refusing to protect her from her rapist, and in fact by facilitating further contact between them by housing him close to her own dormitory. Compl. ¶ 128. In the university context, in which the administration controls not only students' academic lives, but their living arrangements, a reasonable student might well be dissuaded from pursuing a sexual harassment complaint if she thought the university would respond not only by shaming her, but by refusing to protect her from harassment and housing her in proximity to her harasser. *See Miles v. Washington*, No. CIV-08-166-JHP, 2009 WL 259722, at *4 (E.D. Okla. Feb. 2, 2009) (holding that a university "can be liable for retaliation under Title IX if it orchestrated the harassment by the students or knew of the harassment and acquiesced in it in such a manner as to condone or encourage the harassment").

Cavalier also alleged that CUA interfered with her advocacy efforts on behalf of sexual assault survivors in response to her rape report and her complaint to the Department of Education. CUA attempted to limit events to raise awareness of sexual assault organized by Cavalier. Compl. ¶ 133. After Cavalier joined Peer Educators Empowering Respectful Students ("PEERS"), a CUA student group devoted to sexual assault awareness, among other things, CUA retaliated against the group by disinviting them from their primary recruiting event. *Id.* ¶¶ 132–33. It is no "petty slight" for a university to respond to activity protected under Title IX by frustrating a student's efforts to engage with her community on Title IX issues. Mot. Dismiss at 16. Again, "[c]ontext matters." *Burlington Northern*, 548 U.S. at 69. Students at universities are offered valuable learning opportunities, work experience, and leadership opportunities through their participation in school activities. These opportunities are not readily available in spaces outside of the university's control. Title IX does not permit a university to force a student to choose between participating effectively in on-campus activities and protesting her own sexual assault. By interfering with Cavalier's attempts to organize events on campus and with efforts by PEERS to recruit new students, CUA did just that. Its retaliatory behavior is doubly concerning because CUA punished Cavalier for advocating on her own behalf by restricting her ability to advocate on behalf of others.

Cavalier also has alleged enough to plead that CUA's actions were causally connected to her protected activity. "At the prima facie stage of a retaliation case, the causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative . . . action are not completely unrelated." *Emeldi*, 698 F.3d at 726 (alteration in original) (citation omitted); *accord Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 869 (9th Cir. 2014). "[C]ausation may be inferred from circumstantial evidence, such as the

defendant's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory conduct." *Ollier*, 768 F.3d at 869 (alteration and citation omitted).  Here, CUA's retaliatory conduct was in direct response to Cavalier's advocacy for her rights.  She was shamed by CUA officials after she pressed them to reopen their investigation.  Compl. ¶ 107.  Her rapist was housed near her residence around the time she pressed for, and finally was granted, a hearing.  *Id.* ¶ 122; *see id.* ¶ 73.  And she suffered further retaliation in direct connection with her attempts to raise awareness of sexual assault.  *Id.* ¶ 133.  Cavalier has pled enough to show that CUA's adverse actions were not "completely unrelated" to her protected activities.

CUA's contention that there can be no overlap between the conduct that forms the basis for the charge of discrimination and that underlying the charge of retaliation misunderstands the Supreme Court's opinion in *Burlington Northern*.  Mot. Dismiss at 16–17.  In that case, the majority responded to the concern raised by Justice Samuel Alito's concurrence that "the nature of the discrimination that led to the filing of the charge must be taken into account in applying" Title VII's anti-retaliation provision.  *Burlington Northern*, 548 U.S. at 78 (Alito, J., concurring).  "Specifically," Justice Alito worried that "the majority's interpretation logically implies that the degree of protection afforded to a victim of retaliation is inversely proportional to the severity of the original act of discrimination that prompted the retaliation," because people who had suffered more severe discrimination would be required to show greater retaliation to convince a court that the retaliation would have dissuaded their protected activity.  *Id.*  The majority disagreed that its opinion could be so interpreted, clarifying that "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint."  *Id.* at 69.  This language reassures complainants that victims of severe discrimination do not face a higher bar to

proving materially adverse actions; it does not imply that acts constituting deliberate indifference cannot themselves be retaliatory.[14]

Here, Cavalier has alleged not only that CUA refused to protect her from Doe and refused to take her complaint against him seriously, but also that it grew hostile to her in response to her persistent efforts to seek redress.  *See* Compl. ¶¶ 87, 107.  A victim of sexual assault could very well be dissuaded from pressing her rights by the knowledge that not only would the university refuse to take necessary action, but that persistence would antagonize the university against her. *See Topol v. Trustees of the Univ. of Pa.*, 160 F.R.D. 474, 475–76 (E.D. Pa. 1995) (holding that the plaintiff stated "a viable claim of retaliation" when she alleged that "1) she filed a sexual harassment complaint . . . , 2) the defendants hindered plaintiff's efforts to pursue her sexual harassment complaint, and 3) plaintiff's filing of the sexual harassment complaint prompted the defendants to impede her efforts").  Cavalier has thus adequately alleged Retaliation under Title IX (Count 2) against CUA, and this Court must deny the Defendant's Motion.

III.    **Because Students May Bring Claims Against Universities Sounding in Tort, Including Claims That the University Breached Its Duty to Respond Reasonably to Sexual Harassment, Erin Cavalier Has Adequately Alleged a Negligence Claim Against CUA**

Cavalier has adequately pled a claim for negligence based on CUA's unreasonable actions that placed her at risk of foreseeable harm.  "It is well-established that a claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).  Here, CUA argues only that Cavalier failed to show that CUA breached any duty in tort.  Mot. Dismiss at 17–23.  It is wrong.

---

[14] The court in *S.K. v. North Allegheny School District*, 168 F. Supp. 3d 786 (W.D. Pa. 2016), on which CUA relies, Mot. Dismiss at 16–17, similarly misinterpreted *Burlington Northern*.  *See S.K.*, 168 F. Supp. 3d at 805.

CUA assumed a particular duty of care when it undertook to investigate Cavalier's rape and when it purported to take responsibility for her safety by informing her of a no-contact order between herself and Doe.  Compl. ¶¶ 55, 74.  In the District of Columbia, "the scope of the defendant's undertaking determines the scope of its duty."  *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1098 (D.C. 1994) (citation omitted).  "[A] university may *assume* a duty to protect its students by way of its affirmative conduct," including by "express[ing] a strong 'policy of discipline' for" certain infractions.  *Vega v. Sacred Heart Univ., Inc.*, 836 F. Supp. 2d 58, 62 (D. Conn. 2011) (quoting *Furek v. Univ. of Del.*, 594 A.2d 506, 520 (Del. 1991) and collecting cases).  That duty may be to protect students from each other, *see id.*, as well as from the university's own negligence as it relates to that disciplinary policy.  Once CUA committed to investigating Cavalier's rape on December 15, 2012, and subsequently to enforcing a no-contact order to "remain in place indefinitely," Compl. Ex. 9, CUA became liable for the foreseeable harm to Cavalier's mental and emotional well-being resulting from its negligent failures in those undertakings.

Despite its argument to the contrary in its Motion, CUA's sexual assault policies do give rise to an additional duty in tort that it owed to Cavalier.  Mot. Dismiss at 18–19.  *Doe v. University of the South*, No. 4:09-cv-62, 2011 WL 1258104 (E.D. Tenn. Mar. 31, 2011), is a good example of how a school's sexual assault policies create such a duty.  There, the court allowed a male student to proceed with negligence claims against his university resulting from an allegedly improper disciplinary proceeding for sexual assault.  The court held,

> [T]he fact that it may be difficult to establish "precise criteria" by which to judge
> a defendant's actions does not mean that the defendant owes others no duty.  [The
> University] and its agents owe everyone . . . a duty to refrain from conduct that
> poses an unreasonable and foreseeable risk of harm. . . . [I]n this case a jury could
> find that the harm caused by the University's allegedly and arguably haphazard
> implementation of its own Sexual Assault Policies was foreseeable, especially

where . . . the harm was severe: a wrongful conviction by a disciplinary
committee.

*Id.* at *21 (citation omitted).  While CUA's actions did not create a wrongful conviction, they

allowed for a troubling wrongful exoneration of Doe.  And, as in *University of the South*, CUA

owes students like Cavalier a duty to refrain from the haphazard implementation of its own

sexual assault policies.

CUA breached its duty owed to Cavalier in at least five ways.  **First**, CUA breached its

duty of care by allowing Cavalier to be interrogated and shamed by an officer of the

Metropolitan Police Department immediately after rape.  Compl. ¶ 46.  **Second**, CUA breached

its duty to Cavalier by blaming and shaming her for the deficiencies of its own investigation.  It

blamed Cavalier when it told her, falsely, that she had not alleged that she was too incapacitated

to consent to sex with Doe and when it improperly questioned her credibility, despite the witness

evidence supporting her version of events.  CUA shamed Cavalier by calling her a "career

alcoholic."  *Id.* ¶ 107.  **Third**, CUA breached its duty of care by refusing to protect Cavalier from

further harassment by Doe.  CUA never enforced the no-contact order.  *Id.* ¶¶ 111–21.  **Fourth**,

CUA breached its duty owed to Cavalier by facilitating Doe's harassment and by increasing

Cavalier's sense of vulnerability and anxiety when CUA housed DOE near Cavalier's dorm.  *Id.*

¶ 122.  **Fifth**, CUA's failure to train its officials to respond reasonably to sexual assault reports

— as opposed to calling an 18-year-old rape victim a "career alcoholic" — was a breach in a

duty owed to Cavalier.  *Id.* ¶¶ 148, 153, 155.

CUA's breaches in duty — both individually and collectively — caused Cavalier

foreseeable, severe emotional harm.  Cavalier feared for her safety because of CUA's actions and

inaction.  *Id.* ¶ 126.  She suffered from depression and anxiety.  She was distracted from her

coursework, and her role on CUA's lacrosse team diminished.  *Id.* ¶ 124.  She avoided being

alone.  *Id.* ¶ 126.  Finally, CUA made her feel that she was not worth taking seriously and that she was wrong to report her assault.  *Id.* ¶ 125.

CUA argues that any duty it owed Cavalier sounded only in contract, and that it cannot be held liable in tort for any breach.  Mot. Dismiss at 18–19.  As the cases cited above demonstrate, that is incorrect.  "Although the relationship between a university and its students *can* be contractual in nature," the party asserting the contract "must nevertheless 'allege sufficient facts to demonstrate . . . the terms of the contract.'"  *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98–99 (D.D.C. 2012) (emphasis added) (quoting *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007)).  Not all written university policies form contractual obligations.  *See Basch v. George Wash. Univ.*, 370 A.2d 1364, 1366–67 (D.C. 1977).  And the fact that some terms of a relationship are governed by contract does not mean that all are, or that parties in the relationship are incapable of committing torts against one another.  *See Choharis v. State Farm Fire & Casualty Co.*, 961 A.2d 1080, 1089 (D.C. 2008) (noting that a contractual counter-party can be liable in tort when the tort "exist[s] in its own right independent of the contract").  An insurance company that slandered an insured while resolving a dispute would be liable in tort, for example.  *Id.* at 1088.  CUA makes no attempt here to show that its duty to protect Cavalier from and remedy sexual harassment sounds in contract.  It does not identify the contract.  It does not define the terms of the contract.  Instead, CUA cites a barrage of cases that have nothing to do with the student-university relationship and offer no guidance in defining the contours of that relationship.  *See* Mot. Dismiss at 18.[15]  Accordingly, this Court must deny CUA's Motion and allow Count 3 (Negligence) of Cavalier's Complaint to move forward.

---

[15] The two cases CUA cites that did hold that students could not bring tort claims against their universities are similarly unavailing.  In *Valente v. University of Dayton*, the plaintiff recited only duties arising from the University's Honor Code, which he agreed was also the source of

**IV.    Erin Cavalier's Claim Meets the Elements for Negligent Infliction of Emotional Distress**

In disputing Cavalier's claim for negligent infliction of emotional distress, CUA relies on the same flawed arguments it asserts against her claim for negligence generally.  Mot. Dismiss at 24.  Once again, because CUA has not identified the terms of the alleged contract between it and Cavalier or provided any reason to be believe that Cavalier's claims are covered by that contract, her claim for negligent infliction of emotional distress may proceed.

The District of Columbia recognizes a claim for negligent infliction of emotional distress where

> (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff.

*Hedgepeth*, 22 A.3d at 810–11.  CUA disputes only that it had a relationship with Cavalier that necessarily implicated her emotional well-being.  Mot. Dismiss at 25.  But it undertook such an obligation when it investigated Cavalier's claims and when it instituted a no-contact order between her and Doe.

CUA cannot credibly claim that investigating Cavalier's rape and instituting an indefinite no-contact order between Cavalier and the man who raped her did not necessarily implicate Cavalier's emotional well-being.  The relationship between the plaintiff and the defendant forms the basis of a claim for negligent infliction of emotional distress when "[t]he *purpose* of the

---

the University's contractual duties.  438 Fed. App'x 381, 387 (6th Cir. 2011).  *Amin v. Nyack School of Adult and Distance Education* is vague on the nature of the plaintiff's claims, which in any case were related to the school's alleged failure to award him a Bachelor's degree and were moot in light of the fact that the school did award him that degree.  710 F. Supp. 2d 80, 82–83 (D.D.C. 2010).

relationship . . . involve[s] care for another's emotional well-being, and 'emotional distress' [is]

'especially likely to be caused by [a] breach' of duty." *Lesesne v. District of Columbia*, 146 F.

Supp. 3d 190, 196 (D.D.C. 2015) (final alteration in original) (quoting *Hedgepeth*, 22 A.3d at

814). CUA's own policies describe the purpose of its investigation, declaring that the school

will respond to sexual assault by "by *protecting the victim* and our community, conducting

prompt and thorough investigations and providing support." Compl. ¶ 51 (emphasis added).

The Department of Education's guidance, too, is replete with instructions to schools to recognize

and take care to minimize trauma to a survivor of sexual assault during the course of an

investigation and disciplinary proceedings. *E.g.*, Dep't of Educ., Office for Civil Rights,

*Questions and Answers on Title IX and Sexual Violence* 22, 25, 31, 37 (Apr. 29, 2014),

http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf. It also explains that

schools must "protect the complainant as necessary," including taking steps to allow the

complainant "to avoid contact with the alleged perpetrator." *Id.* at 32. These documents make

explicit the obvious: that CUA's undertaking to investigate Cavalier's rape and separate her from

Doe necessarily implicated her emotional well-being and that CUA's negligence in the

performance of these duties was likely to lead to Cavalier's severe distress.[16] Accordingly,

Count 4 (Negligent Infliction of Emotional Distress) withstands CUA's legal challenge, and this

Court must deny CUA's Motion on this basis.

---

[16] Notably, the D.C. Court of Appeals in *Hedgepeth* referenced *Drejza v. Vaccaro*, 650 A.2d
1308 (D.C. 1994), as a case that may have come out differently if the Court at that time had
recognized a claim for negligent infliction of emotional distress based on the relationship
between the parties. *Hedgepeth*, 22 A.3d at 808 & n.31. In *Drejza*, the Court held that a police
officer could not be found liable for negligent infliction of emotional distress for his dismissive
and highly offensive comments to a rape victim who approached him to make a police report.
650 A.2d at 1312 n.9.

**V.      Erin Cavalier's Claim Meets the Elements for Intentional Infliction of Emotional Distress**

Cavalier also has alleged facts sufficient to support a claim for intentional infliction of emotional distress.  To succeed on such a claim, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Drejza*, 650 A.2d at 1312.  CUA challenges only the first element, whether its conduct was sufficiently extreme and outrageous.  Mot. Dismiss at 25–26.

Whether the acts of a defendant are sufficiently extreme to support a claim for intentional infliction of emotional distress depends on "(1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place." *Burnett v. Am. Fed'n of Gov't Emps.*, 102 F. Supp. 3d 183, 190 (D.D.C. 2015) (quoting *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993)).  "In general, a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002) (citation omitted).

Cavalier has alleged just such facts.  "Outrageous conduct may consist of 'the abuse of a position of authority, particularly by, *inter alia*, police officers.'" *Drejza*, 650 A.2d at 1314 (alterations omitted) (quoting *Carter v. District of Columbia*, 795 F.2d 116, 139 (D.C. Cir. 1986)).  Cavalier has pled numerous abuses of authority by CUA officials charged with investigating her rape.  She has pled that CUA officials interfered with her ability to receive medical attention immediately following the rape and instead allowed her to be interrogated by a police officer they knew to be hostile.  Compl. ¶ 106.  She has pled that CUA officials re-traumatized her by baselessly questioning her credibility to her face and blaming her for her own

rape.  *Id.* ¶ 107.  She has pled that CUA officials not only stood by in the face of the hostile

educational environment created by Doe's rape, but actively furthered her sense of fear and

vulnerability by housing her in close proximity to her rapist and, in spite of her numerous

entreaties, refusing to enforce a no-contact order between them.  *Id.* ¶¶ 111–22.  Finally, she has

pled that CUA officials retaliated against her for advocating for her rights, interfering not only

with her own work but with the work of the student group she joined.  *Id.* ¶¶ 128–33.

These allegations show more than "dissatisfaction with the University's response" and

"perceived . . . inadequate sensitivity."  Mot. Dismiss at 26.  They are allegations that a

university turned a blind eye to rape, facilitated continued encounters between a rapist and his

victim, and participated itself in her harassment.  While community standards may once have

entitled a university to close the door and plead privacy in the face of such challenges to its

internal affairs, such standards are no longer the norm.  *See Burnett*, 102 F. Supp. 3d at 190

("[S]tatements that were considered a 'petty oppression,' 'trivial' or merely 'inconsiderate and

unkind' fifty years ago may be 'extreme and outrageous' conduct under 'today's social standards

and principles (or vice-versa).'" (quoting *King*, 640 A.2d at 668)); *Howard Univ. v. Best*, 484

A.2d 958, 986 (D.C. 1984) ("Changing sensitivity in society alters the acceptability of former

terms . . . It is for the trier of fact to determine, taking into account changing social conditions

and plaintiff's own susceptibility, whether the particular conduct was sufficient to constitute

extreme outrage." (alteration in original) (citation omitted)).

CUA's argument that "discrimination alone" is not enough to plead intentional infliction

of emotional distress distorts these facts.  Mot. Dismiss at 26.  It also ignores precedent.  In

*Burnett*, this Court considered whether an African-American contractor could maintain a claim

for intentional infliction of emotional distress when he alleged that he was subjected to racial

slurs and "a number of racially-motivated demeaning or punitive acts."  102 F. Supp. 3d at 191.

While "isolated incidents of race discrimination generally will not qualify as 'extreme and

outrageous' conduct," the Court held, "a pervasive discriminatory environment does."  *Id.* at 190.

And in *Best*, the D.C. Court of Appeals considered a claim by a plaintiff for intentional infliction

of emotional distress based on unwelcome sexual comments, propositions, and touching from her

supervisor.  The Court held that "[c]reation of a hostile work environment by racial or sexual

harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction

of emotional distress."  484 A.2d at 986; *see also Miles*, 2009 WL 259722, at *6 (permitting an

intentional infliction of emotional distress claim to go forward based on a university's inadequate

response to sexual harassment).  Cavalier has pled enough to show that CUA maintained and

contributed to a pervasively hostile educational environment.  That is enough, at this stage, for

her claim to move forward.  Thus, Count 5 (Intentional Infliction of Emotional Distress) survives

CUA's Motion.

## VI.    Erin Cavalier Filed Suit Within the Statute of Limitations

Cavalier has alleged injuries based on continuing violations by CUA of Title IX and the

common law.  Defendant's half-hearted argument that Cavalier's suit is untimely, which does

not address the continuing violations doctrine, does not withstand scrutiny.

### A.    Title IX Claims

Because Title IX does not include its own statute of limitations, Defendant is correct that

the District of Columbia's catch-all three-year statute of limitations for personal injury torts

applies to Cavalier's Title IX claims.  D.C. Code § 12–301(8); *Dasisa v. Univ. of D.C.*, No. 06-

7106, 2006 WL 3798886, at *1 (D.C. Cir. Oct. 3, 2006) (unpublished judgment); *cf. Earle v.

District of Columbia*, 707 F.3d 299, 305 (D.C. Cir. 2012) (addressing claims under 42 U.S.C. §

1983).  While state law determines the statute of limitations, federal law governs when a claim accrues.  *E.g.*, *Beasley v. Ala. State Univ.*, 966 F. Supp. 1117, 1128 (M.D. Ala. 1997); *cf. Earle*, 707 F.3d at 305.  Ordinarily, the statute of limitations begins to run under federal law "the moment the plaintiff knows or has reason to know of the injury that is the basis of the complaint."  *Beasley*, 966 F. Supp. at 1128 (alteration and citation omitted).  But when, as here, a plaintiff alleges continuing violations of the law, the statute of limitations begins to run "after the defendant's last violative act."  *Earle*, 707 F.3d at 307; *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (holding that a court can consider "the entire scope of a hostile work environment claim . . . for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period").

While the D.C. Circuit has never addressed the continuing violation doctrine in the context of Title IX, a claim that a university was deliberately indifferent to sexual harassment giving rise to a hostile educational environment fits easily within that framework.  First and foremost, a hostile work environment is the paradigmatic continuing violation.  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 105.  Because CUA's liability under Title IX is predicated on the persistence of a hostile educational environment while Cavalier was at CUA, there is no reason the logic of *National Railroad Passenger Corp.* should not apply in this case.

More broadly, the D.C. Circuit recognizes two kinds of continuing violations.  Cavalier has adequately alleged continuing violations under either framework.  First, the continuing violation doctrine applies "if the text of the pertinent law imposes a continuing obligation to act or refrain from acting."  *Earle*, 707 F.3d at 307.  Such a claim accrues on the last day the defendant had an ongoing responsibility to the plaintiff.  *See id.* 307–08.  Here, Title IX imposed a continuing obligation on CUA to take appropriate action in response to Cavalier's rape report

and report of continued harassment by Doe.  *Davis*, 526 U.S. 629.  That obligation remained

until May 14, 2016, the day Cavalier graduated from CUA.  Compl. ¶ 8.  Cavalier filed suit on

October 7, 2016, only months after her claim accrued and well within the statute of limitations.

> Second, the continuing violation doctrine applies when conduct

> could not reasonably have been expected to be made the subject of a lawsuit when
> it first occurred because its character as a violation did not become clear until it
> was repeated during the limitations period, typically because it is only its
> cumulative impact (as in the case of a hostile work environment) that reveals its
> illegality.

*Earle*, 707 F.3d at 306 (quoting *Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997)).  In other

words, "a complaint must allege (1) a continuous and repetitious wrong; (2) with damages

flowing from the act as a whole, rather than from each individual act, and (3) at least one

injurious act within the limitations period."  *Cooke-Seals v. District of Columbia*, 973 F. Supp.

184, 188 (D.D.C. 1997).

Because the "cumulative impact" of CUA's actions following Cavalier's rape report is

what evinced deliberate indifference, the continuing violation doctrine applies.  As with other

continuing violations, "no single incident in a continuous chain of tortious activity can 'fairly or

realistically be identified as the cause of significant harm.'"  *Page v. United States*, 729 F.2d

818, 821–22 (D.C. Cir. 1984) (quoting *Fowkes v. Pa. R.R.*, 264 F.2d 397, 399 (3d Cir. 1959));

*see also, e.g.*, *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115 (holding that the continuing violation

doctrine applies to hostile environment claims because "a single act of harassment may not be

actionable on its own."); *Loumiet v. United States*, 968 F. Supp. 2d 142, 154 (D.D.C. 2013)

(relying on *Page*).  Like "the prosecution of an allegedly frivolous lawsuit," which the D.C.

Circuit has "identified . . . as the sort of gradual harm triggering the continuing tort doctrine,"

*Loumiet*, 968 F. Supp. 2d at 154, CUA's inadequate investigation was "a continuous, not an

isolated event" with "effects [that] persist[ed] from the initial [report] to the final disposition of the case," and Cavalier was injured as much by "the cumulative . . . harm caused by an unresolved" proceeding as she was by the initial reaction to her report.  *Id.* (quoting *Whelan v. Abell*, 953 F.2d 663, 673 (D.C. Cir. 1992)).

Put another way, Cavalier cannot and is not required to pinpoint the exact time CUA's actions rose to the level of deliberate indifference, or the moment in time when CUA could not have cured the effects of its previous delinquency.  Had CUA only delayed its investigation for one month, for example, but then properly resolved Cavalier's claim, it is unlikely it would be liable for deliberate indifference.  Had CUA immediately recognized its error in failing to consider Cavalier's intoxication and then promptly granted her a hearing, Cavalier may not have had a claim.  Had the offensive remarks by Capt. Gregory been the only unreasonable aspect of CUA's investigation, Cavalier may not have had a claim.  But the cumulative impact of CUA's actions and inactions do give rise to a cause of action for deliberate indifference.  Because at least some of those actions occurred on or after October 7, 2013 — three years before Cavalier filed suit — all of CUA's actions can be considered.[17]

This is the point that CUA misunderstands when it argues that Cavalier's claim accrued at the time of its first violation, immediately after the rape.  Mot. Dismiss at 27.  That CUA began to bungle the investigation from day one does not mean that Cavalier's deliberate indifference cause of action accrued at day one.  Courts do not incentivize plaintiffs to file suit at the first sign that a university *might* not take necessary action.  Moreover, even if Cavalier had discovered that she had a cause of action before October 7, 2013, that would not insulate CUA

---

[17] Among other things, Cavalier alleged that CUA issued decisions that Doe was not responsible for her rape on October 9 and 21, 2013, and that for the next two years, it failed to enforce the no-contact order between them.  Compl. ¶¶ 77, 98, 119–20.

from liability.  In *National Railroad Passenger Corp.*, the Supreme Court rejected the defendant's contention that the statute of limitations began to run on a hostile work environment claim once the claim was actionable or the plaintiff became aware that she had been subjected to discrimination.  536 U.S. at 117 & n.11.  And this Court has held that the "theory applies . . . even when a plaintiff was sufficiently aware of the harm caused to file an administrative complaint challenging the defendant's conduct."  *Loumiet*, 968 F. Supp. 2d at 154 (quoting *Rochon v. FBI*, 691 F. Supp. 1548, 1563 (D.D.C. 1988)); *see also Page*, 729 F.2d at 823 ("*Page*'s awareness since at least 1972 of his addiction and the attendant harm does not defeat application of the continuing-tort doctrine since its very purpose would be to deny VA an open-ended license to continue the drug program that assertedly caused and maintained *Page*'s addiction." (footnote omitted)).

Given the clear fit of the continuing violation doctrine to a suit such as this one, courts in other circuits unsurprisingly have held that the deliberate indifference of school officials in the face of illegal harassment is a continuing violation.  For example, in *Dibbern v. University of Michigan*, the court "agree[d] with Plaintiff's contention that, in determining whether Plaintiff has plead a plausible Title IX hostile environment claim, the continued deliberate indifference of the University within the limitations period permits this Court to consider events that, although they took place outside the limitations period, are helpful in establishing liability."  No. 12-15632, 2013 WL 6068808, at *8 (E.D. Mich. Nov. 18, 2013).  The district court in *Estate of D.B. by Briggs v. Thousand Islands Central School District* accepted "an alleged ongoing pattern of indifference" resulting in the suicide of a student as a continuing violation under § 1983.  169 F. Supp. 3d 320, 336 (N.D.N.Y. 2016); *see also Bollman v. Ciesla*, No. 2:14-CV-02001, 2014 WL 1765003, at *2 (W.D. Ark. May 2, 2014) ("Furthermore, Plaintiffs have alleged facts from which

it can reasonably be inferred that by remaining deliberately indifferent to student-on-student harassment, Defendants are engaging in a continuing violation of L.B.'s rights."), *aff'd sub nom. Bollman v. Greenwood Sch. Dist.*, 626 F. App'x 657 (8th Cir. 2015).  Courts also have found continuing violations where, as here, harassment of the student continues into the period within the statute of limitations.  *E.g.*, *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011).  Cavalier's Title IX claims are thus timely.

### B.       Common Law Claims

Cavalier's common law claims are also governed by the District of Columbia's catch-all three-year statute of limitations for personal injury torts.  D.C. Code § 12–301(8).  The District of Columbia also recognizes that "a 'continuing tort' can be established for statute of limitations purposes by showing '(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act . . . within the limitation period.'"  *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 547–48 (D.C. 2002) (quoting *DeKine v. District of Columbia*, 422 A.2d 981, 988 n.16 (D.C. 1980)).  "It makes sense to say that the running of the limitations period is tolled until the continuation of the wrongful conduct renders the existence of the cause of action sufficiently manifest to permit the victim to seek recovery."  *Id.* at 548.  While the continuing violation doctrine applied to state law claims in the District of Columbia is more limited than that applied to federal causes of action, *see id.* at 547–48, in this case the result is the same.  Cavalier's cause of action became "sufficiently manifest," *at the earliest*, only when CUA officially found Doe not responsible on October 9, 2013, after the hearing.  That was the time that Cavalier learned that CUA would probably, in the end, do nothing to protect her from her rapist or remediate the hostile environment on campus. However, the no-contact order is "indefinite[]," Compl. Ex. 9, and Cavalier certainly had reason

to believe that even until she graduated on May 14, 2016, CUA would at least prevent further

harassment from her rapist.  Because Cavalier brought suit within three years of the date her

claim accrued either on October 9, 2013, or May 14, 2016, all of her common law claims are

timely.

### Conclusion

For the foregoing reasons, Cavalier's allegations in her Complaint meet the requirements

of Federal Rule of Civil Procedure 12(b)(6) and the relevant case law.  Accordingly, CUA's

Motion to Dismiss must be denied.


Respectfully submitted,


_____/s/_____
Kobie Flowers (Bar No. 991403)
BROWN GOLDSTEIN & LEVY, LLP
1750 K Street, NW, Suite 200
Washington, DC 20006
Tel: (202) 742-5969
Fax: (202) 742-5948
kflowers@browngold.com

Abigail Graber (*via pro hac vice*)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel:  (410) 962-1030
Fax:  (410) 385-0869
agraber@browngold.com

Dated:  November 17, 2016          *Counsel for Plaintiff Erin Cavalier*