**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ERIN CAVALIER,

        *Plaintiff*,

    v.

CATHOLIC UNIVERSITY OF AMERICA,

        *Defendant*.

Civil Action No. 16-2009 (RDM)

---

## MEMORANDUM OPINION AND ORDER

Plaintiff Erin Cavalier alleges that she was sexually assaulted in her dorm room by a fellow freshman at Defendant Catholic University of America ("the University"). According to her complaint, she was "heavily inebriated" at the time of the assault, was "incapable of consenting," and "remembers only finding" the other student—referred to as "John Doe" for purposes of this lawsuit—"on top of her engaging in sexual intercourse." Dkt. 1 at 10–11 (Compl. ¶¶ 37, 40–41). She immediately reported the assault to the University. The University conducted an investigation but concluded that there was insufficient evidence to justify moving forward with disciplinary proceedings against Doe. Cavalier disagreed with that decision and continued to press for a disciplinary hearing. In support of her effort, she produced a toxicology report taken several hours after the alleged assault, which showed by "retrograde extrapolation" that her blood alcohol level at the time of the alleged assault was "almost three times the legal limit" for driving a motor vehicle. *Id.* at 12 (Compl. ¶ 48). Eventually, the University agreed to hold a hearing, and it instructed that Cavalier and Doe avoid any "direct" or "indirect" contact with one another. Dkt. 1-5 at 2; Dkt. 1 at 18 (Compl. ¶ 74). The outcome, however, did not change. The hearing board "found that no force was involved, that [Cavalier was] not incapable

of giving consent, and that [Doe] would not reasonably have thought that [Cavalier was] incapacitated or unable to give consent." Dkt. 1-6 at 2. The Dean of Students, in turn, rejected Cavalier's appeal. *See* Dkt. 1-9. Although the University did leave the no-contact order between Cavalier and Doe "in place indefinitely," Dkt. 1-6 at 1, Cavalier alleges that Doe repeatedly violated the order over the course of the next three years and that, despite her complaints, the University did not redress those violations or provide her with any related accommodations or assistance.

Against this backdrop, Cavalier brings this action against Catholic University under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), and D.C. tort law. She alleges that the University's investigation and disciplinary process were "wholly inadequate, untimely, and biased" and that the University failed to enforce the no-contact order or otherwise to protect her "from further harassment by her rapist." Dkt. 1 at 1–2 (Compl. ¶ 3). The University's response to the assault, she contends, violated Title IX because it was "clearly unreasonable in light of the known circumstances" and resulted in "severe, pervasive" harassment that deprived her of the "educational opportunities or benefits" the University provided to its other students. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648–50 (1999). The University also violated Title IX, according to Cavalier, by retaliating against her for reporting the assault, for pressing the University to take action, and for filing a complaint with the U.S. Department of Education's Office for Civil Rights. Finally, Cavalier brings three tort claims under D.C. law. She alleges that the University (1) negligently failed "to protect [her] from sexual harassment, including sexual assault and a hostile educational environment," Dkt. 1 at 34 (Compl. ¶ 148); (2) negligently subjected her to emotional distress by failing "to promptly, adequately, reliably, fairly, and impartially investigate and resolve [her] complaint" and by

failing to enforce the no-contact order, *id.* at 35–36 (Compl. ¶ 157–60); and (3) intentionally subjected her to emotional distress by engaging "in extreme and outrageous conduct" by failing to take prompt and meaningful action in response to the alleged assault, *id.* at 36 (Compl. ¶ 162).

The University moves to dismiss Cavalier's complaint for failure to state a claim under Title IX and D.C. tort law and as untimely under the relevant statutes of limitations. For the reasons explained below, the Court agrees that Cavalier has failed to state a claim for Title IX retaliation and for intentional infliction of emotional distress. The Court is not convinced, however, that Cavalier's Title IX deliberate indifference claim or remaining D.C. tort law claims fail as a matter of law at this early stage of the litigation. Finally, the Court rejects the University's motion to dismiss on statute of limitations grounds. The Court will, accordingly, **GRANT** in part and **DENY** in part the University's motion to dismiss.

## I. BACKGROUND

The parties agree that the Court must take the factual allegations of the complaint as true for purposes of the present motion, and they agree that the Court may also consider the multiple documents attached to the complaint. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Nichols v. Vilsack*, No. 13-01502, 2015 WL 9581799, at *1 (D.D.C. Dec. 30, 2015). They disagree, however, as to how the Court should consider the attached documents. According to the University, by attaching the investigative reports and related correspondence to the complaint, Cavalier incorporated the content of those materials into her complaint and, as a result, the Court may treat the factual assertions in those materials as true for purposes of the pending motion to dismiss. Dkt. 10 at 2 & n.1. Cavalier agrees that the Court may consider the attachments, but she contends that it should not ineluctably accept each of the assertions contained in the attachments as true. Dkt. 9 at 16.

Cavalier is correct. "When considering incorporation, it is necessary to consider 'why a plaintiff attached the documents, who authored the documents, and the reliability of the documents.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133–34 (D.C. Cir. 2015) (citation omitted). For example, by attaching a written contract to her complaint, a plaintiff might concede that the statute of frauds does not apply, but a plaintiff would not concede the truth of an allegedly libelous writing by attaching it to her complaint. *Id.* at 1133. The same principle applies here. By attaching various investigative documents and related correspondence to her complaint, Cavalier acknowledges that the investigation occurred, that the attached reports and correspondence are true and accurate copies of those prepared in the course of the investigation, and that the timeline of events is, at least in most instances, accurate. She does not concede, however, that all factual assertions contained in those materials—including, most notably, those that are in tension with her current allegations—are true. With this framework in mind, the Court will summarize Cavalier's factual allegations, as set forth in her complaint and as further explicated by the attachments.

## A.      Alleged Assault

According to Cavalier, at approximately 1:00 a.m. on December 15, 2012, she was raped by Doe, who "engaged in sexual intercourse with her [despite] knowing [that] she was intoxicated and incapable of giving consent." Dkt. 1 at 10 (Compl. ¶ 34). Both Cavalier and Doe were freshmen and had just completed their first semester at the Univerisity. Their paths crossed at a party at Flather Hall, a dormitory on the Catholic University campus, at about 11:00 p.m. on the night of December 14, 2012. *Id.* (Compl. ¶ 37). Before that night, they were only "minimally acquainted as . . . athletes;" he was on the football team, and she was on the lacrosse team. *Id.* (Compl. ¶¶ 34, 36). Before arriving at the party, Cavalier had been drinking with a friend, and, by the time Cavalier arrived at the party, she was "heavily inebriated." *Id.* (Compl.

¶ 37).  She continued to drink after arriving at the party.  *Id.* (Compl. ¶ 37).  More significantly, she alleges that her state of inebriation was evident to Doe and others and that, indeed, she "pass[ed] out at the party as a result of her excessive drinking."  *Id.* (Compl. ¶ 37).  Doe also drank at the party, but "he maintained control of his actions."  *Id.* (Compl. ¶ 38).

When the party ended, Cavalier apparently asked Doe to walk her back to her dorm at Ryan Hall, although Cavalier does not remember how she got back to her room.  *Id.* at 11 (Compl. ¶ 40).  She does remember, however, "finding Doe on top of her engaging in sexual intercourse with her."  *Id.* (Compl. ¶ 40).  Cavalier does not remember Doe leaving her room.  *Id.* (Compl. ¶ 42).  At around 1:30 a.m., a Resident Assistant saw Cavalier in the bathroom, and Cavalier "broke down and cried," telling the Resident Assistant "I think I've just been raped."  Dkt. 1-2 at 6; Dkt. 1 at 16 (Compl. ¶ 69).  At around 2:00 a.m., the Resident Assistant "called [the University] Area Coordinator Nicole Giglia and alerted her that [Cavalier] may have been sexually assaulted."  Dkt. 1 at 11 (Compl. ¶ 43).  Giglia, in turn, called Lieutenant Dicks of the University's Department of Public Safety ("DPS"), who met Giglia at the dormitory.  *Id.* (Compl. ¶ 43).  According to a report prepared by Giglia, Cavalier was crying in her room and told Giglia that she had been "raped."  Dkt. 1-11 at 2; Dkt. 1 at 11 (Compl. ¶ 43).  Cavalier also told Giglia that "the details of the night were blurry" due to her drinking.  Dkt. 1-11 at 2; Dkt. 1 at 11 (Compl. ¶ 43).  Lieutenant Dicks interviewed Cavalier, and the D.C. Metropolitan Police Department ("MPD") and the D.C. Fire and Emergency Medical Services Department were contacted.  Dkt. 1 at 11 (Compl. ¶¶ 44–45).

Officer Moore of the MPD arrived at the scene and, according to Giglia, upon hearing Cavalier's story, "rolled his eyes" and said, "I'm not touching this, I'm calling the Sex Crimes Unit."  Dkt. 1-11 at 2; Dkt. 1 at 11 (Compl. ¶ 46).  When the paramedics arrived and Giglia went

to retrieve Cavalier, however, Officer Moore followed Giglia into Cavalier's room and asked to interview her with only Lieutenant Dicks in the room. Dkt. 1-11 at 2; Dkt. 1 at 11−12 (Compl. ¶ 46). Cavalier agreed. Although outside the room, Giglia was nonetheless able to hear Officer Moore ask Cavalier if she "want[ed] to see the . . . nurse because [she] believe[d] [she was] sexually assaulted or . . . because [she thought she] could get pregnant." Dkt. 1-11 at 2; Dkt. 1 at 12 (Compl. ¶ 43). After the interview, Cavalier was transported to the hospital. The report signed by the emergency medical technicians made "findings" of "ALCOHOL USE (SUSPECTED); SEXUAL ASSAULT," and it noted that Cavalier "stated that she had been drinking alcohol in her dorm room with an acquaintance and he proceeded to rape her without a condom." Dkt. 1-8 at 2; Dkt. 1 at 12 (Compl. ¶ 47). The following morning, at around 8:30 a.m., a blood sample was taken from Cavalier. That sample showed that her blood alcohol level was 0.097 g/dL, which Cavalier alleges corresponds—by "retrograde extrapolation"—to a blood alcohol level of 0.216 g/dL at the time of the alleged assault. Dkt. 1-8 at 3; Dkt. 1 at 12 (Compl. ¶ 48). If so, that would mean that her blood alcohol level at the relevant time was "almost three times the legal limit" to drive a motor vehicle. Dkt. 1 at 12 (Compl. ¶ 48). Cavalier left the hospital later that morning and returned home to California for the Christmas break. Dkt. 1-2 at 3.

**B.      Initial Response and Investigation**

On December 17, 2012, Rachel Wainer, one of University's Assistant Deans of Students, contacted Cavalier by email to "check in and see how [she was] doing." Dkt. 1-1 at 3. Wainer invited Cavalier to "schedule some time to talk" about any "questions or concerns" that she might have. *Id.* Three days later, Cavalier responded, proposing that they talk the following day, December 21. *Id.* The University was closed for the holiday break, however, and neither Wainer nor any other University staff member responded to Cavalier's email until January 14,

2013, when Cavalier reinitiated contact to inquire as to her "options" regarding moving forward with "a judiciary process." *Id.* at 2–3. Wainer met with Cavalier that same day, *id.* at 2, and provided Cavalier "with information about the support services, policies, and disciplinary procedures available to her," Dkt. 1 at 14 (Compl. ¶ 54).

Shortly thereafter, Kim Gregory, a captain from the University's DPS, initiated a "fact-finding . . . investigation" into Cavalier's assault report. *Id.* (Compl. ¶ 55). According to the investigative report, Lieutenant Dicks initially spoke to Cavalier and Doe the morning that Cavalier reported the assault. Dkt. 1-2 at 3. Dicks's report of that conversation is, in certain respects, consistent with Cavalier's current allegations, and, in other respects, at odds with or goes beyond what Cavalier remembers. Dicks confirmed that Cavalier was drinking on the night of the alleged assault and that she did not recall how she got back to her dorm. *Id.* But, although Cavalier alleges that she has no recollection of what occurred before she found Doe on top of her, Dkt. 1 at 11 (Compl. ¶ 40), Dicks says that Cavalier told him that "she and [Doe] started hugging," that "she consented to having sex with a condom," and that she "offered [Doe] a condom." Dkt. 1-2 at 3. According to Dicks, Cavalier further stated that Doe "refused to use a condom and penetrated her[,] . . . ejaculat[ing] inside of her," which "caused her to be upset." *Id.*

Dicks also spoke to Doe the morning of the alleged assault. Doe stated that Cavalier "got drunk" and asked him to walk her home, and he agreed to do so. *Id.* According to Doe's account, once he and Cavalier were in her room, she "performed oral sex on him." *Id.* Cavalier then asked him if he had a condom, Doe said "no," and Cavalier then retrieved a condom from a desk drawer. *Id.* Doe further stated that the condom broke while they were having intercourse, and that he stopped at that point, placed the broken condom in the trash, and then left the room.

*Id.* Despite evidence that Cavalier had consumed a great deal of alcohol, Dicks reported that neither Cavalier nor Doe appeared intoxicated. *Id.* Cavalier left for the Christmas break the same day these initial interviews took place. *Id.*

The University's investigation did not resume until January 16, 2013, two days after the students returned following the Christmas break. Dkt. 1 at 14 (Compl. ¶ 56); Dkt. 1-2 at 3. On that day, Captain Gregory and a DPS investigator, Charles Callis, interviewed Cavalier, who—according to the investigative report—confirmed that she had been drinking on the night of the alleged assault; that she did not recall how she got back to her dorm room; and that she remembers that she was "on her bed, unclothed from the waist down," with Doe "on top of her." Dkt. 1-2 at 3−4. The report further noted that Cavalier did "not remember exactly what was said, but [that she did] recall [Doe] saying something about a condom." *Id.* at 4. She also "remember[ed] having oral sex with [Doe]." *Id.* After Doe left, according to the report, Cavalier said she went to the bathroom, where she was found by a fellow student, and the student contacted the Resident Assistant. *Id.*

Gregory and Callis also spoke to Doe, who repeated much of what he had previously said. *Id.* He acknowledged that Cavalier "appeared to be drunk," stated that she initiated their sexual contact, and, once again, asserted that Cavalier produced the condom, which broke while they were engaged in sexual intercourse. *Id.* Doe "said that[,] although [Cavalier] appeared to be drunk, she seemed to be in control and coherent," and "further stated that he did not use any force[] and did not initiate the sex acts." *Id.* at 5. Although Doe again asserted that he "did not ejaculate inside of [Cavalier]," he told her before leaving her room "that he would get her the Plan B pill." *Id.* at 4. Gregory also noted in her report that MPD Officer Moore "observed a

broken condom inside of the trash can" in the room "during the course of his investigation." *Id.* at 3. The condom was not preserved, however.

According to the investigative report, other witnesses reported that Cavalier "appeared to be drunk" while at Flather Hall and "was staggering when she left" the party, Dkt. 1-2 at 5, that she and a friend "seemed drunker than any of" the others present, *id*. at 7, and that she "was very drunk and [was] falling asleep" while at Flather Hall, *id*. Another witness, however, reported that, when Cavalier came to her room at some point after the alleged assault, she "didn't seem drunk," but the witness "could smell an odor of alcohol." *Id.* at 6. The Resident Assistant who found Cavalier in the bathroom told the investigators that, when she saw her, Cavalier "broke down and cried" and said, "I think I've just been raped." *Id.* Cavalier expressed "concern[]" about . . . being pregnant," and told the Resident Assistant that, while she "was having sex" with Doe, she "asked [him] to put on a condom" and that he "would not pull out and put one on because, he said, he had already ejaculated." *Id.*

The investigators also contacted Detective Yvette Maupin of the MPD Sexual Assault Unit, who interviewed Cavalier at the hospital following the alleged assault. *Id.* at 8. According to the investigative report, Maupin reported that Cavalier told her "that the sexual encounter with [Doe] was consensual up until the time he refused to use a condom." *Id*. at 8. When Maupin told Cavalier that "a condom was found on the scene of the incident," and Cavalier was asked "where did she think the condom came from," Cavalier reportedly responded: "It must have been ours." *Id.*

From the above information, the investigators concluded that Cavalier had been drinking on the night of the alleged assault; that Cavalier "acknowledge[d] that she consented to have sex with" Doe; and that "the point of contention" is that Cavalier asserts that "she did not consent to

have sex without a condom." *Id.* The investigation, moreover, "revealed that a condom was used during the sexual encounter;" that "[t]he discarded condom was observed in the trashcan in [Cavalier's] room;" and that, when questioned by the MPD, Cavalier indicated "that the condom [that was] found, must have been the one used by them." *Id.* Overall, the investigative report concluded that "it is clear that a 'rape' did not occur," that Cavalier "consented to having sex with" Doe, and that "a condom was used during the sexual encounter." *Id.* at 9. The report further states that "by [Cavalier]'s own admission[s] to DPS, MPD[,] and her friends, her consent was given based upon the use[] of a condom," and thus the "investigation [should] be closed, and a copy of the investigation forwarded to the Office of the Dean of Students for whatever action [is] deem[ed] appropriate." *Id.* The investigation was closed "without requesting or consulting Cavalier's toxicology report." Dkt. 1 at 17 (Compl. ¶ 71).

Upon receiving the investigative report, the Dean of Students, Jonathan Sawyer, met with Cavalier and then sent her a letter memorializing their conversation. As reflected in the letter, Dean Sawyer "found that DPS staff conducted a thorough and impartial investigation" and determined that, "[a]fter careful consideration of all of the information contained []in the investigative report," "evidence [did] not exist to substantiate moving forward with [a] student disciplinary action" against Doe. Dkt. 1-3 at 2. Notwithstanding this decision, Dean Sawyer did undertake to "review [Cavalier's] academic schedule and on-campus housing arrangements on a regular basis to try to limit any future contact between [Cavalier] and [Doe]." *Id.*

C.    **Disciplinary Hearing and No-Contact Order**

Shortly after Dean Sawyer determined that the investigative report did not support initiating a disciplinary action against Doe, Cavalier provided the University with a copy of the D.C. Fire Emergency Medical Services ("DCFEMS") incident report and the toxicology report from her examination at the hospital on December 15, 2012. Dkt. 1-4 at 2. The incident report

indicated that Cavalier exhibited "symptoms of anxiety," that alcohol use was "suspected," and that Cavalier alleged that she was the victim of a sexual assault. Dkt. 1-8 at 2. It further indicated that, by 3:15 a.m., Cavalier was "alert" and her speech was "normal." *Id.* The toxicology report from the blood sample taken at 8:28 a.m. that morning, however, told a different story. It showed that her blood alcohol level was 97 mg/dL (0.097 g/dL) hours after the alleged assault. *Id.* at 3. Based on "retrograde extrapolation," a means of estimating an individual's blood alcohol level at an earlier time, Cavalier alleges that the toxicology report shows that her blood alcohol level "would have been" 0.216 g/dL at the time of the alleged assault—that is, almost three times the legal limit to drive a motor vehicle. Dkt. 1 at 12 (Compl. ¶ 48).

After reviewing these additional materials, Gregory submitted an addendum to her initial report. *Id.* at 20 (Compl. ¶ 87). According to the addendum, Gregory and Callis met with Cavalier and a staff attorney from the Network for Victim Recovery of D.C. regarding the additional information. Dkt. 1-4 at 3. During this second interview, Cavalier asserted that the toxicology report demonstrated that "she was too drunk to give consent." *Id.* Gregory's report states that she "explained . . . that many of the witnesses interviewed stated that [Cavalier] appeared coherent and understood what was occurring" and that neither Cavalier "nor any of the witnesses said that she was incapacitated or unconscious during the sexual encounter." *Id.* Although it is unclear what Gregory meant by "incapacitated" and "coherent," Cavalier alleges that a number of witnesses indicated that Cavalier was "staggering," "drunker than" others, "very drunk," and "falling asleep," and she herself reported that she could not remember much of what happened over the preceding few hours. Dkt. 1 at 15−16 (Compl. ¶¶ 64−68); Dkt. 1-2 at 5−7. Cavalier also alleges that during this second interview, Gregory commented that, "despite her

high blood alcohol level, 'career alcoholics' can develop a high tolerance for alcohol," thereby "insinuat[ing] that . . . Cavalier somehow had developed a natural resistance . . . to the intoxicating effects of alcohol." Dkt. 1 at 25 (Compl. ¶ 107); Dkt. 1-10 at 3. When Cavalier's counsel took offense at the suggestion that Cavalier was a "career alcoholic," the investigators apologized. Dkt. 1-10 at 3.

After considering the additional information, Gregory's addendum to her report nonetheless concluded that "there is no evidence" showing that Cavalier's "blood alcohol level impaired her ability to give consent at the time of the incident." Dkt. 1-4 at 3. Gregory added:

> On the night of the incident, [Cavalier] had contact with several people. Each of those individuals stated that [Cavalier] appeared coherent. She was coherent during her encounter with DPS and MPD; the EMT personnel documented alcohol use, however, [they] also indicated that she appeared oriented, alert[,] and [had] normal speech. Each of these individuals from different agencies[] had contact with [Cavalier] at various times that night and none of them reported that she was incoherent, incapacitated or displayed symptoms of being under the influence of alcohol.

*Id.* Although the conclusion that Cavalier did not "display[] symptoms of being under the influence of alcohol" is difficult to square with Gregory's earlier investigative report—which reflected Doe's own acknowledgement that Cavalier was drunk—Gregory recommended that the "investigation be classified as closed by the Department of Public Safety" and that her recommendation "be forwarded to the Dean of Students['] Office for whatever action [is] deemed appropriate." *Id.*

Cavalier continued to press University administrators to schedule a disciplinary hearing to consider Doe's actions. "On August 21, 2013, over eight months after she reported [the alleged] rape, Cavalier and members of her support network met with [the University's] General Counsel Larry Morris, Dean Sawyer, and [the University's] Title IX Coordinator Lisa Wood to press for a hearing." Dkt. 1 at 17−18 (Compl. ¶ 73). At that meeting, Dean Sawyer and the

General Counsel informed Cavalier that, in light of the toxicology report, the University would hold a disciplinary proceeding. *Id.* (Compl. ¶ 73). That decision was memorialized in a letter dated August 27, 2013. Dkt. 1-5 at 2. According to the letter, the University determined "[a]fter an extensive investigation and review of the investigative reports and related evidence that . . . sufficient evidence exists to warrant resolving [the] matter through a hearing before a University Hearing Board." *Id.* The hearing, according to the letter, would "be scheduled for late September 2013." *Id.*

The August 27 letter also addressed the issue of "contact" between Cavalier and Doe. It asserted that, "[a]s outlined during your meeting with Dean Sawyer on August 21, an *order of no contact* is in place between you and [Doe]. You are to have no direct, indirect or third[-]party contact with [Doe]. This means that you may not speak to or contact him in person, by phone, via email or through friends or other third parties." *Id.* The letter further explained that "failure to comply with this directive . . . will result in further university disciplinary action up to and including suspension on an interim basis." *Id.* The letter also indicated that Doe "was advised on [August 21] that the *order of no contact* that was put in place with him during the investigative process is still active and he received a similar notice of our expectations. Should [Doe] contact you or any student attempt to discuss this matter with you, please immediately contact [the Associate Dean of Students] during normal business hours." *Id.*

The disciplinary hearing occurred on October 3, 2013. Dkt. 1 at 18 (Compl. ¶ 76). Cavalier received only forty-eight hours' notice of the hearing and, as a result, her parents (who live in California) were not able to attend. *Id.* (Compl. ¶ 76). Cavalier, moreover, was not allowed to call witnesses who were not associated with the University, including Lindsey Silverberg of the Network for Victim Recovery of D.C., even though Silverberg was with

Cavalier at the hospital and observed that she was "clearly intoxicated[,] that she slurred her words[,] and had trouble staying awake during [the] conversation." *Id.* at 21−22 (Compl. ¶¶ 89, 95). Cavalier was allowed, however, to provide a written statement from Silverberg. Dkt. 1-10 at 6.

The University Hearing Board heard testimony from eight witnesses and received testimony and documentary evidence from Cavalier, including, among other things, the toxicology report from the hospital and Silverberg's written statement. Dkt. 1-6 at 2. On October 9, 2013, Dean Sawyer wrote to Cavalier, informing her that the Board had concluded, "by [a] preponderance of the evidence, that there was insufficient evidence to support a finding" that Doe's actions had violated the University's prohibition against sexual assault. *Id.* "The Board found that no force was involved, that [Cavalier was] not incapable of giving consent, and that [Doe] would not reasonably have thought that [Cavalier was] incapacitated or unable to give consent." *Id.* Dean Sawyer did, however, inform Cavalier that "[t]he Order of No Contact between [Cavalier] and [Doe would] remain in place indefinitely." *Id.*

Cavalier promptly appealed the Board's decision, and the appeals committee recommended that Dean Sawyer deny her appeal. Dkt. 1-9 at 2. In a letter dated October 21, 2013, Dean Sawyer informed Cavalier that he concurred in that recommendation. *Id.* As he explained, under the University's Code of Student Conduct, an appeal must be based on either "a significant procedural error that changes the findings of fact" or "[n]ew evidence that significantly alters the finding of fact." *Id.* Concluding that the University Hearing Board "followed established disciplinary procedural guidelines," both the appeals committee and Dean Sawyer concluded that there was no basis for an appeal. *Id.* Dean Sawyer, however, once again

told Cavalier that "[t]he Order of No Contact between [her] and [Doe would] remain in place indefinitely." *Id.*

Cavalier remained dissatisfied with the University's decision and, in December 2013, she filed a formal complaint with the U.S. Department of Education's Office of Civil Rights. *See* Dkt. 1-10. The Office of Civil Rights ("OCR") completed its investigation and review of Cavalier's complaint on October 31, 2017, concluding that "[a]lthough the grievance procedures in place at the time the Student filed a complaint with the University were not fully compliant with Title IX requirements as written, OCR found that the University responded to the Student's complaint promptly and equitably." Dkt. 11-1 at 8. Neither party, however, suggests that OCR's findings are controlling for present purposes.

**D.      Alleged Violations of the No-Contact Order**

According to Cavalier, she pressed the University for months "to implement a no-contact order to protect her from" Doe and that, although she did not receive documentation until August 27, 2013, she received oral assurances that one was in place. Dkt. 1 at 26 (Compl. ¶ 111). She also alleges, however, that "the no-contact order did little to stop Doe's harassing behavior[] and [that the University] refused to further intervene." *Id.* (Compl. ¶ 112). "For example, on October 4, 2013, just one day after the disciplinary hearing, Doe appeared at an off-campus lacrosse house party where he knew Cavalier, a lacrosse player, would probably be present." *Id.* (Compl. ¶ 113). "Cavalier asked the homeowner to have Doe leave," Doe refused to do so, and, "[i]nstead, he began an argument, and a physical altercation ensued . . . between Doe and Cavalier's friends." *Id*. (Compl. ¶ 115). Cavalier raised this "violation" with Dean Sawyer, but the University "did nothing," and Doe continued to violate the no-contact order. *Id.* (Compl. ¶ 116).

More generally, Cavalier alleges that Doe "persistent[ly]" violated the no-contact order. *Id.* at 26−27 (Compl. ¶ 117). Although it is unclear whether Cavalier raised this incident with the University, she alleges that in January or February 2013, while the initial investigation was still underway, "Doe had his friends approach Cavalier, who was sitting alone at" the University's student union, and they called her a "slut" and a "whore." *Id.* (Compl. ¶ 117(a)). In addition, at some point between February 2013 and October 2013, "Doe appeared at another lacrosse party, knowing that Cavalier would be there," and, when Cavalier complained to a University official about this, the University took no action. *Id.* at 27 (Compl. ¶ 117(b)). Similarly, in February 2014, "Doe harassed and intimated Cavalier at an off-campus house party, telling [her] that the house was 'his territory' and she 'need[ed] to leave.'" *Id.* (Compl. ¶ 117(c)).

Overall, Cavalier alleges that Doe violated the no-contact order approximately once every two weeks during their freshman year; approximately twice a week during their sophomore year; and approximately once a month during their junior and senior years. *Id.* (Compl. ¶¶ 118−20). According to Cavalier, she informed Dean Jonathan Sawyer and Associate Dean Omar Torres "at least six times" that Doe "continually confronted her both on and off campus," yet the University "never changed its [ineffective] approach to enforcing the no-contact order," *id.* (Compl. ¶ 121), and it did "nothing to stop the traumatic confrontations between Cavalier and [Doe]," *id.* at 3 (Compl. ¶ 3(h)). Indeed, "in the face of Cavalier's objections," the University housed "Doe 200 feet from Cavalier in [the] Fall [of] 2013." *Id.* at 27 (Compl. ¶ 122).

## E.  Alleged Retaliation

Cavalier also alleges the University retaliated against her for exercising her rights under Title IX. She contends that this retaliation took a number of different forms. In large part, it

consisted of the University's refusal to remedy "the hostile educational environment occasioned by her rape." *Id.* at 29 (Compl. ¶ 128). In addition, Cavalier further alleges, the University retaliated against her "by attempting to limit her advocacy activities." *Id.* at 30 (Compl. ¶ 133). On one occasion, for example, the University "sought to limit" certain advocacy "events planned by Cavalier," and, after Cavalier joined an advocacy group—Peer Educators Empowering Respectful Students ("PEERS")—the University "uninvited PEERS from attending" an event called "Emerging Leaders Night." *Id.* (Compl. ¶¶ 132−33). Finally, she alleges that the University promoted Gregory to the position of "Deputy Title IX Coordinator just days before Cavalier's graduation, knowing the painful blow this would deal to [her]." *Id.* (Compl. ¶ 134).

## II. LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (internal citation omitted). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at

555–56 (quotation marks omitted).  The Supreme Court, moreover, has recognized that, "[i]n an appropriate case, there is no reason why courts . . . could not" resolve a Title IX hostile educational environment claim on a motion to dismiss.  *Davis*, 526 U.S. at 649.

## III.  ANALYSIS

### A.    Title IX Discrimination

Title IX mandates that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Universities that accept federal funding, like Catholic University, must comply with Title IX's requirements, and the rights guaranteed by the statute are "enforceable [by individual plaintiffs] through an implied private right of action."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979)).  "[A] damages remedy will not lie [against a university] under Title IX," however, unless the plaintiff can demonstrate that "an official who at minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [university]'s behalf ha[d] actual knowledge of the discrimination in the [university]'s programs and fail[ed] adequately to respond."  *Id.* at 290.  The university's response—or failure to respond—moreover, "must amount to deliberate indifference to discrimination."  *Id.*

In *Davis v. Monroe County Board of Education*, the Supreme Court held that, in "certain limited circumstances," a university "may be liable for damages under Title IX . . . for discrimination in the form of student-on-student harassment."  526 U.S. at 639, 643.  The governing test, however, is not easily met.  First, the plaintiff must show that the university had "actual knowledge" of the "sexual harassment" or discrimination.  *Id.* at 650.  Second, because "a recipient of federal funds may be liable in damages under Title IX only for its own

misconduct," the plaintiff must show that the university "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." *Id.* at 640, 645. Third, the sexual harassment complained of must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Finally, mere negligence is not enough; the plaintiff must demonstrate that the university was "deliberately indifferent to [the known acts of] sexual harassment." *Id.*

This is a "high standard," *id.* at 643, intended to permit "[s]chool administrators" to maintain "the flexibility they require," *id.* at 648. A court, accordingly, may find "deliberate indifference" only if the university's response, or failure to respond, "to the harassment . . . is clearly unreasonable in light of the known circumstances." *Id.* Consideration of the reasonableness of the university's response, moreover, must take into account "both . . . the level of disciplinary authority available to the school" and "the potential liability arising from certain forms of disciplinary action." *Id.* at 649. Finally, although Title IX confers a right on those enrolled at institutions receiving federal funding to have equal access to educational opportunities and benefits without regard to their sex, the statute does not confer a right on "victims of peer harassment . . . to make particular remedial demands." *Id.* at 648.

Whether a plaintiff alleging student-on-student harassment has met these requirements is "a fact[-]intensive inquiry that often must be resolved by the trier of fact." *Karasek v. Regents of the Univ. of Cal.*, No. 15-cv-3717, 2016 WL 4036104, at *11 (N.D. Cal. July 28, 2016). This does not mean, however, as the *Davis* dissent feared, that the "clearly unreasonable" standard "transforms every disciplinary decision into a jury question." 526 U.S. at 679 (Kennedy, J., dissenting). Rather, as the *Davis* majority responded, "there is no reason why courts" cannot, in

"appropriate case[s]," conclude "as a matter of law" that the university's response was "not 'clearly unreasonable.'" *Id.* at 649. That authority, moreover, extends to both motions to dismiss and motions for summary judgment. *Id.*; *see also Wells v. Hense*, 235 F. Supp. 3d 1, 8 (D.D.C. 2017) ("The Supreme Court has recognized that it may be possible to determine on a motion to dismiss that a school's response to a report of peer sexual harassment is not clearly unreasonable as a matter of law." (internal quotation marks omitted)).

Cavalier's complaint identifies a litany of University actions, and failures to act, that she alleges reflect deliberate indifference to her alleged assault. She alleges that the University took too long to reach out to her after the alleged attack, too long to interview key witnesses, too long to complete the investigation, and too long to schedule a disciplinary hearing. She alleges that the investigations preceding both the University's initial decision not to initiate a disciplinary hearing and its later decision to hold a hearing were anemic and biased in favor of Doe. She alleges that the University failed to preserve and seek out important evidence, failed to interview important witnesses, and failed to credit the witness statements it did obtain. She alleges that, when the University did hold a hearing, the playing field was tipped decidedly against her: that she was not allowed to call an important witness, that officials involved in the process had already reached firm conclusions about what had happened and were therefore biased, and that the hearing was scheduled on such short notice that her parents could not attend to provide support. Through all of this, moreover, Cavalier contends that her accusation was treated with hostility. She alleges, for example, that the DPS investigators attempted to explain away her high blood alcohol level by asserting that "'career alcoholics' can develop a high tolerance for alcohol," implying that Cavalier was a habitual drinker who "had developed a natural resistance

. . . to the intoxicating effects of alcohol." Dkt. 1 at 25 (Compl. ¶ 107). And, finally, Cavalier alleges that the University failed to maintain and to enforce a no-contact order and thus exposed her to continuing harassment throughout her time in college.

In resolving the University's motion to dismiss, the Court must "refrain from second-guessing the disciplinary decisions made by school administrators," *Davis*, 526 U.S. at 648, and must distinguish between allegations of insensitivity, negligence, or lack of zeal—which are not actionable—and allegations of "deliberate indifference" to "known acts of harassment in [the University's] programs or activities, *id.* at 633—which are. Many of Cavalier's allegations arguably fall into the former category. It is difficult to conclude, for example, that the University's initial response and investigation—although imperfect—were "clearly unreasonable." *Id.* at 649. For present purposes, however, the Court need not, and should not, separately assess each of the alleged actions or failures to act identified in Cavalier's complaint to determine whether each discrete episode might, standing alone, support a claim of deliberate indifference to student-on-student harassment. Cavalier has asserted only one claim alleging discrimination under Title IX, and the Court's task at this preliminary stage in the litigation is limited to deciding whether the complaint contains any factual allegations sufficient to support "the reasonable inference that the [University] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As explained below, the Court concludes that Cavalier has alleged "sufficient factual matter," *id.*, in at least two respects: the University's delay in convening a disciplinary hearing and its failure continuously to maintain and to enforce a no-contact order. Because these allegations are sufficient to "state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, the Court need not address the sufficiency of Cavalier's remaining allegations and will deny the University's motion to dismiss Cavalier's Title IX discrimination claim.

1.      *Delay in Scheduling a Disciplinary Hearing*

Many of Cavalier's allegations focus on the University's lack of dispatch in (1) contacting her following the alleged assault, (2) investigating the alleged assault, and (3) convening a disciplinary hearing.  In support of this set of allegations, she notes that OCR's "Dear Colleague Letter," applicable at the time of the alleged assault, advised universities that "a typical investigation takes approximately 60 calendar days following receipt of the complaint." Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't Educ., at 12 (Apr. 11, 2011) [hereinafter 2011 DCL].[1]  According to Cavalier, Catholic University's investigation of her alleged assault "took 298 days from the time [she] reported the assault on December 15, 2012, to the date of [the University's] decision not to hold Doe accountable on October 9, 2013." Dkt. 1 at 13 (Compl. ¶ 52).  She adds that Assistant Dean Wainer took about a month to contact her following the alleged assault, *id.* at 13−14 (Compl. ¶ 54); that important witnesses were not interviewed for more than two months after the incident, *id.* at 14 (Compl. ¶¶ 57−59); and that the University took four-and-a-half months after receiving her toxicology report before it decided to convene a disciplinary hearing, *id.* at 17−18 (Compl. ¶ 73); *see* Dkt. 1−4.

To the extent Cavalier contends that the Dear Colleague Letter ("DCL") sets a judicially enforceable time limit for completing an investigation of alleged sexual assault, she is incorrect. The DCL is not itself enforceable in a private action brought under Title IX, *see Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 892 (N.D. Ohio 2017); *Moore v. Regents of the Univ. of Cal.*, No. 15-cv-5779, 2016 WL 2961984, at *5 (N.D. Cal. May 23, 2016); *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 758 (E.D. Tenn. 2009), nor is a university's failure to follow the DCL sufficient, standing alone, to establish deliberate indifference to a known act of harassment, *see Kollaritsch*

---

[1]  Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

*v. Mich. State Univ. Bd. of Trs.*, No. 15-cv-1191, 2017 WL 6766312, at *8 (W.D. Mich. Nov. 2, 2017); *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 757 (W.D. Va. 2016). Even more to the point, the DCL does not purport to set a firm time limit; it merely reports that "a typical investigation takes approximately 60 calendar days" to complete, but adds that the timeliness of an investigation "will vary depending on the complexity of the investigation." 2011 DCL at 12.

That does not, however, resolve the matter. Even though the DCL is neither binding nor dispositive, it may "contribute to the [University's] notice of proscribed misconduct," *Davis*, 526 U.S. at 647, and may constitute "a factor that the court considers," *Butters*, 208 F. Supp. 3d at 757. More importantly, regardless of the DCL, Title IX provides a cause of action in cases of "deliberate indifference to the known harassment," and unjustified delays in responding to an alleged attack may, "in some instances[,] constitute deliberate indifference." *Moore*, 2016 WL 2961984, at *4−6; *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296−97 (11th Cir. 2007) (eleven-month delay in holding a disciplinary hearing could constitute deliberate indifference); *Tubbs v. Stony Brook Univ.*, No. 15-cv-0517, 2016 WL 8650463, at *7 & n.6 (S.D.N.Y. Mar. 4, 2016) (three-month delay in holding a hearing could constitute deliberate indifference). As with other aspects of a university's response to an alleged assault, the Court must, accordingly, consider whether the plaintiff has alleged facts that, if true, would plausibly support a claim that the university's delay in responding to known acts of harassment was "clearly unreasonable." *Davis*, 526 U.S. at 649. That is, are the allegations of delay sufficient to show that the university was "deliberately indifferent to known acts of . . . harassment"? *Id.* at 647.

Many of Cavalier's allegations relating to the dispatch with which the University responded to the alleged assault do not meet this demanding test. The University's initial

response to the alleged assault, for example, was undoubtedly timely. University staff responded immediately to a call from Cavalier's Resident Assistant alerting them at 2:00 a.m. on December 15 that Cavalier "may have been sexually assaulted," and the staff facilitated Cavalier's transport to a hospital just ninety minutes later. Dkt. 1-11 at 2–3. The same morning, University investigators interviewed both Cavalier and Doe. Dkt. 1-2 at 3. And, two days later, Assistant Dean Wainer reached out to Cavalier to "see how [she was] doing" and to address any "questions or concerns" she might have. Dkt. 1-1 at 3. Cavalier does not fault the timing of any of this.

Cavalier does find fault, though, in the lack of alacrity with which the University took other steps. She alleges, for example, that it took 30 days for Wainer to provide her "with information about the support services, policies, and disciplinary procedures available to her," and, more importantly, that no witness other than Cavalier and Doe was interviewed for over a month after the alleged assault occurred and that two witnesses were not interviewed until February 20, 2013, over two months after the relevant events. Dkt. 1 at 14 (Compl. ¶¶ 54−57). She also alleges that it was not until March 20, 2013—95 days after the alleged assault—that she received a letter from Dean Sawyer informing her that the "investigation was closed and that [the University] had 'determined that evidence does not exist to substantiate moving forward with student disciplinary action.'" *Id.* at 14−15 (Compl. ¶ 60).

That timeline, however, must be placed in context. Most notably, the University closed for the Christmas holiday, Dkt. 1-1 at 2, and Cavalier returned to her home in California for the break, Dkt. 1-11 at 3. Although Wainer did not promptly respond to an email that Cavalier sent on December 20, 2012, proposing that they talk the next day, she did respond within nine minutes to Cavalier's January 14, 2017 email, requesting that they meet "to discuss [Cavalier's] options." *Id.* at 2−3. Two days later, moreover, Gregory and Callis re-interviewed Cavalier and

interviewed another witness, and, over the following two weeks, they re-interviewed Doe and interviewed four other witnesses. Dkt. 1-2 at 3−6. They interviewed four additional witnesses from February 13 to 20, 2013, and spoke with the MPD detective assigned to the case on February 7, 2013. *Id.* at 7−8. Gregory and Callis completed their investigation on or about February 18, 2013, and, at that time, they recommended that the investigation be closed. *Id.* at 2, 8−9. Dean Sawyer then met with Cavalier on March 13, 2013, to discuss the investigators' recommendation, and he sent her a letter a week later memorializing that discussion and his decision to accept the recommendation. Dkt. 1-3 at 2.

Cavalier is correct that the University could have "sought statements from witnesses" by "phone or e-mail" over the break, Dkt. 9 at 24 & n.7; that, ideally, Assistant Dean Wainer would have responded to Cavalier's email over the holiday break; and that, by waiting until February to interview some of the witnesses, the investigators showed a lack of urgency. The question for the Court, however, is whether the complaint, as explicated by the attached materials, alleges facts sufficient to show that the University acted "with deliberate indifference" to the alleged assault and any ongoing consequences. *Davis*, 526 U.S. at 633. None of the allegations outlined above satisfy that standard. Overall, Cavalier alleges that it took the University about 90 days to complete its investigation and to render a decision. According to the DCL, that is 30 days longer than the typical investigation. 2011 DCL at 12. But, if one accounts for the month the University was closed for the Christmas holiday, it is on par with what the Department of Education expects to see. One can debate whether the University could have—and should have—responded to Cavalier's email and advanced the investigation during the break, but the Court cannot conclude that the University's failure to act during the break was "clearly unreasonable." *Davis*, 526 U.S. at 649.

Cavalier is on firmer ground, however, in alleging that the University waited too long to hold a disciplinary proceeding, and, although a close question, the Court concludes that she has alleged enough to survive a motion to dismiss. Overall, Cavalier alleges that the University waited almost ten months before holding a disciplinary hearing and issuing a decision on her charge that Doe sexually assaulted her. Dkt. 1 at 18 (Compl. ¶¶ 76−78). The first three-and-a-half months of this delay is unremarkable for the reasons discussed above: the University was on break for a month and then conducted an investigation and rendered a decision. The reason for the delay from early April 2012 to late August 2013, however, is far less clear. On April 4, 2013, Gregory received a copy of Cavalier's December 1, 2012 toxicology report, which Cavalier apparently gave to the Dean of Students. It was not until August 21, 2013, however— four-and-a-half months later—that the University "informed Cavalier that, in light of [the] toxicology report, [it] would reverse its decision and hold a disciplinary hearing." Dkt. 1 at 17−18 (Compl. ¶ 73). The Court need not decide whether this unexplained delay would be sufficient, standing alone, to survive a motion to dismiss, because other allegations contained in the complaint, and explicated in the attached materials, at least arguably give rise to an inference that University officials were deliberately indifferent to what the toxicology report allegedly showed—that Cavalier was extremely inebriated at the time of the alleged assault.

Between April 4, 2012 and August 21, 2013, Gregory and Callis prepared a follow-up report addressing the "additional information" that Cavalier provided the University in support of her contention that she was "too drunk to give consent" to sexual contact on the night of the alleged assault. Dkt. 1-4 at 3. According to Cavalier, that report sought to discount the significance of the toxicology report by falsely asserting that there was "no evidence" that Cavalier was "incapacit[ated]" at the time of the alleged assault. Dkt. 1 at 20−21 (Compl. ¶ 88).

Although the supplemental report never explains what Gregory and Callis meant by "incapacitated," drawing all reasonable inferences in Cavalier's favor for purposes of the motion to dismiss, *see Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017), Cavalier is correct that the report arguably leaves a misimpression of the overall evidence. Most notably, the follow-up report asserts that neither Cavalier "nor any of the witnesses said that she was incapacitated" and that none of the personnel who had contact with Cavalier on the night of the alleged assault reported that she "displayed symptoms of being under the influence of alcohol." Dkt. 1-4 at 3. And, although the report notes that Cavalier said "that she had been drinking" and that "the EMT personnel documented alcohol use," *id.* at 3, it ignores Doe's prior acknowledgement that Cavalier was "drunk," Cavalier's assertions that she had so much to drink that she could not recall much of what happened, and witness statements indicating that she was "drunk," "staggering," "very drunk," "falling asleep," and, along with a friend, "seemed drunker than any" of the others at the party, Dkt. 1-2 at 3−7. This unacknowledged evidence, along with the toxicology report, is difficult to square with the apparent thrust of the supplemental report—that Cavalier appeared coherent and did not display symptoms of being under the influence of alcohol. And that inconsistency permits the reasonable inference that Gregory and Callis sought to avoid the conclusion that alcohol played a significant role in the incident. To be sure, the University ultimately rejected their recommendation that the matter remain "closed," but it took another four months to do so, and that four-month delay remains unexplained.

Courts have taken a range of approaches to delay, often dictated by the unique factual circumstances presented. Some have held that alleged delays in completing disciplinary proceedings are sufficient to state a claim. In *Williams v. Board of Regents of the University System of Georgia*, for example, the Eleventh Circuit held that the plaintiff's allegation that the

university "waited almost eleven months to take corrective action" was sufficient to state a claim of deliberate indifference, even though "the disciplinary panel ultimately decided not to sanction the alleged assailants." 477 F.3d at 1297. Similarly, in *Tubbs v. Stony Brook University*, the district court held that a reasonable jury could conclude that it was "clearly unreasonable" for the university to have taken over three "months to complete an investigation and hold a disciplinary hearing." 2016 WL 8650463, at *7. Others have held that an alleged delay did not, standing alone, violate Title IX. In *Oden v. Northern Marianas College*, for example, the Ninth Circuit held that a nine-month delay in commencing a disciplinary hearing may have been "negligent, lazy, or careless" but did not rise to the level of "deliberate indifference." 440 F.3d 1085, 1089 (9th Cir. 2006). And still others have required that plaintiffs amend their complaints to allege further specifics about the alleged delays. *See*, *e.g.*, *Karasek*, 2015 WL 8527338, at *15.

Although a close question, the Court concludes that Cavalier has alleged enough—although just enough—to clear the motion to dismiss hurdle. A four-and-a-half month delay is substantial, and Gregory and Callis had completed their supplemental investigation by April 23, 2013—leaving an *unexplained* delay of four months. The more difficult question is whether the University's delay in convening a disciplinary hearing "effectively bar[red]," or was "deliberately indifferent" to third-party interference with, "the victim's [equal] access to an educational opportunity or benefit." *Davis*, 526 U.S. at 630; *see also Williams*, 477 F.3d at 1298. Establishing the required nexus to equal educational opportunity, moreover, poses a particular challenge here because, prior to April 2013, the University had found that there was insufficient evidence to "substantiate" Cavalier's charges, Dkt. 1-3 at 2, and, after holding a disciplinary hearing, it found that Cavalier was "not incapable of giving consent[] and that [Doe] would not reasonably have thought that [she was] incapacitated or unable to give consent," Dkt. 1-6 at 2.

For two reasons, however, accepting Cavalier's factual allegations as true, and drawing all reasonable inferences in her favor, the Court concludes that she has alleged enough to allow her case to proceed. *See Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016). First, the University's delay in agreeing to convene a disciplinary hearing is arguably intertwined with its alleged failure to provide clear notice to Doe that neither he nor anyone acting on his behalf was to have contact with Cavalier, and, as discussed below, Cavalier has plausibly alleged that this failure interfered with her educational opportunities. Second, Cavalier has plausibly alleged that she felt unsafe on the Catholic University campus and that the failure of the University to "take her rape seriously and [to] give her a hearing" interfered with "her coursework and her role on the . . . lacrosse team." Dkt. 1 at 28 (Compl. ¶¶ 123−26).

This, of course, does not mean that Cavalier will prevail on her claim or, indeed, that her claim will survive a motion for summary judgment. She will ultimately bear the burden of establishing the required nexus between the University's delay and her access to an equal education, and she will need to show that the delay was the product of the University's deliberate indifference to student-on-student harassment. For the reasons stated above, establishing the required nexus may prove particularly challenging. It is easy to imagine, moreover, a range of alternative explanations for the delay. It might be, as the OCR Report states, that Dean Sawyer never doubted the result of the original investigation and only "allow[ed] the case to be heard by a hearing panel [to] bring closure to all parties." Dkt. 11-1 at 9. It might be that Cavalier and others were unavailable during the summer break. It might be that the University was concerned that Doe might challenge the lawfulness of the decision to reopen the matter. *See id.* at 13 ("[B]y entertaining [Cavalier's] appeal and allowing the matter to continue to a hearing, the University deviated from its written procedures."); *see also Davis*, 526 U.S. at 649 (standard "is sufficiently

flexible to account . . . for the potential liability arising from certain forms of disciplinary action").  Or it might be, as Cavalier suggests, that Captain Gregory and others intentionally ignored significant evidence—that is, they were "deliberately indifferent" to the alleged assault—because they did not want to acknowledge that their original investigation was incomplete.  At this stage of the proceeding, however, the Court need not, and should not, attempt to resolve which of these, or any other, explanations is most persuasive.  To survive a motion to dismiss, a plaintiff need not demonstrate that its theory of the case is the *only* plausible one; rather the plaintiff needs merely to identify one "alternative explanation[]" that meets the plausibility standard.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alterations in original) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (complaint will survive a motion to dismiss "even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible'")).  The Court concludes that Cavalier has met this modest burden.

2.  *Failure Consistently to Maintain and to Enforce No-Contact Order*

Cavalier also plausibly alleges that the University acted with "deliberate indifference" to ongoing acts of student-on-student harassment when it failed consistently to maintain and to enforce a requirement that Doe refrain from directly or indirectly having contact with her following the alleged assault.  She alleges that "[f]or months, she pressed [the University] to implement a no-contact order to protect her from [Doe]," Dkt. 1 at 26 (Compl. ¶ 111); that she "received no documentation of such an order" until the University agreed in August 2013 to hold a disciplinary proceeding, *id.* (Compl. ¶ 111); that Doe repeatedly violated the no-contact order, *id.* at 26−27 (Compl. ¶¶ 111−22); that she "informed Dean Sawyer and Associate Dean Torres at least six times over the course of her four years at [the University] that [Doe] continually

confronted her both on and off campus," *id.* at 27 (Compl. ¶ 121); and that the University "never changed its approach to enforcing the no-contact order, despite its knowledge that its actions, if any, were ineffective," *id.* (Compl. ¶ 121). For this set of allegations to survive the University's motion to dismiss, they must plausibly establish—or permit the reasonable inference—that Cavalier was the victim of sex-based, student-on-student harassment; that the University was aware of this harassment; that its response was "clearly unreasonable;" and that the ongoing harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] Cavalier's] access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633, 648.

The first and forth prongs of the test are best considered together—that is, has Cavalier adequately alleged that Doe and others acting on his behalf interacted with her after the alleged assault in a manner was "so severe, pervasive, and objectively offensive" that interfered with her equal access to educational opportunities? The Court concludes that she has. According to Cavalier, Doe repeatedly violated the no-contact order the University told her was in place from sometime after the alleged assault until she graduated in 2016. She alleges that during her freshman year, Doe violated the "order approximately once every two weeks," that during her sophomore year, he violated the "order approximately twice a week," and that during her junior and senior years, he violated the order "approximately . . . once a month." Dkt. 1 at 27 (Compl. ¶¶ 118−20). She gives four examples: First, she alleges that shortly after the alleged assault "Doe had his friends approach" her while she "was sitting alone at" the student union, and "[t]hey called [her] a 'slut' and a 'whore.'" Dkt. 1 at 27 (Compl. ¶ 117). Second, she alleges that the day after the disciplinary hearing, "Doe appeared at an off-campus lacrosse house party where he knew Cavalier, a lacrosse player, would [likely] be." *Id.* at 26 (Compl. ¶ 113). "Cavalier asked the homeowner to have Doe leave," but Doe refused to do so and, "[i]nstead, he

began an argument, and a physical altercation ensued . . . between Doe and Cavalier's friends." *Id.* (Compl. ¶ 115). Third, she alleges that on another occasion in 2013, "Doe appeared at another lacrosse party, knowing [that] Cavalier would be there." *Id.* at 27 (Compl. ¶ 117). Fourth, she alleges that "in February 2014, Doe harassed and intimidated Cavalier at an off-campus house party, telling [her] that the house was 'his territory' and she 'need[ed] to leave.'"[2] *Id.* (Compl. ¶ 117).

Although the Court recognizes "that name-calling in school which implicates a student's sex does not in itself permit an inference of sex-based discrimination," *Doe v. East Haven Bd. of Educ.,* 200 F. App'x 46, 48 (2d Cir. 2006); *see also Davis*, 526 U.S. at 652 ("Damages are not available for simple acts of . . . name-calling . . . even where these comments target differences in gender."), "name-calling" and other altercations can rise to the level of sexual harassment "in the context of a reported rape," *East Haven Bd. of Educ.*, 200 F. App'x. at 48. Even accepting the University's finding that there was insufficient evidence to show that Doe raped Cavalier, moreover, the allegations contained in the complaint, if accepted as true, provide ample basis to conclude that Cavalier was traumatized by her interaction with Doe, that that interaction was no less defined by Cavalier's sex than the relevant events in most other Title IX harassment cases, and that frequent interactions—some of them ugly—with the person she believed raped her interfered with her education. *See Wills v. Brown Univ.*, 184 F.3d 20, 37 (1st Cir. 1999) ("[T]he continuing presence of the harasser may so alter the terms and conditions of education that the victim of harassment may be able to establish a claim for sex discrimination."); *Goodwin v.*

---

[2] In addition to these examples, Cavalier alleges that Doe "continually confronted her both on and off campus." Dkt. 1 at 27 (Compl. ¶ 121). Although the word "confront" connotes more than simply passing Cavalier on the way to class, Cavalier will need to add substance to this allegation on summary judgment.

*Pennridge Sch. Dist.*, No. 17-2431, 2018 WL 1169468, at *5 (E.D. Pa. Mar. 6, 2018) (concluding that the school "exacerbated the hostile environment when it continued to allow [the plaintiff's] harassers to be near her"); *Kollaritsch*, 2017 WL 6766312, at *6 (finding deliberate indifference in part because the university "did not put in place any accommodations to prevent [the plaintiff] from encountering her harasser" and failed to "provide any interim safety measures after [the plaintiff] reported the violations of the no-contact order"). Any doubt that the interaction was defined by Cavalier's sex, moreover, is firmly answered by her allegation that Doe's friends called her a "slut" and "whore" after the alleged assault. *See East Haven Bd. of Educ.*, 200 F. App'x at 48 (explaining that "verbal abuse" that "reflect[ed] sex-based stereotypes" such as a female student being called "[a] slut, a liar, a bitch, a whore," could "constitute[] sexual harassment" "in the context of a reported rape").

This, then, leaves the second and third prongs of the test—the University must have been aware of the alleged harassment and must have acted with deliberate indifference to those acts of discrimination. *Davis*, 526 U.S. at 633. Cavalier addresses the second prong by alleging that she reported the alleged violations of the no-contact order to "Dean Sawyer and Associate Dean Torres at least six times." Dkt. 1 at 27 (Compl. ¶ 121). And she addresses the third prong by alleging that the University ignored her objection to housing Doe 200 feet from her in the fall of 2013, *id.* (Compl. ¶ 122); failed to take any effective action in response to her repeated complaints about Doe's violation of the no-contact order, *id.* (Compl. ¶ 121); and failed to provide any written confirmation of the order until late August, eight months after the alleged assault, *id.* (Compl. ¶ 111). To be sure, a school is not required to "purg[e] [itself] of actionable peer harassment" and is not required to accept the "remedial demands" of the alleged victim.

*Davis*, 526 U.S. at 648.  It is required, however, to respond to any such known acts of harassment in a manner that is not "clearly unreasonable."  *Id.*  As a result,

> where a [university] has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior.  Where [it] has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such [university] has failed to act reasonably in light of the known circumstances.

*Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000); *see also Willis v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) (holding that "if [an institution] learns that its measures" to "end the harassment" of the plaintiff "have proved inadequate, it may be required to take further steps to avoid new liability"); *Canty v. Old Rochester Reg'l Sch. Dist.*, 66 F. Supp. 2d 114, 116–17 (D. Mass. 1999) (explaining that, after the school district learned that its "written reprimands" and its efforts to "restrict[]" a coach from contacting a student "were inadequate," the district's decision to send "a third reprimand letter was plainly inadequate and . . . may amount to deliberate indifference"); *Ha*, 2014 WL 5893292, at *2 ("If Northwestern had learned that its response was proven to be inadequate to prevent future harassment . . . , it would have been required to take further steps to avoid liability.").

The questions whether a no-contact order was necessary to protect Cavalier from known acts of sex-based harassment, and whether the University's failure to implement and enforce of the no-contact order was "clearly unreasonable" are fact bound and not appropriately resolved on a motion to dismiss.  *See S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 805 (W.D. Pa. 2016) (denying a motion to dismiss plaintiff's Title IX claim because the "ongoing harassment of [the] plaintiff" was repeatedly "reported to appropriate officials" but "continued undeterred" even "after it became clear that the [district's initial response] had proved to be ineffective"); *BPS v. Bd. of Trs. for Colo. Sch. for the Deaf & Blind*,  No. 12-cv-2664, 2015 WL 5444311, at

*15 (D. Colo. Sept. 16, 2015) (concluding that a "factual dispute exist[ed] as to whether [the] [d]efendants' actions were clearly unreasonable" when they "did not alter their known to be ineffective tactics in responding [to] sexual harassment for approximately two years").  Although the University may yet prevail at summary judgment, for present purposes the Court must accept Cavalier's allegations as true and must indulge all reasonable inferences in her favor.  *See Iqbal*, 556 U.S. at 678.  Having done so, the Court concludes that Cavalier has alleged sufficient facts to withstand a motion to dismiss, and the Court will, accordingly, deny the University's motion to dismiss Cavalier's Title IX discrimination claim.

**B.      Title IX Retaliation**

The University also moves to dismiss Cavalier's Title IX retaliation claim.  In that claim, she alleges that the University retaliated against her for reporting that she was sexually assaulted, advocating that the University "take meaningful and appropriate action" in response to that assault, and "then report[ing] [the University's] Title IX violations to" the Department of Education for failing to do so.  Dkt. 1 at 32 (Compl. ¶ 144).  She alleges that the University took at least eight "adverse actions" in retaliation for this protected activity: it (1) "[f]acilitat[ed] and contribut[ed] to the hostile educational environment" that Cavalier experienced; (2) "[m]a[de] Capt[ain] Gregory the Deputy Title IX Coordinator just days before Cavalier graduated;" (3) "[r]efus[ed] to enforce the no-contact order against Doe;" (4) "[h]ous[ed] Doe 200 feet from Cavalier;" (5) "[s]ham[ed] and degrad[ed] Cavalier [by] calling her a 'career alcoholic,' acquiescing to [MPD] Officer Moore's harassing comments implying that she only wanted to go to the hospital because she feared pregnancy, and falsely informing her that her version of events was discredited by other witnesses;" (6) "[d]elay[ed] the resolution of [her] complaint for 298 days;" (7) "[c]onduct[ed] an investigation and hearing [that was] distorted by conflicts of interest and unreasonable decision-making;" and (8) "[i]mped[ed] [her] sexual assault advocacy efforts."

*Id.* at 32–33 (Compl. ¶ 146). The University moves to dismiss this claim on the grounds that none of the alleged retaliatory actions constitute an "adverse action" for purposes of a Title IX retaliation claim; that the alleged "'retaliatory acts' . . . are the same conduct on which she bases her Title IX-deliberate indifference claim;" and that Cavalier fails to allege "a causal link between any alleged action and her report of sexual misconduct." Dkt. 8 at 18–19.

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). To state a claim for Title IX retaliation, the plaintiff must allege that the defendant is a recipient of federal funding and that the defendant retaliated against the plaintiff "*because* [s]he complain[ed] of sex discrimination." *Id.* at 174. Beyond this, neither the Supreme Court nor the D.C. Circuit has outlined the precise contours of a Title IX retaliation claim. Various decisions from this district and from other circuits, however, "have generally held" that Title VII's retaliation standard governs. *See, e.g.*, *Wells*, 235 F. Supp. 3d at 9–10 (citing *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011)). Under that standard, a plaintiff must "establish three elements: that she made a charge or opposed a practice made unlawful by Title [IX], that the [university] took a materially adverse action against her, and that the [university] took the action because of her protected conduct." *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015); *see also Wells*, 235 F. Supp. 3d at 9–10 (explaining that "[a]s in the context of Title VII, . . . a plaintiff who lacks direct evidence of retaliation must . . . show[] (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two" (internal quotation marks omitted)). Therefore, to survive a motion to dismiss,

Cavalier's "complaint must 'contain sufficient factual matter, accepted as true,' to plausibly establish those three elements." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). The University does not dispute that Cavalier engaged in protected activity. It does, however, take issue with Cavalier's efforts to allege facts sufficient to satisfy the remaining two elements of the standard.

The University devotes the bulk of its argument to the second element, arguing that none of the eight retaliatory actions identified in the complaint "constitute[] [an] 'adverse action' for purposes of a Title IX retaliation claim." Dkt. 8 at 18–20. In pressing this argument, the University takes two tacks. First, it argues that deciding not to screen a documentary, "adjusting group events such as Take Back the Night [and] Emerging Leaders Night," and "nam[ing] a new deputy Title IX Coordinator within days of . . . Cavalier's graduation" do not rise to the level of an adverse action. Dkt. 8 at 19. The Court agrees. An action is "materially adverse" if it "might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). In making that determination, moreover, "[c]ontext matters," and thus the Court must assess the "significance" of the action in light of "the particular circumstances." *Id.* at 69. Considered in that light, the Court cannot conclude that a sexual assault victim would decline to report an alleged rape, to pursue a remedy, or to file a complaint with the Department of Education out of a concern that her university might, in retaliation, "[i]mped[e]" her "sexual assault advocacy efforts" or might, "just days before [the] student graduated," make an undesirable appointment to the position of "Deputy Title IX Coordinator." Dkt. 1 at 32 (Compl. ¶ 146(b), (h)). The same is true, moreover, with respect to Cavalier's allegations that the

University retaliated against her by "acquiescing" in a "harassing comment[]" made by a police officer and by telling her that "'career alcoholics' can develop a high tolerance for alcohol." *Id.* at 25, 33 (Compl. ¶ 107, 146(e)).

The University recognizes, however, that this argument only goes so far, and it, accordingly, raises a second argument, which touches upon both the "adverse action" and "causal link" elements of the cause of action. As to these remaining acts of alleged retaliation, the University first argues that they "are not retaliatory at all; rather they are the same conduct on which she bases her Title IX-deliberate indifference claim." Dkt. 8 at 19. That argument carries some force, but it also stops short of disposing of Cavalier's retaliation claim. There is, concededly, a certain "circularity" to Cavalier's claims. *See S.K.*, 168 F. Supp. 3d at 805 ("To show materially adverse action plaintiff advances the very conduct that . . . gave rise to her complaints of discriminatory conduct. . . . [s]uch circular reasoning seeks to circumvent the Supreme Court's admonishment against focusing on the original claim of discrimination in order to assess whether an objective showing of retaliatory action has been made." (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69)). She alleges, for example, that the University's flawed investigation, delay in resolving her complaint, and "false[] [assertion] that her version of events was discredited by other witnesses" were actions taken in retaliation for her complaining about and reporting that same conduct. Dkt. 1 at 32–33 (Compl. ¶ 146(e), (f), (g)). To the extent Cavalier lumps all of her allegations together, without attempting to delineate which "adverse actions" were taken in response to her complaints about which alleged deficiencies in the University's response to the alleged assault, the Court agrees that her claims are either circular or too vague to satisfy Rule 8. *See* Fed. R. Civ. P. 8; *Ciralsky v. CIA*, 355 F.3d 661, 670 n.9 (D.C. Cir. 2009) ("[A] complaint may be struck under Rule 8 if it 'is so vague or ambiguous that a

party cannot reasonably be required to frame a responsive pleading'" (quoting *McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996))).

This is not to say that there is anything illogical, however, about a claim that an annoyed administrator, for example, declined to enforce Cavalier's no-contact order or chose to assign Doe to a dorm 200 feet away from Cavalier's because of her earlier suggestion that the administrator failed to do his or her job properly. But, if that is Cavalier's theory of the case, she needs to allege with greater specificity which adverse actions were allegedly taken in response to which protected acts and how those events correspond. In other words, she needs to allege facts that would permit the reasonable inference that the University "intentional[ly]" failed to enforce the no-contact order or intentionally assigned Doe to the dorm near Cavalier's "*because* [s]he complain[ed] of sex discrimination." *Jackson*, 544 U.S. at 173. Assuming that the Title VII retaliation standard applies in this context, that means that it is not enough to show that retaliation was a "substantial" or "motivating factor" in the University's conduct; rather, to survive a motion to dismiss, the complaint must allege sufficient facts that, if accepted as true, would plausibly establish that the University's retaliatory motive was the "but-for" cause of the University's decision to house Doe within 200 feet of Cavalier's dorm or its decision not to enforce the no-contact order. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

At the motion to dismiss stage, the hurdle of alleging a causal link is not a high one. *See Jones v. Bernanke*, 685 F. Supp. 2d 31, 40 (D.D.C. 2010) ("[A] plaintiff alleging retaliation faces a relatively low hurdle at the motion to dismiss stage."); *Winston v. Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010) (same). Temporal proximity, for example, may suffice, *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012); *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C.

Cir. 2007); *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003), as may other factual allegations that, construed in the light most favorable to the plaintiff, would "plausibly" establish this element of the claim, *Twombly*, 550 U.S. at 570; *see also Billington*, 737 F.3d at 772. It bears emphasis, moreover, that "plausibility" is a less demanding standard than "probability." *Iqbal*, 556 U.S. at 678. But, if applying "its judicial experience and common sense," the Court cannot "infer more than the mere possibility of misconduct," it must dismiss the complaint. *Id.* at 679.

Although a close question in light of the liberal pleading rules, the Court concludes that Cavalier must allege more to state a claim for retaliation, particularly given the fact that she alleges what are, in effect, retaliatory *omissions*. She alleges, for example, that the University—over her objection—housed Doe within 200 feet of her dorm room in retaliation for her protected activity, but she does not identify when the alleged protected activity occurred or when Doe's housing assignment was made, and she fails to include any allegation even suggesting that the assignment of Doe to a dormitory near Cavalier's was, in any way, outside the ordinary process for assigning students to the dormitories of their choice. [3] Indeed, she appears to allege only that the University failed to heed her request that Doe be moved from the dormitory to which he was assigned in the ordinary course. Similarly, the complaint does not include any allegation that might establish a temporal or any other nexus between Cavalier's protected activity and the University's failure to enforce the no-contact order. Cavalier may well be able to allege a

---

[3] Cavalier does assert that Doe "was housed near her residence around the time she pressed for, and finally was granted, a hearing," Dkt. 9 at 37, but the relevant questions are when the University made the decision about dormitory assignments and how those decisions were made and by whom.

retaliation claim, but, as currently framed, her complaint fails to offer any allegation that plausibly satisfies the causal link requirement.

Accordingly, the Court will dismiss Cavalier's retaliation claim, but will grant Cavalier leave to replead.

## C.     Common Law Claims

In addition to her claims under Title IX, Cavalier asserts two claims sounding in negligence and a claim for intentional infliction of emotional distress.

### 1.     *Negligence Claims*

At oral argument, counsel for Cavalier withdrew her claim of negligence *per se,* which she had alleged—along with other theories—in Count 3 of her complaint.  *See* Dkt. 1 at 35 (Compl. ¶ 155); *see also* Oral Arg. Tr. (Rough at 80) ("We are also not alleging negligence per se, we would move the Court to amend the complaint to remove that cause of action.").  With that concession, the Court perceives no material difference between Counts 3 and 4 of the complaint.  Although Count 3 is captioned "Negligence" and Count 4 is captioned "Negligent Infliction of Emotional Distress," both allege that the University caused Cavalier to suffer "severe emotional, psychological, and mental distress."  Dkt. 1 at 35, 36 (Compl.  ¶¶ 154, 160).  Both allege that "a special relationship" existed between the University and Cavalier.  *Id.* at 34, 35 (Compl. ¶¶ 149, 157).  And both allege that the University violated its duty to Cavalier by failing to conduct a timely, adequate, and fair investigation of the alleged assault; by reaching an erroneous decision in the disciplinary proceeding; and by failing to enforce the no-contact order, thus leaving Cavalier exposed to Doe's continuing harassment.  *Id.* at 34–36 (Compl. ¶¶ 153, 158–60).

The University moves to dismiss both claims on essentially the same ground—that is, the University did not have a duty cognizable under D.C. tort law to conduct an investigation, to impose any disciplinary action on Doe, or to maintain or enforce a no-contact order. Dkt. 8 at 21–28. "In the District of Columbia, as elsewhere, '[t]o establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach.'" *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006) (quoting *District of Columbia v. Beretta, U.S.A., Corp.*, 847 A.2d 1127, 1134 n.2 (D.C. 2004)). "Whether or not a duty of care exists" between two parties in a given situation is "a question of law." *Whetzel v. Jess Fisher Mgmt. Co.*, 282 F.2d 943, 946 (D.C. Cir. 1960); *see also In re Sealed Case*, 67 F.3d 965, 968 (D.C. Cir. 1995) ("The existence of the first element, a legal duty owed by the defendant to the plaintiff, is a question of law, to be determined by the court.").

Under D.C. law, the existence of a duty "is determined, in large part, by the nature of the relationship between the parties." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 794 (D.C. 2011). Moreover, in cases like this one in which the plaintiff seeks "damages for only mental pain and suffering (independent of any physical injury)," a unique "framework" applies. *Id.* at 795. The plaintiff must show that (1) "the defendant ha[d] a relationship with the plaintiff, or ha[d] undertaken an obligation to the plaintiff, of a nature that necessarily implicate[d] the plaintiff's emotional well-being;" (2) "there [was] an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff;" and (3) "negligent actions or omissions of the defendant in breach of that obligation [did], in fact, cause[] serious emotional distress to the plaintiff." *Id.* at 810–11. "Whether the defendant breached [its] obligations is to be determined by reference to the specific terms of the undertaking agreed upon by the parties or,

otherwise, by an objective standard of reasonableness applicable to the underlying relationship or undertaking." *Id.* at 811.

In its motion to dismiss, the University asserts that Cavalier has failed to allege facts sufficient to meet the first element of this test and, more generally, that Cavalier cannot identify any relevant authority establishing that "a student's relationship with a university" is the type of "'special relationship' that 'necessarily implicates' her emotional well-being." Dkt. 8 at 28. Cavalier responds that the University undertook an obligation "necessarily implicat[ing] [her] emotional well-being" when it "investigated [her] claims and when it instituted a no-contact order between her and Doe." Dkt. 9 at 42. For support, she points to, among other things, the University's Title IX policy, which states that the University "will respond to reported violations of Title IX by protecting the victim." Dkt. 1 at 13 (Compl. ¶ 51) (emphasis removed).

The University is correct that Cavalier fails to identify any D.C. case law or precedent from this Court even suggesting that the relationship between a university and its students represents the sort of "special relationship" that can give rise to a duty sufficient to support a negligence claim for emotional distress, nor could the Court locate any such authority itself. In *Hedgepeth v. Whitman Walker Clinic*, for example, the D.C. Court of Appeals listed a series of relationships that might qualify—"psychiatrist/therapist and patient," "doctor-patient," "funeral home or hospital" and the family of a decedent, and "persons who are appointed to act as guardians and counsel for those who are especially vulnerable," like "children, the elderly, and the disabled"—but nowhere mentions a university-student relationship. 22 A.3d at 813–15. And in *Sibley v. St. Albans School*, the D.C. Court of Appeals concluded that "[t]he relationship between a student and his school . . . is not enough, without more, to impose the predicate duty of care for a claim of negligent infliction of emotional distress." 134 A.3d 789, 798 (D.C. 2016).

The Court nonetheless agrees with Cavalier that, to the extent she challenges the University's failure to enforce its no-contact order, her negligence claim survives the University's motion to dismiss. To arrive at that conclusion, the Court need not—and does not—suggest that the university-student relationship, on its own, constitutes the type of "special relationship" necessary to satisfy the first element of the D.C. Court of Appeals' test in *Hedgepeth* or that the University's Title IX policy is enforceable as a matter of D.C. tort law. But, by affirmatively representing to Cavalier that a no-contact order was in place between her and Doe and that, should Cavalier report Doe's violations of that order, it would take the necessary steps to enforce it, *see* Dkt. 1-5, the University knew, or should have known, that it was "undertaking" an obligation in a "situation[] where the emotional well-being of [Cavalier] [wa]s at the core" of its responsibility. *Hedgepeth*, 22 A.3d at 814. On three separate occasions, the University allegedly assured Cavalier that a no-contact order prohibiting Doe from speaking to or contacting her was in place, *see* Dkt. 1-5 at 2; Dkt. 1-6 at 2; Dkt. 1-9 at 2, and the University impressed upon Cavalier that she should "immediately contact" a University official if Doe violated the order. Dkt. 1-5 at 2. In other words, under the "specific terms of the undertaking agreed upon by the parties," *Hedgepeth*, 22 A.3d at 811, the University undertook a responsibility to protect Cavalier from future harassment by Doe, and it allegedly failed to do so despite repeated complaints that Cavalier registered with the responsible administrators. Given the context in which the no-contact order was imposed, it is not difficult to infer that the University's failure to follow through with its undertaking would cause Cavalier "serious emotional distress." Dkt. 1 at 35–36 (Compl. ¶¶ 157, 160).

At this stage, the "only question before [the Court] is whether [Cavalier has] alleged facts that, taken as true, render h[er] claim . . . plausible." *Harris v. D.C. Water & Sewer Auth.*, 791

F.3d 65, 70 (D.C. Cir. 2015); *see also Iqbal*, 556 U.S. at 679 ("[A] complaint that states a plausible claim for relief survives a motion to dismiss.").  Because the Court concludes that Cavalier has done so, the Court will deny the University's motion to dismiss her negligence and negligent infliction of emotional distress claims.

        2.    *Intentional Infliction of Emotional Distress*

Cavalier also asserts a claim for intentional infliction of emotional distress ("IIED"), alleging that the University "engaged in extreme and outrageous conduct" by, for example, "[r]efusing to properly investigate [her] rape" and "[r]efusing to meaningfully and appropriately discipline Doe."  *See* Dkt. 1 at 36–37 (Compl. ¶¶ 161–63).  To make out a claim for IIED under D.C. law, Cavalier must allege "(1) extreme and outrageous conduct on the part of [the University] which (2) either intentionally or recklessly (3) cause[d] [her] severe emotional distress."  *Halcomb v. Woods*, 610 F. Supp. 2d 77, 80 (D.D.C. 2009) (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)).  "Liability will not be imposed for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'"  *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (quoting *Waldon v. Covington*, 415 A.2d 1070, 1078 (D.C. 1980)).  Rather, Cavalier must allege facts sufficient to show that the University committed acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (internal quotation marks omitted).  "This is a 'very demanding standard' [that] is 'only infrequently met.'"  *Holloway v. Howard Univ.*, 206 F. Supp. 3d 446, 453 (D.D.C. 2016) (quoting *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997)).

The Court agrees with the University that Cavalier's complaint fails to allege that the University engaged in the type of "extreme or outrageous conduct sufficient to support a plausible claim of IIED." Dkt. 8 at 29. Cavalier alleges, for example, that the University acted outrageously by "allow[ing] her to be interrogated by a police officer" on December 15, 2012, Dkt. 9 at 44, but permitting a police officer to speak with the victim of a reported rape in the immediate aftermath of the assault can hardly be said to prompt "an average member of the community" to "exclaim, 'Outrageous!'" *Homan*, 711 A.2d at 818. Similarly, she has failed to demonstrate that the University's investigation, hearing process, or ultimate decision not to discipline Doe were "atrocious" or "utterly intolerable." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 n.10 (D.C. 1994). To be sure, the University might well have performed a faster or more complete investigation into Cavalier's report, but its efforts did not fall outside "all possible bounds of decency." *Id.*

Although the Court has concluded that Cavalier has alleged facts sufficient—and just sufficient—to state a claim of "deliberate indifference" to sex-based harassment, there is a "big difference" between conduct that is "'clearly unreasonable' for purposes of Title IX" and "conduct that is utterly intolerable in a civilized society."[4] *See Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1114 (D. Minn. 2017); *see also, e.g.*, *Harris v. District of Columbia*, 696 F. Supp. 2d 123 (D.D.C. 2010) (concluding that the arrest of an employee at a daycare facility by

---

[4] Cavalier's only citation to an IIED claim in a campus sexual assault case surviving a motion to dismiss comes from *Miles v. Washington*, No. CIV-08-166, 2009 WL 259722 (E.D. Okla. Feb. 2, 2009). In that case, however, the defendants "discourag[ed] [the] [p]laintiff from reporting the rape;" "fail[ed] to protect her after she reported it;" actively "expressed their disgust and displeasure" with the plaintiff's decision to seek a protective order; and "fail[ed] to punish other students" who threatened to "beat her down," sent text messages saying they "want[ed] to kill" her, and tried to "break . . . down" plaintiff's door" while "screaming threats" at the her. *Id.* at *1, 5. The facts Cavalier has alleged here do not rise to the same level of "extreme and outrageous conduct" as the facts presented in *Miles*.

twelve officers with guns drawn and in front of children coupled with a sergeant's falsified affidavit did not constitute outrageous conduct); *Larijani*, 791 A.2d 41 (D.C. 2002) (concluding that a university's inaction in response to an employee intentionally causing a co-worker severe physical and mental injuries did not constitute outrageous conduct). The one alleged action that might conceivably support a finding of "extreme and outrageous conduct" is that the University intentionally housed Doe in a dorm near Cavalier's in order to punish her for engaging in activity protected by Title IX. As explained above, however, if that is what Cavalier intends to allege, she has not alleged any facts that "nudge[]" that claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. She alleges no facts that, even if accepted as true, would plausibly support the contention that Doe was assigned to a dorm near Cavalier's in order to cause Cavalier distress. Rather, at most, the complaint alleges that the University ignored Cavalier's requests that it depart from its usual process for assigning dorm rooms in order to keep Doe away from her. Even if unwise and insensitive, such a decision would fall far short of meeting the "very demanding standard" necessary to state an IIED claim.

The Court will, accordingly, grant the University's motion to dismiss Cavalier's IIED claim.

## D.     Statute of Limitations

Finally, the University argues that Cavalier's claims are time-barred. The parties agree that both Cavalier's Title IX and remaining tort claim are subject to a three-year statute of limitations. *See* D.C. Code § 12–301(8); *see also Mwabira-Simera v. Howard Univ.*, 692 F. Supp. 2d 65, 71 (D.D.C. 2010); *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 238 (D.D.C. 2007). According to the University, Cavalier's claims are untimely because she reported the alleged assault on December 15, 2012, and she maintains that the "University was deliberately

indifferent 'from day one,'" but she did not bring suit until October 7, 2016—that is, more than three years after December 15, 2012. Dkt. 8 at 30 (quoting Dkt. 1 at 2 (Compl. ¶ 3(a)). At least for purposes of the University's motion to dismiss, which requires that the Court accept Cavalier's allegations as true and that it draw all reasonable inferences in her favor, the Court is unpersuaded. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("[C]ourts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.").

If Cavalier sought to recover for a series of discrete acts occurring on or before October 7, 2013, the University's statute of limitations defense would have substantial force. But that is not what she claims. Rather, fairly construed, the complaint alleges that the University engaged in an ongoing violation of Title IX and an ongoing pattern of negligence from on or before the date of the alleged assault until Cavalier graduated in 2016. That is how Cavalier reads her complaint, and, in response to the University's statute of limitations defense, she contends that both her Title IX and negligence claims are timely under "the continuing violation doctrine." Dkt. 9 at 46–52. The applicability of that doctrine turns on the relevant facts and, in the case of an alleged statutory violation, "the text of the pertinent law." *Earle v. District of Columbia*, 707 F.3d 299, 307 (D.C. Cir. 2012). The Court will, accordingly, first consider Cavalier's argument as it applies to Title IX and will then turn to her remaining common law claim.

Although the D.C. Circuit has "occasionally recognized [an] application of the continuing violation doctrine" to statutes that "impose[] a continuing obligation to act or refrain from acting," *id.* (citing *AKM LLC v. Sec'y of Labor*, 675 F.3d 752, 763 (D.C. Cir. 2012) (Garland, J., concurring)), neither the Supreme Court nor the D.C. Circuit has yet to address whether the doctrine applies to Title IX claims alleging deliberate indifference to sexual harassment. Both of

those courts, however, have applied the continuing violation doctrine to claims alleging a hostile work environment in violation of Title VII. Most notably, in *National Railroad Passenger Corp. v. Morgan*, the Supreme Court held that "[h]ostile environment claims are different in kind from discrete acts" and that, by "[t]heir very nature," such claims "involve[] repeated conduct." 536 U.S. 101, 115 (2002). As a result, an "unlawful employment practice . . . cannot be said to occur on any particular day," but, rather, "occurs over a series of days or perhaps years." *Id.* (internal quotation marks omitted). Moreover, "[i]n determining whether an actionable hostile work environment claim exists," a court must "look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 116 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Because "the incidents constituting a hostile work environment are part of one unlawful employment practice," the Court concluded, "the employer may be liable for all acts that are part of this single claim," as long as the employee initiates proceedings within the specified time following at least one act in the series. *Id.* at 118–19; *see also Baird*, 662 F.3d at 1251–53; *Singletary*, 351 F.3d at 526–29.

As courts outside this circuit have recognized, the same reasoning extends to Title IX claims alleging an ongoing pattern of harassment. *See Pepelino*, 633 F.3d at 89–91; *Kunzi v. Ariz. Bd. of Regents*, No. CV-12-2327, 2013 WL 6178210, at *3–4 (D. Ariz. Nov. 25, 2013); *cf. Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136–37 (9th Cir. 2006) (applying the "continuing violation" framework but concluding that no acts contributing to the hostile educational environment took place within the limitations period). The Court agrees that the "continuing violation" doctrine applies in this case. Here, as in *Morgan*, the plaintiff alleges that

she was subjected to "repeated conduct" that "occur[red] over a series of . . . years." *Morgan*, 536 U.S. at 115. And, as in *Morgan*, "in determining whether an actionable hostile [educational] environment claim exists," the Court must consider "all the circumstances," including the "frequency of the" alleged harassment, "its severity," and whether it interfered with Cavalier's right to obtain equal educational opportunities. *Morgan*, 536 U.S. at 116 (internal quotation marks omitted). Because the alleged series of actions, and inactions, "exhibit the relationship necessary to be considered 'part of the same actionable hostile environment claim,'" *Baird*, 662 F.3d at 1251–52, Cavalier has alleged enough to survive a motion to dismiss her Title IX claim as untimely.

This, then, leaves Cavalier's remaining negligence claim. Under D.C. law, "a 'continuing tort' can be established for statute of limitations purposes by showing '(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act [occurring] within the limitation period.'" *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 547–48 (D.C. 2002) (citation omitted). Like the rule announced in *Morgan*, this rule turns, at least in part, on the theory that a "continuing tort has a cumulative effect, such that the injury might not have come about but for the entire course of conduct." *Id.* at 548 (emphasis omitted). And, combining the elements of with the "discovery rule," the D.C. continuing tort doctrine also recognized that "[i]t makes sense to say that the running of the statute of limitations period is tolled until the continuation of the wrongful conduct renders the existence of the cause of action sufficiently manifest to permit the victim to seek recovery." *Id.*

Applied here, this rule might limit Cavalier's ability to pursue her negligence claim to the extent it seeks to recover for discrete acts that occurred before October 7, 2013. Much of her

claim, however, extends well beyond that date, and at least some of her allegations posit a "continuous and repetitious wrong." *Id.* She alleges, most notably, that the University was negligent for failing to enforce the no-contact order over a period of three-and-a-half years, extending all the way to her graduation on May 14, 2016. Dkt. 9 at 52. Accordingly, as with her Title IX claim, Cavalier has alleged enough to overcome the University's motion to dismiss her negligence claim as untimely.

## CONCLUSION

For the reasons explained above, the University's motion to dismiss, Dkt. 8, is hereby **GRANTED** in part and **DENIED** in part. Counts 2 and 5 are hereby **DISMISSED** without prejudice. The parties are **ORDERED** to appear for a status conference on April 25, 2018, at 10:15 a.m., in Courtroom 21.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 27, 2018