UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERIN CAVALIER,

        *Plaintiff,*

    v.

THE CATHOLIC UNIVERSITY OF
AMERICA,

        *Defendant.*

Civil Action No. 16-2009 (RDM)

## MEMORANDUM OPINION AND ORDER

In the August of 2012, Erin Cavalier began her freshman year of college at The Catholic University of America (the "University"). Dkt. 1 at 4 (Compl. ¶ 8). Less than four months later, she was allegedly raped in her dormitory room. *Id.* at 1 (Compl. ¶ 2). Cavalier immediately notified the University. This case is about its response.

The parties cast that response in starkly different terms. Cavalier contends that it was wholly lacking: the University "failed to interview key witnesses and collect key evidence," "failed to train the key decision-makers," failed to conduct a legitimate hearing, and "failed to protect" her from her alleged rapist. Dkt. 72 at 9. It was a "campaign of indifference," *id.*, a process so "consistently re-victimiz[ing]" that it was "almost as bad as being raped" again. Dkt. 65-1 at 32 (Pl.'s Resp. SUMF ¶ 211). The University sees things in a different light. It contends that its investigation was thorough and thoughtful; its hearing timely and fair; and its decisionmakers trained and informed. Dkt. 61 at 5–6. In the University's view, it did "more, not less, than required." Dkt. 73 at 5.

The parties' dueling accounts are now before this Court on the University's motion for summary judgment on Cavalier's two remaining claims: the first, for unlawful discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), and the second, for negligent infliction of emotional distress under D.C. tort law. Dkt. 61 at 34–35, 52. As explained below, the Court concludes that a reasonable jury could find that the University acted in a clearly unreasonable manner in one respect: when investigating Cavalier's complaint, it failed adequately to consider her incapacitation and, consequently, erroneously delayed setting a hearing to address her complaint until August 2013. Under the governing Supreme Court test, however, it is not enough that the University did something wrong; its actions must have themselves subjected Cavalier to discrimination, and the parties have yet to address whether the University's delay in setting a hearing caused her to suffer the type of discrimination prohibited by Title IX. The Court, accordingly, concludes that the University's motion for summary judgment on Cavalier's Title IX claim is unavailing, but leaves open the possibility that the University may yet prevail on one or more of the defenses it has asserted.[1] Finally, the Court concludes that the University is entitled to summary judgment on Plaintiff's claim for negligent infliction of emotional distress.

The Court will, accordingly **GRANT** in part and **DENY** in part the University's motion for summary judgment, Dkt. 61.

---

[1] Among other issues raised by this framing of Cavalier's remaining claim, the statute of limitations defense that the University previously raised—and that the Court previously rejected on a continuing violation theory—arguably reemerges.

# I. BACKGROUND

"On a motion for summary judgment, [the Court] view[s] the facts in the light most favorable to the nonmoving party." *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1000 (D.C. Cir. 2009). Viewed through that lens, the relevant facts are as follows:

## A.    The Alleged Rape and the Initial Response

Late in the evening on December 14, 2012, Erin Cavalier and John Doe, then both first-semester freshmen at The Catholic University of America, met at a party in Flather Hall, a dormitory on the University campus. Dkt. 1 at 10 (Compl. ¶ 37). Earlier in the evening, each had been drinking heavily: Cavalier had consumed "two or three cups of wine[,] two or three shots of tequila, [and] . . . a mixed drink of Sprite and vodka with about three shots of vodka in it," Dkt. 78 at 23 (Cavalier); Doe had consumed "three-quarters of a handle of Captain Morgan and . . . about four or five" beers, *id.* at 26 (Doe). As the party dissipated, Cavalier asked Doe to walk her home. Dkt. 72-2 at 3; Dkt. 61 at 11; Dkt. 1 at 11 (Compl. ¶ 40). Doe obliged, Dkt. 72-2 at 3, and upon returning to Cavalier's dormitory room, Doe and Cavalier engaged in sexual intercourse. Dkt. 61 at 6; Dkt. 45-3 at 3 (Def.'s SUMF ¶ 11). Doe then left. Dkt. 45-3 at 3 (Def.'s SUMF ¶ 11).

A short time later, another student found Cavalier partially unclothed on the floor of the dormitory bathroom. Dkt. 65-1 at 2–3 (Pl.'s Resp. SUMF ¶ 3); *see also* Dkt. 64-5 at 5. Cavalier asked the other student to get the Resident Assistant ("RA"). Dkt. 65-1 at 2–3 (Pl.'s Resp. SUMF ¶ 3); *see also* Dkt. 64-5 at 5. The RA arrived and accompanied Cavalier to her room, where she cried and told a friend over the phone that she thought "she 'may have been raped.'" Dkt. 65-1 at 2–3 (Pl.'s Resp. SUMF ¶ 3); *see also* Dkt. 64-6 at 2. The RA then reported Cavalier's allegations to the University's Area Coordinator, Nicole Giglia. Dkt. 65-1 at 2–3 (Pl.'s Resp. SUMF ¶ 3); *see also* Dkt. 64-6 at 2.

That same morning, shortly after 2:00 a.m., Giglia and Lieutenant Marvin Dicks of the University's Department of Public Safety ("DPS") arrived at Cavalier's dormitory in response to her reported assault. Dkt. 45-3 at 1–2 (Def.'s SUMF ¶¶ 1, 4); Dkt. 65-1 at 2–3 (Pl.'s Resp. SUMF ¶¶ 1, 4); *see also* Dkt. 45-5 at 2. Lieutenant Dicks took Cavalier's statement and Giglia told Cavalier that she would be able to see a Sexual Assault Nurse Examiner ("SANE nurse") at Washington Hospital Center. Dkt. 45-3 at 2 (Def.'s SUMF ¶ 4); Dkt. 65-1 at 3 (Pl.'s Resp. SUMF ¶ 4); *see also* Dkt. 45-5 at 4; Dkt. 45-6 at 2. Before the Emergency Medical Services ("EMS") unit arrived to transport Cavalier to the hospital, Officer A.D. Moore of the Metropolitan Police Department ("MPD") arrived at the dormitory. Dkt. 45-6 at 2. Lieutenant Dicks "briefed [Moore] on the situation," after which, according to Giglia, Moore "rolled his eyes and said, 'I'm not touching this, I'm calling the Sex Crime Unit.'" *Id.* Before paramedics were able to transport Cavalier to the hospital for evaluation, Officer Moore questioned Cavalier in her dormitory room, with Lieutenant Dicks present. *Id.* Giglia overheard Moore asking Cavalier "do you want to see the SANE nurse because you believe you were sexually assaulted or do you just want to go because you think you could get pregnant." *Id.*

According to the report that Lieutenant Dicks later prepared, Cavalier told him that she had been drinking alcohol on campus earlier that night and eventually returned to her dormitory with John Doe. Dkt. 45-5 at 4. Cavalier further indicated that she did "not remember how she got [back to her dormitory]," "was unsure of whether [John Doe] was signed in [to her dormitory] as a guest," and did not "remember the time this incident occurred." *Id.* Cavalier also told Lieutenant Dicks that after she and Doe arrived at her dorm room, they "started hugging," at which point she "consented [to] having sex only with a condom" and "offered" Doe one. *Id.* According to the report, Cavalier told Lieutenant Dicks that Doe "refused to use a

condom," "penetrated her vagina with his penis," and "informed her that he had ejaculated inside of her." *Id.* This "caused [Cavalier] to be upset," and she "kicked [Doe] out of her room." *Id.* Cavalier has since testified that she does not remember what she told Lieutenant Dicks in her statement that night. Dkt. 65-1 at 3–4 (Pl.'s Resp. SUMF ¶ 6); *see also* Dkt. 66-1 at 13 (Cavalier Dep. 38:4–20). In an email to himself memorializing the events of that morning, Lieutenant Dicks indicated that, even though Cavalier admitted to drinking that night and Doe conceded that she was "drunk," "[n]either [Cavalier] nor Doe appeared to be intoxicated while being interviewed by DPS." Dkt. 45-8 at 2.

Around 3:30 a.m. that same morning, Cavalier was transported to the hospital to be evaluated for a potential sexual assault. Dkt. 45-3 at 2 (Def.'s SUMF ¶ 8); *see also* Dkt. 66-8 at 2. The EMS report from her transport indicated that "alcohol use" was "suspected" but also suggested that Cavalier was "oriented," "alert," "obey[ed] commands," had a "strong" grip, and had "normal" speech. Dkt. 66-8 at 2 (capitalization altered). Upon arrival at the hospital and prior to receiving medical treatment, Cavalier was interviewed by MPD Sexual Assault Unit Detective Yvette Maupin. Dkt. 45-3 at 3 (Def.'s SUMF ¶ 13); *see also* Dkt. 45-10 at 4–7. A report prepared by Detective Maupin later that day indicates that Cavalier told Maupin that she had drunk "tequila, wine, vodka/sprite and beer" just before eleven p.m. that night. Dkt. 45-10 at 6. The report further indicates that although Cavalier she did not remember signing Doe into her building, the security officer who tended the front desk of Cavalier's dormitory recalled Cavalier both using her key to enter the building and signing Doe into the logbook. *Id.* at 7. The security officer, according to the report, stated that Cavalier "did not smell or act as if she was intoxicated and walked down the stairs by herself." *Id.*

Maupin's report further asserts that Cavalier could not recall whether she gave Doe a condom, *id.* at 6, and that Cavalier "told the RA she was raped because she felt [the sexual act] was consensual with a condom," but that a condom was not used. *Id.* The report then notes that "Officer Moore [had] stated [to Detective Maupin] that . . . a used condom [had been found] in [Cavalier's] trashcan." *Id.* Maupin asked Cavalier if "there [would] be a condom in her trashcan from her last sexual encounter a month ago," and Cavalier responded, in apparent reference to her and Doe, that "I guess [the condom found in her trashcan] would be ours." *Id.*

At around 4:30 a.m. that same morning, December 15, 2020, Lindsey Silverberg, a victim advocate with the Network for Victim Recovery of D.C, arrived at the hospital to assist Cavalier. Dkt. 66-7 at 2. In a letter dated October 1, 2013, nearly ten months later, Silverberg reported that, upon introducing herself to Cavalier at the hospital, she "noticed that [Cavalier] was intoxicated, slurring her words, and falling asleep during [the] conversation." *Id.* A toxicology report from the hospital taken four hours later, at 8:28 a.m., measured Cavalier's then-current blood alcohol level at .097—nearly twenty-five percent over the legal limit to drive—even though Cavalier had not consumed alcohol in roughly seven hours. Dkt. 66-8 at 3.

Lieutenant Dicks and Detective Maupin also spoke with Doe. Dkt. 45-5 at 5; Dkt. 45-10 at 6–7. According to Lieutenant Dicks's report, Doe told him that Cavalier "got drunk[,] knocked on his door . . . [and] ask[ed] him to walk her home." Dkt. 45-5 at 5. Once back at Cavalier's dormitory room, Doe asserts that Cavalier "performed oral sex on him." *Id.* Lieutenant Dicks's report further indicates that Doe "acknowledged that [Cavalier] asked if he had a condom with him" and that Doe replied that he did not. *Id.* According to Doe, Cavalier then "reached into her desk drawer and retrieved a condom." *Id.* Doe stated to Lieutenant Dicks that "he had sex [with Cavalier] using the condom" and that, "when it broke," "[h]e told her that

6

the condom broke and that he would get her a . . . morning after pill in the morning." *Id.* The

report indicates that Doe disposed of the condom in the trashcan in Cavalier's dorm room and

recounts that a condom was found by an MPD officer in Cavalier's dorm room's trashcan. *Id.* at

5. "The condom was not preserved, however." Dkt. 13 at 9.

Detective Maupin's interview with Doe was much the same.  According to Detective

Maupin, after introducing herself to Doe, he "went straight into stating:"

> I want to clear my name[.]  [S]he asked me to walk her to her dorm.  She signed
> me in.  When we got into the dorm she kissed me and I kissed her back.  She
> gave me oral sex and from there she asked me if I had a condom and I didn't[.]
> [S]he went to her drawer and gave it to me. · We had sex on her roommate's
> bed[,] the condom busted and I stopped immediately.  I panicked and told her
> what had just happened[:] the condom broke.  I didn't have a chance to finish
> because the condom broke.  We talked about me going to get her the morning
> after pill in the morning.  I left the room and told my friend Ronnie I messed up,
> [that] the condom broke[,] and that I needed to go get the morning after pill to
> be safe.

Dkt. 45-10 at 6–7.  Detective Maupin asked Doe "where the condom [was] now," to which Doe

responded, "When it broke[,] I put it in the [trashcan] in [Cavalier's] room." *Id.* at 7.

Later that same day, December 15, 2012, Cavalier left campus and flew home to

California for winter break.  Dkt. 45-3 at 4 (Def.'s SUMF ¶ 19); Dkt. 65-1 at 7 (Pl.'s Resp.

SUMF ¶ 19).  The following Monday, December 17, 2012, Cavalier received an email from

Rachel Wainer, an Assistant Dean at the University, "whose responsibilities included offering

support to students who had complained of sexual assault." Dkt. 45-3 at 4 (Def.'s SUMF ¶ 20);

Dkt. 65-1 at 7 (Pl.'s Resp. SUMF ¶ 20).  Wainer explained that she "wanted to check in and see

how [Cavalier was] doing" and stated that she "underst[oo]d that [Cavalier might] have

questions or concerns, and [that she] would be more than happy to connect with [Cavalier]."

Dkt. 45-3 at 5 (Def.'s SUMF ¶ 21); Dkt. 65-1 at 7 (Pl.'s Resp. SUMF ¶ 21); *see also* Dkt. 45-12

at 4.  Three days later, on December 20, 2012, Cavalier responded, indicating that she was

available to speak by phone the following day.  Dkt. 45-12 at 4.  For the remainder of the winter

break, Cavalier did not receive a response to this email.  Dkt. 65-1 at 22 (Pl.'s Resp. SUMF

¶ 22).

**B.      The University's Continued Investigation**

On January 14, 2013, Cavalier returned to campus after the winter break.  Dkt. 45-3 at 5

(Def.'s SUMF ¶ 25); Dkt. 65-1 at 7 (Pl.'s Resp. SUMF ¶ 25).  That day, she emailed Wainer,

explaining that she found the University's "policy regarding sexual harassment . . . to be very

wordy and confusing."  Dkt. 45-12 at 3–4.  Cavalier then asked to meet with Wainer in person

that day or the next to discuss her options.  *Id.*  Nine minutes later, Wainer responded and

explained that she was free the remainder of the day.  *Id.* at 3.  The two met that afternoon at

4:00 p.m.  *Id.* at 2–3; Dkt. 45-15 at 2.  At 5:21 p.m. that same day, Wainer emailed Sawyer to

explain what had occurred at her meeting with Cavalier.  Dkt. 45-15 at 2.  The email states that

Wainer discussed with Cavalier the University's investigatory process, its policy of

confidentiality and privacy, and "what action could be taken to address retaliation . . . [including

an] order of no contact [and] counseling services."  *Id.*  After informing Cavalier of her options,

Wainer asked Cavalier "if she felt any of this was necessary at th[at] point."  *Id.*  According to

Wainer, Cavalier responded that "she had a therapist at home, had not been in touch with [Doe]

or his friends, and had followed-up with the [a]dvocate [Silverberg] who met her at the SANE

program following the incident."  *Id.*  Cavalier later testified that Wainer's email to Sawyer

accurately recollected their conversation.  Dkt. 45-7 at 34 (Cavalier Dep. 62:1–15).

The following day, January 15, 2013, Wainer emailed Cavalier to provide additional

information regarding the University's policies and practices.  Dkt. 45-12 at 2–3.  Wainer further

explained that she was Cavalier's "point of contact if [she] would like an [o]rder of [n]o

[c]ontact, information about on-campus or community counseling resources, [or] another review

of the campus conduct process." *Id.* Wainer emailed Cavalier again on January 17, 2013 and on January 27, 2013. *Id.* at 2. Cavalier testified that she does not recall whether she ever responded, and there is no evidence in the record that she did. Dkt. 65-1 at 8–9 (Pl.'s Resp. SUMF ¶ 31); *see also* Dkt. 45-7 at 35–36 (Cavalier Dep. 69:3–70:6).

On January 15, 2013, "Captain Kim Gregory of DPS contacted Cavalier to schedule a meeting to discuss what had taken place between her and Doe." Dkt. 45-3 at 7 (Def.'s SUMF ¶ 34) (citing Dkt. 45-17 at 2); Dkt. 65-1 at 9 (Pl.'s Resp. SUMF ¶ 34). Between January 16, 2013 and February 14, 2013, Captain Gregory and Investigator Charles Callis, also of the DPS, interviewed Cavalier, John Doe, and at least nine other witnesses. Dkt. 45-3 at 8 (Def.'s SUMF ¶ 40); Dkt. 65-1 at 10 (Pl.'s Resp. SUMF ¶ 40). Meanwhile, on February 5, 2013, Bradley Troy, Associate Director of Residence Life at the University, met with Doe to discuss the alleged rape. Dkt. 45-3 at 6–7 (Def.'s SUMF ¶ 33). In an email from the same date summarizing that conversation, Troy wrote that Doe "said that he hasn't spoken to the woman involved since the night of the incident and does not intend to." Dkt. 45-16 at 2–3. Troy told Doe that he thought "this plan seemed reasonable" and warned Doe "that he should not engage in any negative behaviors/communications with [Cavalier]." *Id.*

Gregory and Callis issued a report of their investigation on February 18, 2013. Dkt. 64-4. The report states that Cavalier told Gregory and Callis during her interview on January 16, 2013 that she drank alcohol with friends at various locations over the course of the evening prior to the alleged rape. *Id.* at 3–4. With respect to Doe, the report states that Cavalier:

> does not remember how she got back to [her dormitory]; nor does she remember signing John in [to her dormitory]. She said she remembers being on her bed, unclothed from the waist down and [Doe] was on top of her. She does not remember exactly what was said, but does recall him saying something about a condom. [Cavalier] said that a condom was found inside of the [trashcan] in her room; that condom was not there prior to [Doe] being there. [Cavalier] further

9

> stated that she does not remember kicking [Doe] out of her room. . . . [Cavalier] said that she does remember having oral sex with him, but not sure when it happened.

*Id.* at 4.

After recounting the interviews of other witnesses, including Doe, Gregory and Callis's

Report summarizes its findings as follows:

> On the night of December 14th 2012, Erin Cavalier had been drinking with [her friend] prior to attending the party at Flather Hall, and continued drinking at the party. While at the party, [Cavalier] met [Doe] and the two of them walked back to [Cavalier's dormitory]. [Cavalier] signed [Doe] into her residence hall, and once inside of her room, the two of them engaged in a sexual intercourse. [Cavalier] acknowledges that she consented to have sex with [Doe] however; the point of contention with [Cavalier] involves that she did not consent to have sex without a condom.

> This investigation revealed that a condom was used during the sexual encounter between [Cavalier] and [Doe.] According to [Doe,] [Cavalier] asked if he had a condom; he said "no[,"] she then retrieve[d] a condom from her desk and gave it to him. The discarded condom was observed in the trashcan in [Cavalier's] room. When questioned by the MPD detective, [Cavalier] indicate[d] that the condom found[] must have been the one used by them.

> Based upon the information gathered in this investigation, it is clear that a "rape" did not occur. [Cavalier] consented to having sex with [Doe] and a condom was used during the sexual encounter. By [Cavalier's] own admission to DPS, MPD and her friends, her consent was given based upon the usage of a condom.

> It is recommended that this investigation be closed, and a copy of the investigation forwarded to the Office of the Dean of Students for whatever action deem[ed] appropriate.

*Id.* at 9.

In preparing their report, Gregory and Callis interviewed neither the individual who

found Cavalier on the bathroom floor nor the employee who witnessed Cavalier sign Doe into

her dormitory. *See* Dkt. 65-1 at 10 (Pl.'s Resp. SUMF ¶ 40). Of perhaps greater significance,

they also failed to request Cavalier's toxicology report from December 15, 2012. Dkt. 66-10 at

14 (Gregory Dep. 274:1–17). Gregory and Callis's report offered no standard or definition of

"rape," nor did it squarely address whether Cavalier was too drunk to consent, despite multiple

witnesses, including Doe, describing Cavalier as "drunk," despite Cavalier's description of the

excessive amount of alcohol that she consumed, and despite evidence that Cavalier could not

remember the details of what had happened even briefly after the alleged rape.  Dkt. 64-4 at 3, 7–

9.  The report also omitted observations related to Cavalier's intoxication that were found in

Gregory's investigative notes, such as that Cavalier "remembered drinking at least two shots of

tequila, one glass of wine, and two or three shots of vodka mixed with sprite in a one-hour

period;" that Cavalier told Gregory that she was using a prescription medication (Adderall) on

the night of the alleged rape; that Cavalier told Gregory she had blacked out on previous

occasions; that Cavalier was found by a fellow student partially unclothed in the bathroom who

described Cavalier as "still intoxicated"; or that Doe had told Gregory that Cavalier was "drunk."

Dkt. 65-1 at 28–29 (Pl.'s Resp. SUMF ¶¶ 185–88) (citing Dkt. 66-3); *see also* Dkt. 73-2 at 2–3

(Def.'s Resp. to Pl.'s SUMF ¶¶ 185–88).

Gregory and Callis's report was provided to Jonathan Sawyer, the University's Dean of

Students, on February 28, 2013.  Dkt. 46-1 at 3.  Sawyer's role was to review the report and to

determine whether a "reasonable Hearing Board based on [the] set of facts [in the report could]

achieve a finding of responsibility" by applying a preponderance of the evidence standard.  Dkt.

64-10 at 19 (Sawyer Dep. 282:3–7).  At a meeting on March 14, 2013, Sawyer advised Cavalier

that he had determined that the report did not justify proceeding with a disciplinary hearing.  Dkt.

45-3 at 12 (Def.'s SUMF ¶ 66); Dkt. 65-1 at 14 (Pl.'s Resp. SUMF ¶ 66).  Six days later, on

March 20, "Sawyer sent Cavalier a letter confirming his decision."  Dkt. 45-3 at 12 (Def.'s

SUMF ¶ 67); *see also* Dkt. 50-11.  In the letter, Sawyer also stated he would "review [Cavalier's]

academic schedule and on-campus housing arrangements on a regular basis to try to limit any

future contact between [Cavalier] and [Doe]." Dkt. 50-11 at 2. Then, in an email to Cavalier on March 22, 2013, Sawyer offered to "talk [with her] about housing and classes for the future so that [Sawyer] c[ould] work to help limit any contact" between Cavalier and Doe. Dkt. 45-3 at 12 (Def.'s SUMF ¶ 68); Dkt. 65-1 at 14 (Pl.'s Resp. SUMF ¶ 68).

**C.     Cavalier's First Appeal and Continued Negotiations About a Hearing**

On March 27, 2013, Cavalier requested that Sawyer reconsider his decision because Gregory and Callis's report "did not include information relating to [her] level of intoxication during the December 15, 2012 incident." Dkt. 46-4 at 2. Cavalier further explained that the Student Code of Conduct provided that "[c]onsent cannot be obtained from someone who is mentally or physically incapacitated due to drugs, alcohol or some other condition" and that she believed "the factual circumstances concerning [her] assault places [her] squarely within this definition." *Id.* Cavalier attached the EMS report memorializing her transfer to the hospital on December 15, 2012. *Id.* at 3. As mentioned above, that report indicated that "alcohol use" was "suspected" but also suggested that Cavalier was "oriented," "alert," "obey[ed] commands," "grip[ped] strong" and had "normal" speech. Dkt. 66-8 at 2 (capitalization altered). Attached to the report was a toxicology report showing that, as of 8:28 a.m. on December 15, 2012, Cavalier's blood alcohol level was .097. *Id.* at 3. In response to Cavalier's request and the new information that she provided, Sawyer informed Cavalier that he would ask Gregory to reopen the investigation, even though the University's policies did not, at the time, permit Cavalier to appeal the University's decision. Dkt. 45-3 at 13 (Def.'s SUMF ¶¶ 75–76); Dkt. 65-1 at 15 (Pl.'s Resp. SUMF ¶¶ 75–76).

On April 23, 2013, Gregory and Callis issued a two-page addendum to their previous report. Dkt. 46-8. In the section of that report entitled "Additional Information," Gregory and

Callis discussed the EMS and toxicology reports and detailed a meeting they had with Cavalier

and Cavalier's attorney, Matthew Ornstein.  In pertinent part, Gregory and Callis wrote:

> The toxicology report submitted is from the Washington Hospital Center.
> According to the report, a specimen was collected at 8:28 am EST on December
> 15, 2012.  The results of the toxicology collected from Erin Cavalier show[] an
> Ethanol level of 97H.

> On April 10, 2013, Captain Gregory and Investigator Calais met with Erin
> Cavalier and Matthew Ornstein, Staff Attorney for Network for Victim
> Recovery of D.C., regarding the additional information from the hospital.
> During this meeting, [Cavalier] contend[ed] that, based upon the toxicology
> report, she was too drunk to give consent.  [Cavalier] was informed that we did
> not have access to the toxicology report and that it was known, by her own
> admission, at the time of the incident that she had been drinking.  It was further
> explained to [Cavalier] that many of the witnesses interviewed stated that she
> appeared coherent and understood what was occurring.  [Cavalier] was reminded
> that neither she[] nor any of the witnesses said that she was incapacitated or
> unconscious during the sexual encounter or [during] the events leading up to
> and/or after the sexual encounter.

*Id.* at 2–3.  Gregory and Callis concluded this "Additional Information" section by noting that

Detective Maupin had contacted Gregory and stated that an Assistant United States Attorney in

the District of Columbia's United States Attorney's Office "declined to issue a warrant for"

Doe's arrest after reviewing the evidence.  *Id.* at 3.  Gregory and Callis summarized their

supplemental conclusions as follows:

> The additional information presented [*i.e.*, that regarding Cavalier's
> intoxication] was considered, and based upon the evidence gathered pertaining
> to the sexual encounter, there is no evidence presented that states [Cavalier's]
> blood alcohol level impaired her ability to give consent at the time of the
> incident.

> On the night of the incident, [Cavalier] had contact with several people.  Each
> of those individuals stated that [Cavalier] appeared coherent.  She was coherent
> during her encounter with DPS and MPD; the EMT personnel documented
> alcohol use, however, the EMT also indicated that she appeared oriented, alert
> and [had] normal speech.  Each of these individuals from different agencies[]
> had contact with [Cavalier] at various times that night and none of them reported
> that she was incoherent, incapacitated or displayed symptoms of being under the
> influence of alcohol.

13

*Id.* Gregory and Callis then "recommended that th[e] investigation be classified as closed by" the DPS and that "the additional information be forwarded to the Dean of Students Office for whatever action [is] deemed appropriate." *Id.*

On April 25, 2013, Sawyer emailed Cavalier to tell her he had received Gregory and Callis's addendum report and wanted to speak with Cavalier the following week to discuss it. Dkt. 45-3 at 15 (Def.'s SUMF ¶ 86); Dkt. 65-1 at 16 (Pl.'s Resp. SUMF ¶ 86); Dkt. 46-10 at 2. Sawyer and Cavalier eventually met on May 10, 2013, after the meeting was postponed one week so that Cavalier's attorney could attend. Dkt. 46-10 at 3–6; Dkt. 45-3 at 15 (Def.'s SUMF ¶¶ 87–88); Dkt. 65-1 at 16 (Pl.'s Resp. SUMF ¶¶ 87–88). At that meeting, Sawyer explained that he continued to think a hearing was unwarranted. Dkt. 45-3 at 15 (Def.'s SUMF ¶ 88); Dkt. 65-1 at 16 (Pl.'s Resp. SUMF ¶ 88). Cavalier, in turn, responded that she felt "she had a right to a hearing and that was the only way she could gain closure." Dkt. 45-3 at 16 (Def.'s SUMF ¶ 89) (quoting Dkt. 45-14 at 27 (Sawyer Dep. 283:17–19)); Dkt. 65-1 at 16 (Pl.'s Resp. SUMF ¶ 89). Sawyer then told Cavalier that "he would give the matter additional thought," Dkt. 45-3 at 16 (Def.'s SUMF ¶ 91), subsequent to which he drafted, but did not send, "a letter advising Cavalier that he had not changed his mind and there would be no hearing," *id.* (Def.'s SUMF ¶ 92).

The University and Cavalier continued to communicate after the May 10, 2013 meeting. Dkt. 45-3 at 16 (Def.'s SUMF ¶¶ 93–95); Dkt. 65-1 at 16–17 (Pl.'s Resp. SUMF ¶¶ 93–95). As a product of these conversations, Cavalier proposed that she and her counsel meet with the University again in July 2013. Dkt. 45-3 at 16 (Def.'s SUMF ¶ 96); Dkt. 65-1 at 17 (Pl.'s Resp. SUMF ¶ 96). The meeting eventually took place on August 21, 2013, to ensure that Cavalier and her attorneys could both attend in person. Dkt. 45-3 at 16–17 (Def.'s SUMF ¶¶ 96–98); Dkt. 65-

14

1 at 17 (Pl.'s Resp. SUMF ¶¶ 96–98).  At his deposition, Sawyer "testified that [Cavalier's
attorney, Matthew] Ornstein did most of the talking, describing the facts from [Cavalier's]
perspective in a way that suggested to Dean Sawyer that Cavalier did not understand why he had
decided against holding a hearing."  Dkt. 45-3 at 17 (Def.'s SUMF ¶ 98) (citing Dkt. 45-14 at
33–35 (Sawyer Dep. 290:14–292:1)).  Sawyer further testified that, at the meeting, he "turned to
Cavalier and asked her whether . . . a hearing would bring her closure and she would be satisfied
with the outcome, even if the hearing board found against her."  Dkt. 45-3 at 17 (Def.'s SUMF
¶ 99) (citing Dkt. 45-14 at 33–35, 38–39 (Sawyer Dep. 290:11–292:12; 304:3–305:2)).  When,
according to the University, Cavalier responded "yes," Sawyer "decided to grant [Cavalier] a
hearing."  *Id.* (quotation marks omitted).

Later that day, Sawyer contacted Associate Dean Omar Torres to advise him that a
hearing would occur in Cavalier's case and that he hoped it could be scheduled for the last week
in September.  *Id.* at 21 (Def.'s SUMF ¶ 124); Dkt. 65-1 at 20 (Pl.'s Resp. SUMF ¶ 124); Dkt.
47-5 at 2.  The hearing was ultimately scheduled for October 3, 2013 in order to accommodate
Cavalier and her attorneys' schedules.  Dkt. 45-3 at 22 (Def.'s SUMF ¶¶ 126–27); Dkt. 65-1 at
21 (Pl.'s Resp. SUMF ¶¶ 126–27); Dkt. 47-7; Dkt. 47-8.

**D.      Disciplinary Hearing and No Contact Order**

To prepare for the hearing, Torres was tasked with selecting the hearing board—that is,
the group of University officials who would review Cavalier's case and determine Doe's
culpability under the University's standards.  Four individuals were selected, each of whom
Torres and the University's Title IX Coordinator, Lisa Wood, later trained "on Title IX generally
and the specific procedures and concepts they would need to be aware of and apply in the
hearing."  Dkt. 45-3 at 22 (Def.'s SUMF ¶¶ 128–29); Dkt. 65-1 at 21 (Pl.'s Resp. SUMF ¶¶ 128–
29).  Prior to the hearing, Cavalier, Doe, and the hearing board received copies of Gregory and

15

Callis's investigative reports, which, along with the live testimony of witnesses and various

documents from Cavalier, comprised the record on which the hearing board would make its

decision. Dkt. 45-3 at 23 (Def.'s SUMF ¶¶ 132–33); Dkt. 65-1 at 22 (Pl.'s Resp. SUMF ¶¶ 132–

33). Among the documents were Captain Gregory's report of her interview with Silverberg, the

victim advocate who met Cavalier at the hospital the day of the alleged rape; a letter submitted

by Silverberg herself; the EMS report; and the toxicology report. *See* Dkt. 45-3 at 23–24 (Def.'s

SUMF ¶¶ 134–35, 138–41); Dkt. 65-1 at 22–23 (Pl.'s Resp. SUMF ¶¶ 134–35, 138–41); Dkt.

66-8 at 3 (toxicology report); Dkt. 47-15 (Silverberg letter); Dkt. 58-13 at 2 (Zeich Decl. ¶¶ 3–4).

Before the hearing took place, Cavalier contends that she requested that the University

permit Silverberg and Cavalier's friend ████████ to testify and that the University denied

both requests. Dkt. 65-1 at 22 (Pl.'s Resp. SUMF ¶¶ 136–37); Dkt. 45-3 at 23 (Def.'s SUMF

¶¶ 136–37). According to Sawyer and Torres, University policy prevented Silverberg from

testifying "[b]ecause Silverberg was not a member of the University community and had not

observed Cavalier near the time of the incident with Doe." Dkt. 45-3 at 23 (Def.'s SUMF

¶ 136); Dkt. 65-1 at 22 (Pl.'s Resp. SUMF ¶ 136). ████████, meanwhile, was a member of

the University community, but, as Cavalier does not dispute, ████████ never saw (but did speak

to) Cavalier the night of her alleged rape. Dkt. 65-1 at 22 (Pl.'s Resp. SUMF ¶ 137); Dkt. 45-3

at 23 (Def.'s SUMF ¶¶ 136–37). The University also rejected Cavalier's request to present

expert testimony regarding her blood alcohol content at the time of the alleged rape (based on an

extrapolation using her blood alcohol content the following morning) and regarding the

combined effects of Adderall and alcohol. Dkt. 64-11 at 2. As the University explained its

decision, permitting "'expert'-like testimony would then require notice to the other party,

16

opportunity to find contrary evidence—and quickly become the quasi-trial that Title IX doesn't contemplate." *Id.*

At about 9:00 a.m. on the morning of October 3, 2013, the day of the hearing, Torres emailed the hearing board with "REVISED slides from the training" that the hearing board previously had. Dkt. 67-2 at 2. Those revised slides related to the "definition for sexual harassment" and the "definition for incapacitation," which Torres explained would "be critical to the matter we are reviewing later today." *Id.* Neither Cavalier nor her lawyer received advance notice of these changes, nor did the changes appear in the University's 2011–2013 Codes or sexual assault policies that Cavalier was led to believe governed her case. Dkt. 65-1 at 21–22 (Pl.'s Resp. SUMF ¶ 130).

At the October 3, 2013 hearing, Cavalier, Doe, Giglia, and five other student witnesses testified. *See* Dkt. 45-3 at 25, 27 (Def.'s SUMF ¶¶ 144–45, 160); Dkt. 65-1 at 23 (Pl.'s Resp. SUMF ¶¶ 144–45). The hearing board heard conflicting testimony concerning Cavalier's apparent level of intoxication from Cavalier, Doe, and the other witnesses. *See* Dkt. 45-3 at 25–28 (Def.'s SUMF ¶¶ 146–63); Dkt. 65-1 at 23–26 (Pl.'s Resp. SUMF ¶¶ 146–63). Cavalier testified, for instance, that "[t]here's no doubt that [she] was drinking and that [she] was drunk." Dkt. 78 at 17 (Cavalier). As she explained at the beginning of the hearing:

> I had been drinking heavily. I started drinking probably around, I want to say, 10:00-ish, and I could not tell you the time I ended drinking, but I can tell you that before I left my hall, I had had two or three cups of wine and two or three shots of tequila, and then I had made a mixed drink of Sprite and vodka with about three shots of vodka in it. I do not know what other alcohol I consumed that night.

*Id.* at 23 (Cavalier). Meanwhile, a friend of Cavalier's testified that, at 9:00 a.m. the morning of the rape, Cavalier "definitely . . . sounded a little like she was tipsy, still slightly intoxicated." *Id.* at 68 (███████). And, a third witness, who had previously communicated to Gregory that

17

Cavalier "was very drunk and falling asleep" prior to the alleged rape, testified that he, Doe,

Cavalier, and other students "were all like really heavily drinking. We were all pretty bad." *Id.*

at 102 (███). This witness further testified he "remember[ed] [the group] moving over and

[Cavalier] [lying] down in the bed," although he no longer "remember[ed] [Cavalier] specifically

falling asleep," but instead that Cavalier was "just kind of . . . [lying] down." *Id.*

> At the hearing's conclusion, Cavalier characterized the day's proceedings as follows:

> [O]ne thing throughout the day that has . . . been very consistent is the evidence
> showing that I was extremely intoxicated, as well as vulnerable the night I was
> raped. Nearly all the witnesses said that I had been drinking and that I was
> drunk. [One witness] talked about how much alcohol we consumed before going
> out. [Another individual] said that even though he's not here, in his statement it
> said that not only was I drunk, but I was staggering when I left. . . . Doe's
> roommate, also commented on how everyone was drinking, and he further
> commented today that we were drinking a ton. [A third witness] also [testified]
> to my drinking that night, and even that I was [lying] down and possibly falling
> asleep on the bed . . . . And, finally, even [Doe] told investigators that he thought
> I was drunk.

*Id.* at 119–20 (Cavalier).

But not all of the witnesses supported Cavalier's account. Doe, for example, testified

that, although he "knew [Cavalier] had been drinking[,] . . . she wasn't staggering [and] her

speech wasn't slurred." *Id.* at 35 (Doe). When asked whether Cavalier ever needed "any

assistance walking or moving," Doe responded: "No. Like I said, I didn't have to hold her hand

or [hold] her up. Like I said, she didn't stagger or fall down. She didn't throw up, she didn't

gag. Nothing to prove that she was blackout [or] unconscious[.]" *Id.* at 36 (Doe).

Doe's description of Cavalier's behavior more or less matched the descriptions provided

by four other witnesses. Giglia, Cavalier's area coordinator, testified that she interacted with

Cavalier "a few hours" after Cavalier had been drinking and that, at that point, Giglia "did not

notice any direct signs of intoxication." *Id.* at 49–50 (Giglia). Similarly, Cavalier's RA, when

asked whether she observed "any sort of indication of intoxication" after she brought Cavalier

back to her dorm room, testified: "Not that I could tell, no.  It was hysterical crying.  So to me,

that's all I could really tell."  *Id.* at 58 (Williams).  Likewise, the individual whom Cavalier

asked to accompany her to the hospital testified that, in the early morning following the alleged

rape, Cavalier was "really upset[] [b]ut seemed [] really put together."  *Id.* at 80 (████).  This

witness further testified that she "knew that [Cavalier] had been drinking because [she] . . . could

smell [alcohol] on [Cavalier], but [she] didn't [] realize how much [Cavalier had drunk], and it

wasn't until later that night, when [she] was [] with [Cavalier] at the hospital that [she] . . .

realized . . . that [Cavalier] was still [] intoxicated."  *Id.*  According to this witness, "at the time

when [Cavalier] came to [her], [she] wouldn't have known" that Cavalier was intoxicated.  *Id.*

Finally, Doe's roommate, who attended the party at which Doe and Cavalier met, was asked

whether he remembered if either Cavalier or Doe "appear[ed] intoxicated," were "stumbling

around," or had slurred speech at the time Cavalier and Doe left the party; he answered: "No, no

one was falling around that I noticed."  *Id.* at 91 (████).

　　　After the witnesses testified, Cavalier was given the opportunity to explain, albeit without

an expert to aid her, the toxicology report that showed that her blood alcohol content was .097

nearly seven hours after the alleged rape.  She stated:

> [T]here is scientific evidence that can . . . tell you how intoxicated I was.  The
> [toxicology report] is an extremely important piece of evidence.  It shows, as I
> said earlier, that at 8:30 in the morning, I had a blood alcohol content of .097.
> This was not taken through a Breathalyzer.  This was taken because when I was
> admitted to the hospital, they took a blood test and found my ethanol level is just
> not in any way an average—it was exactly what it is.  .2—so then when using
> this calculation at 1:30 in the morning . . . I would have had a blood alcohol
> content of over .2.  It is an *exceptionally high level of intoxication*, and my ability
> to stand [or] walk on my own[] was *extremely impaired*.

*Id.* at 120 (Cavalier) (emphasis added).

The hearing board resolved to take that evidence, alongside Cavalier's statements, the witness testimony and the documentary evidence described above, into account. Dkt. 78 at 12–13; Dkt. 58-13 at 2 (Zeich Decl. ¶¶ 3–4). At the hearing's conclusion, the board stated that it was "looking at potentially the next seven to ten days" before it would issue its resolution of the dispute. *Id.* at 127.

At 6:58 p.m. on that same day, the hearing board issued its findings. First, it concluded, "based on the preponderance of evidence," that Doe "would not have reasonably thought [that Cavalier] was incapacitated/unable to give consent." Dkt. 48-7 at 2 (emphasis omitted). In support of that conclusion, the hearing board reasoned: (1) while "[s]ome witness statements indicate that [Cavalier] was 'drunk,' . . . no one described [Cavalier] as having" signs of incapacitation, such as "slurred speech, bloodshot eyes, shaky equilibrium, vomiting, outrageous behavior, stupor, severe motor impairment, staggering, or unconsciousness;" (2) the fact that Cavalier had consumed alcohol did not itself "indicate incapacitation/inability to give consent;" (3) neither the RA, Giglia, nor Lieutenant Dicks, each of whom observed Cavalier shortly after the alleged rape, observed signs of intoxication; (4) the EMS report indicated that Cavalier "was walking at the scene[,] oriented, alert, and [used] normal speech." *Id.*

The hearing board next concluded, again "based on the preponderance of evidence," that Cavalier's "words and actions did reasonably indicate to [Doe] that consent was given." *Id.* The hearing board observed that: (1) Cavalier "signed [Doe] in to her residence hall . . . and invited [Doe] to her room;" (2) Cavalier originally reported to DPS that she consented to having sex while using a condom; (3) Doe testified at the hearing that Cavalier had "provided [him a] condom;" and (4) a condom was found in the trashcan in Doe's room. *Id.* at 2–3. Based on

20

these two conclusions, the board "decided that [Doe] [wa]s not in violation of the [University's]

Code of Student Conduct." *Id.* at 3.

Cavalier appealed the board's decision the following week. Dkt. 59-9. Cavalier argued

that: (1) "the inherent failing[] of the report"—its conclusion that she was not incapacitated—

was "outright contradicted by several witnesses in the report itself," *id.* at 3–4; (2) the University

failed to provide her "the underlying notes and/or interviews produced during the investigation

before they were summarized for the report," *id.* at 3; (3) the University relied on evidence from

MPD and the EMTs who transported Cavalier to the hospital—neither of whom were affiliated

with the University—while preventing Cavalier from having favorable non-affiliated personnel

testify on her behalf; *id.* at 3–4; (4) the University disallowed Cavalier from interviewing

witnesses, *id.* at 4; and (5) the University waited an unreasonably long time before holding a

hearing to evaluate Cavalier's claim, *id.* These procedural errors rendered the hearing

ineffectual, Cavalier argued, because she was "prevented from providing the exact kind of

evidence that was ultimately necessary to establish [her] level of intoxication." *Id.* at 5.

An appeals committee was convened two days later, on October 17, 2013. Dkt. 59-10 at

2. Four days after that, on October 21, 2013, Sawyer reported to Cavalier that "[t]he committee

determined that the University Hearing followed established disciplinary procedural guidelines

and recommended that the appeal be denied." *Id.* Sawyer further noted that, "[a]fter [his own]

careful consideration of the disciplinary record," he "concur[red] with the committee's

recommendation." *Id.* Cavalier's case against Doe was then closed.

E.      **No-Contact Order**

One thing remained: In the same email announcing the denial of appeal, Cavalier was

notified that "[t]he [o]rder of [n]o [c]ontact between [her and Doe would] remain in place

indefinitely." *Id.* The no-contact order was issued about a month prior to the October hearing,

21

on August 27, 2013. Dkt. 45-3 at 18 (Def.'s SUMF ¶ 102); Dkt. 65-1 at 17–18 (Pl.'s Resp.

SUMF ¶ 102). According to Torres, who contacted Cavalier to inform her about the no-contact

order's imposition, the order mandated that Doe and Cavalier were "to have no direct, indirect or

third[-]party contact." Dkt. 45-3 at 18 (Def.'s SUMF ¶ 102); Dkt. 65-1 at 17 (Pl.'s Resp. SUMF

¶ 102). Torres further explained that the no-contact order "mean[t] that Cavalier [could] not

speak to or contact [Doe] in person, by phone, via email or through friends or other third

parties." Dkt. 58-1 at 2. Doe was to abide by the same rules, having himself been advised on

August 26, 2013, "that the order of no contact that was put in place with [Doe] during the

investigative process [wa]s still active." *Id.* Doe also received a notice similar to that which

Cavalier had received regarding the University's "expectations" of his compliance with the no-

contact order. *Id.*

     According to Cavalier, the no-contact order was ineffectual: Doe violated the order,

Cavalier contends, on several occasions over the next few years. For instance, on October 4,

2013, the day after the hearing, Cavalier encountered Doe at a party at the home of several

members of the men's lacrosse team. *See* Dkt. 45-3 at 19 (Def.'s SUMF ¶ 110); Dkt. 65-1 at 19

(Pl.'s Resp. SUMF ¶ 110). Cavalier was unsure whether she or Doe arrived at the party first, but

after Doe refused to leave the party, Cavalier chose to leave. *See* Dkt. 45-3 at 19 (Def.'s SUMF

¶ 111); Dkt. 65-1 at 19 (Pl.'s Resp. SUMF ¶ 111). Cavalier did not speak with Doe at the party

and did not see Doe again that evening. Dkt. 45-3 at 19 (Def.'s SUMF ¶ 111); Dkt. 65-1 at 19

(Pl.'s Resp. SUMF ¶ 111).

     Cavalier reported the incident to Sawyer four days later. Dkt. 45-3 at 19 (Def.'s SUMF

¶ 110); Dkt. 65-1 at 19 (Pl.'s Resp. SUMF ¶ 110). In response, Sawyer spoke with Doe to

confirm what had happened, after which Sawyer "concluded that [Doe's] alleged actions, even if

true, would not constitute a violation of the" no-contact order.  Dkt. 45-3 at 19 (Def.'s SUMF ¶ 112).  As Sawyer later testified, despite Doe and Cavalier seeing other at the party: "[W]e don't put a bubble around people[;] it's not a stay away order . . . [or] a directive that says the first person there gets to say there.  They're equally told in an ideal world if you show up some place and the other person is there, you'll need to make a choice."  Dkt. 45-14 at 19 (Sawyer Dep. 231:9–21).  According to Cavalier, however, Sawyer's response to Doe's alleged violation of the no-contact order deviated from University policy, which, Cavalier asserts, "required DPS to complete an incident report and for [the Dean of Students Office] to then determine if it needed to refer the matter to the Office of Student Conduct and Ethical Development for a formal review."  Dkt. 65-1 at 19–20 (Pl.'s Resp. SUMF ¶ 112) (quotation marks omitted).

On January 23, 2015, Cavalier once more encountered Doe at an off-campus party, this time at a house where members of the University's football team lived.  Dkt. 65-1 at 20 (Pl.'s Resp. SUMF ¶¶ 113, 119).  According to Cavalier, she arrived at the party first and, after Doe arrived, Doe "chose to stare at Cavalier."  Dkt. 65-1 at 20 (Pl.'s Resp. SUMF ¶ 113); Dkt. 67-9 at 2.  Cavalier's counsel promptly reported this incident to the University's General Counsel, who in turn alerted Sawyer.  Dkt. 67-9 at 2–3; Dkt. 65-1 at 20 (Pl.'s Resp. SUMF ¶¶ 113, 119).  Sawyer again concluded that Doe's actions did not violate the no-contact order, Dkt. 45-14 at 19 (Sawyer Dep. 231:4–21), but he nonetheless gave Doe a "directive about following the" no-contact order, which Cavalier again contends deviated from the University's standing policy regarding no-contact orders, Dkt. 67-9 at 2 (quotation marks omitted).[2]

---

[2]  As the University correctly notes, Cavalier did not mention the January 23, 2015 incident in her complaint, Dkt. 1 (Compl.), nor did she specifically identify it in her response to the University's interrogatory asking her to "[i]dentify by date, time and location every occasion on which [she] saw John Doe in person," Dkt. 71-7 at 3 (Pl.'s Resp. to Def.'s Interrogatories); *see also* Dkt. 73 at 15 n.8.

Cavalier also contends that she encountered Doe on campus a number of times throughout her tenure at the University and that many, if not all, of these encounters violated the no-contact order. Dkt. 45-3 at 19–20 (Def.'s SUMF ¶¶ 114–19) Dkt. 65-1 at 20 (Pl.'s Resp. SUMF ¶¶ 114–19). But Cavalier concedes that she failed to report any of those incidents to the University. Dkt. 45-3 at 19–20 (Def.'s SUMF ¶¶ 114–18) Dkt. 65-1 at 20 (Pl.'s Resp. SUMF ¶¶ 114–18); *see also id.* (Pl.'s Resp. SUMF ¶ 119).

**F.      Subsequent Events**

On December 19, 2013, a little over two months after the hearing, Cavalier filed a formal Title IX Complaint against the University with the United States Department of Education, Office for Civil Rights ("OCR"). Dkt. 45-3 at 29 (Def.'s SUMF ¶ 171); Dkt. 65-1 at 27 (Pl.'s Resp. SUMF ¶ 171). OCR reviewed Cavalier's claims, which were "based on the same facts and circumstances as this lawsuit," and, on October 31, 2017, found "insufficient evidence that the University failed to respond to [Cavalier's] sexual violence complaint in a prompt and equitable manner." Dkt. 45-3 at 30 (Def.'s SUMF ¶¶ 172, 174); Dkt. 65-1 at 27 (Pl.'s Resp. SUMF ¶¶ 172, 174). In particular, OCR found: (1) "no fault with the amount of time that passed between various milestones in the case and 'did not find that the delays affected the fairness of the process overall for the complainant,'" Dkt. 45-3 at 30 (Def.'s SUMF ¶ 175) (quoting Dkt. 59-12 at 14); (2) that "the University's decision to allow [Silverberg] to present written testimony, rather than participate in the hearing did not violate Title IX or affect the equitability of the process," Dkt. 59-12 at 13; and (3) that "the University's response, including its willingness to hear [Cavalier's] concerns about the decision not to hold a hearing and its effort to support [Cavalier] after the resolution of her complaint, demonstrate[d] a commitment to supporting its students in these circumstances," *id.* at 14. OCR did have one criticism, however: it reproached the University for "subject[ing] *the accused* [Doe] to an inequitable process." Dkt. 45-3 at 30–

31  (Def.'s SUMF ¶ 178) (second alteration in original) (emphasis added); Dkt. 65-1 at 28 (Pl.'s

Resp. SUMF ¶ 178).[3]

  In the semesters following the alleged rape, Cavalier "was depressed, unable to get out of

bed in the morning to go to class and wanting to sleep in a dark room all day." Dkt. 65-1 at 31

(Pl.'s Resp. SUMF ¶ 206) (quotation marks omitted).  She also began managing and coaching,

rather than playing on, the University's lacrosse team. *Id.* (Pl.'s Resp. SUMF ¶ 208); Dkt. 66-1

at 45, 47 (Cavalier Dep. 201:10–22; 203:4–12).  Cavalier testified that she felt "consistently re-

victimized" by the University's investigation of her complaint and that her experience with the

University's Title IX grievance process was "almost as bad as being raped." Dkt. 65-1 at 32

(Pl.'s Resp. SUMF ¶ 211).

  Cavalier graduated from the University in May 2016 with a ███ GPA.  Dkt. 45-3 at 31

(Def.'s SUMF ¶¶ 179–81); Dkt. 65-1 at 28 (Pl.'s Resp. SUMF ¶¶ 179–81).  While on campus,

Cavalier also became active in, and took a leadership role of, a student organization focused on

sexual violence prevention and related issues.  Dkt. 45-3 at 31 (Def.'s SUMF ¶ 181); Dkt. 65-1 at

28 (Pl.'s Resp. SUMF ¶ 181).  Cavalier received a graduate business degree from the University

in 2018, after which she entered the workforce.  Dkt. 45-3 at 31 (Def.'s SUMF ¶¶ 182–83); Dkt.

65-1 at 28 (Pl.'s Resp. SUMF ¶¶ 182–83).

**G.**  **Procedural Background**

  Cavalier filed this suit on October 7, 2016.  Dkt. 1 (Compl.).  She alleged that the

University's investigation and disciplinary process were "wholly inadequate, untimely, and

biased" and that the University failed to enforce the no-contact order or otherwise to protect her

---

[3] "Neither party . . . suggests that OCR's findings are controlling for present purposes." Dkt. 13
at 5; *see also Doe v. Forest Hills School District*, 2015 WL 9906260 at *7 (W.D. Mich. Mar. 31,
2015).

"from further harassment by her rapist." *Id.* at 1–2 (Compl. ¶ 3). The University's botched

response to her alleged rape, Cavalier claimed, violated Title IX because it was "clearly

unreasonable in light of the known facts and circumstances" and resulted in "severe, pervasive"

harassment, *id.* at 13, 31 (Compl. ¶¶ 53, 139), that deprived her of the "educational opportunities

or benefits" that the University provided to its other students, *Davis v. Monroe Cty. Bd. of Educ.*,

526 U.S. 629, 648–50 (1999). Cavalier further alleged that the University violated Title IX by

retaliating against her for reporting the alleged rape, for pressing the University to take action,

and for filing a complaint with OCR. Finally, Cavalier asserted three tort claims under D.C. law,

alleging that the University (1) negligently failed "to protect [her] from sexual harassment,

including sexual assault and a hostile educational environment," Dkt. 1 at 34 (Compl. ¶ 148);

(2) negligently subjected her to emotional distress by failing "to promptly, adequately, reliably,

fairly, and impartially investigate and resolve [her] complaint" and by failing to enforce the no-

contact order, *id.* at 35–36 (Compl. ¶¶ 157–60); and (3) intentionally subjected her to emotional

distress by engaging "in extreme and outrageous conduct" by failing to take prompt and

meaningful action in response to the alleged rape, *id.* at 36 (Compl. ¶ 162).

    The University moved to dismiss Cavalier's complaint for failure to state a claim under

both Title IX and D.C. tort law and as untimely under the relevant statutes of limitations. Dkt. 8.

In an opinion and order issued on March 27, 2018, the Court partially agreed with the University,

concluding that Cavalier failed to state a claim for Title IX retaliation and for intentional

infliction of emotional distress. Dkt. 13 at 3. The Court was not "convinced, however, that

Cavalier's Title IX deliberate indifference claim or remaining D.C. tort law claims fail[ed] as a

matter of law at th[at] early stage of the litigation." *Id.* The Court further "reject[ed] the

University's motion to dismiss on statute of limitations grounds." *Id.*

After the Court rendered that decision, the parties commenced discovery, which closed in

the summer of 2019. Minute Order (June 26, 2019). The Court then set a briefing schedule for

motions for summary judgment, Minute Order (July 22, 2019), and the University moved for

summary judgment. Dkt. 61. The Court held oral argument on July 16, 2020, Dkt. 76 at 1, and

Cavalier subsequently submitted additional precedent for the Court's consideration, Dkt. 77.

The motion is now fully briefed and ripe for decision.[4]

## II. LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it

can "show[ ] that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment

"bears the initial responsibility" of "identifying those portions" of the record that "demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). A fact is "material" if it could affect the outcome of the litigation under governing law.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott

v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most

---

[4]  After Cavalier filed her response to the University's motion for summary judgment, the
University filed a motion to strike an expert declaration that Cavalier had included alongside her
response. Dkt. 68; *see also* Dkt. 72-12 (expert report). The University argued that the expert
report violated Federal Rule of Civil Procedure 26 and that it was untimely filed. Dkt. 68 at 3–7.
The Court will deny the University's motion as moot because, to the extent the Court herein
denies the University's motion for summary judgment, it has not relied upon the expert report
and, even had the Court considered the report, the Court's conclusions would remain unchanged.

favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

### III. ANALYSIS

The University moves for summary judgment on Plaintiff's two remaining claims—unlawful discrimination under Title IX and negligent infliction of emotional distress under D.C. tort law. Dkt. 61. The Court will address each claim in turn.

### A.    Title IX Discrimination

Title IX mandates that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Universities that accept federal funding, like Catholic University, must comply with Title IX's requirements, which are "enforceable [by individual plaintiffs] through an implied private right of action."

28

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979)). "[A] damages remedy will not lie [against a university] under Title IX," however, unless the plaintiff can demonstrate that "an official who at minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [university]'s behalf ha[d] actual knowledge of discrimination in the [university]'s programs and fail[ed] adequately to respond." *Id.* at 290. The university's response—or failure to respond— moreover, "must amount to deliberate indifference to discrimination." *Id.*

In *Davis v. Monroe County Board of Education*, the Supreme Court held that, in "certain limited circumstances," 526 U.S. at 643, a university "may be liable for damages under Title IX . . . for discrimination in the form of student-on-student harassment," *id.* at 639. The governing test, however, is not easily met. First, a university "may be liable in damages under Title IX only for its own misconduct," *id.* at 640, and thus, the plaintiff must show that the university had "actual knowledge" of the "sexual harassment" or discrimination, *id.* at 650. Second, the plaintiff must show that the university "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." *Id.* at 645. Third, the sexual harassment complained of must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Fourth, mere negligence is not enough; the plaintiff must demonstrate that the university was "deliberately indifferent to [the known acts of] sexual harassment." *Id.* Finally, when the university has "not engage[d] in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment." *Id.* at 644. "That is," the university's "deliberate indifference must, at a minimum, 'cause [a student or students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645 (citations

29

omitted); *see also id.* at 642–43 ("[R]ecipients" of federal funding may "be liable in damage only where their own deliberate indifference effectively 'cause[d]' the discrimination.") (second alternation in original) (citation omitted).

This is a "high standard," *id.* at 643, intended to permit "[s]chool administrators" to maintain "the flexibility they require" in resolving campus disputes, *id.* at 648. A court may find that a university was "deliberately indifferent" only if its response or failure to respond "to the harassment . . . is clearly unreasonable in light of the known circumstances." *Id.* This means that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," *id.* at 648, and it means that a court can, "[i]n an appropriate case, . . . identify a response as not 'clearly unreasonable' as a matter of law" and, on that basis, enter summary judgment in favor of the school, *id.* at 649. The deliberate-indifference inquiry must also take into account "both . . . the level of disciplinary authority available to the school" and "the potential liability arising from certain forms of disciplinary action." *Id.* at 649.

Cavalier asserts that the University was deliberately indifferent in myriad ways, namely by: (1) failing to hold a timely hearing, Dkt. 72 at 33; (2) "delegat[ing] Title IX enforcement to untrained employees," *id.*; (3) investigating her complaint in a clearly unreasonable manner, *id.* at 37–40; (4) instituting an inequitable hearing process given that Doe, unlike Cavalier, "had a right to hearing, and . . . had the right to appeal any decision," *id.* at 41; (5) holding a "sham" hearing to address her claims, *id.* at 41–43; (6) deviating from its standard operating procedure of routinely issuing no-contact orders in cases of sexual assault without requiring a party to request such an order and failing to issue a no-contact order as soon as Cavalier requested one, *id.* at 18–20; and (7) failing to sufficiently enforce the no-contact order once it was imposed, *id.* at 45–46. In addition, Cavalier argues that the University's actions, when considered in gross and not in

isolation, also amount to deliberate indifference.  Dkt. 76 at 54 (Queen) ("[C]learly unreasonable should be viewed in the totality[.]  It should not be viewed as these one-offs as we believe that Catholic University would have you to believe[.]").

As explained below, the Court concludes that Cavalier's claims regarding the October 2013 hearing and the enforcement of the August 2013 no-contact order cannot survive the University's motion for summary judgment.  But the Court also concludes that Cavalier is correct in arguing that a reasonable jury could find that elements of the University's response to the alleged rape were clearly unreasonable—most notably, the University's failure to give serious consideration to whether Cavalier was too intoxicated to consent until months after Cavalier reported the alleged rape.  More is needed, however, for Cavalier to prevail on her Title IX claim; she will also need to prove that the University's "deliberate indifference . . . cause[d] [her] to undergo harassment or ma[d]e [her] liable or vulnerable to it."  *Davis*, 526 U.S. at 645 (internal quotation marks and citations omitted).  And, the Court cannot resolve that issue on this existing record because the parties have not (1) addressed a circuit split on the meaning of *Davis*'s subsequent-harassment requirement; (2) focused on the facts relevant to the subsequent-harassment inquiry; or (3) briefed whether the University's previously asserted (and rejected) statute of limitations defense might take on a new life if the case is reframed to turn exclusively on events occurring during the winter and spring of 2013.  Absent the parties' input on these questions, the Court must deny the University's motion for summary judgment as to Cavalier's claim that the University's delayed consideration of her capacity to consent rose to the level of deliberate indifference.

The Court first addresses the aspects of Cavalier's Title IX claim that fail, starting with her claim that the disciplinary hearing that the University provided her was a "sham," and then

31

turns to Cavalier's contention that the University was, at least at first, deliberately indifferent to the prospect that she was too intoxicated to consent.

      1.    *Sham Hearing*

Cavalier argues that the October 2013 disciplinary hearing was a sham because: (1) the University held the hearing only to give Cavalier "closure;" (2) the hearing board applied a standard of review that was not disclosed to Cavalier and that was newly introduced the day of the hearing; (3) the University unreasonably withheld evidence from Cavalier that would have strengthened her case against Doe; and (4) the University did not permit Cavalier to call material witnesses and then did not adequately consider the written statements from those witnesses who were not allowed to appear in person. Dkt. 72 at 41–43.

In response, the University argues that: (1) Cavalier has no evidence to support her allegation that, because Sawyer's rationale for holding the hearing was to bring her closure, he "practically admit[ted]" the hearing was biased; (2) the standard of review was not modified the day of the hearing; (3) the hearing board was trained on the appropriate standard of review; (4) Cavalier does not explain how the then-withheld information would have benefited her; and (5) the University did, in fact, consider the written statements that Cavalier submitted. Dkt. 73 at 19–22.

The Court is unconvinced by Cavalier's arguments. First, even if one of the reasons that Sawyer agreed to hold the hearing was to provide Cavalier with closure, *see* Dkt. 64-10 at 20–22, 25–26 (Sawyer Dep. 290:14–292:12, 300:14–301:22), there is no evidence from which a reasonable jury could find that the hearing board (1) was biased; (2) had reached a predetermined conclusion; or (3) failed to take Cavalier's arguments and evidence seriously. Nor is there any evidence suggesting that Sawyer (or anyone else) alerted members of the hearing board to

32

Sawyer's view that a goal of the hearing was to provide Cavalier closure. As the Supreme Court emphasized in *Davis*, "courts should refrain from second-guessing the disciplinary decisions made by school administrators," 526 U.S. at 648, and nothing about Sawyer's reference to bringing "closure" to Cavalier undermines the deference that the Court must accord the deliberations and decision of the hearing board.

Cavalier's second assertion—that the hearing board applied a new standard of review—also misses the mark. According to Cavalier, the University modified the standard by which Doe's culpability would be determined the morning of the hearing. Dkt. 72 at 41–42. In support of that assertion, Cavalier points to an email and a slide presentation that were circulated to the hearing board on October 3, 2013 at 9:08 a.m. Dkt. 67-2 at 2 (email); Dkt. 67-3 (slide presentation). As Cavalier notes, attached to the email were "slides from" a training session that the hearing board had previously attended with Wood, the University's Title IX coordinator. Dkt. 67-2 at 2 (capitalization altered). The email instructed the hearing board to "look through the . . . changes" that had been made to the presentation which, the email recounted, had occurred on three slides: (1) "Slide #5:  Definitions (definition for sexual harassment revised);" (2) "Slide #16:  Hearing Board (definition for incapacitation revised);" and (3) "Slide #18: Hearing Board (bottom part of slide revised)." *Id.* The additional language on the bottom of slide 18 read: "Question is whether complainant is incapacitated, and whether respondent reasonably knew or should have known.  Whether complainant chose to get intoxicated should not affect the finding but may affect the sanction applied to the respondent." Dkt. 67-3 at 19. The hearing board was instructed to review these three changes closely, as they would "be critical to the matter [that the board was] reviewing later [that day]." Dkt. 67-2 at 2.

Cavalier asserts that the change to slide 18 created a "new policy, for the first time, [that] required the hearing board to consider 'whether respondent reasonably knew or should have known' about the complainant's incapacitation." Dkt. 72 at 18 (quoting Dkt. 67-3 at 19). Cavalier is wrong. As the University explains, "slide 21, which was *not* among those revised, already instructed the hearing board members to ask, in the event the evidence showed the complainant to be incapacitated, 'Does [the] evidence show respondent knew or reasonably should have known complainant was experiencing this incapacity?'" Dkt. 73 at 19–20 (quoting Dkt. 67-3 at 22) (alteration in original). The hearing board, according to the evidence, Dkt. 67-2 at 2, was trained on this standard days before the hearing took place. Cavalier cites no evidence to the contrary.

Cavalier is on firmer footing in faulting the University for modifying the definitions of incapacitation and sexual harassment and explaining those changes to the hearing board only the day of the hearing—the University does not contest either point. Dkt. 67-2 at 2. But neither party explains what about those definitions was changed or how those changes affected the hearing. Thus, as the record stands, there is no evidence that the change was "clearly unreasonable" or subjected Cavalier to ongoing harassment. *Davis*, 526 U.S. at 645 (University's "deliberate indifference must, at a minimum, cause [a student or students] to undergo harassment or make them liable or vulnerable to it." (internal quotation marks and citations omitted)). Cavalier also fails to explain how these last-minute changes evidence the University's deliberate indifference to discrimination or to identify any cognizable harm that she suffered because of the University's delay in modifying the definitions.

Cavalier's third argument fails for the same reason. The University does not contest that it withheld certain information from Cavalier—for example, Captain Gregory's notes and the

34

event report prepared by Lieutenant Dicks. Dkt. 73 at 20–21. But Cavalier has once again failed to explain how the University's error caused her a cognizable harm—as the University correctly points out, Cavalier does not identify any helpful information that she was denied. *Id.* Moreover, it is not the Court's role to review the disciplinary process in the manner that an appellate court might review a proceeding in district court; the sole question for the Court is whether there is evidence that would permit a reasonable jury to find that the process was so flawed that it constituted deliberate indifference to discrimination. *Davis*, 526 U.S. at 648. Cavalier has offered no evidence that would satisfy that demanding standard. Finally, even if the University's failure to produce Gregory's notes and Dicks's report qualified as clearly unreasonable actions, Cavalier does not identify how the University's errors in this regard left her vulnerable to further harassment. *See id.* at 645. The University continued to impose and enforce a no-contact order after the hearing, and Cavalier does not argue that the hearing board's determination as to Doe's culpability was *itself* clearly unreasonable.[5]

Finally, Cavalier's argument that the University did not allow her to call material witnesses and then did not adequately consider the written statements from those witnesses who

---

[5] In Cavalier's response to the University's motion for summary judgment, she argues that "the October 2013 hearing was designed to arrive at a pre-determined outcome." Dkt. 72 at 41. But Cavalier never asserts that that outcome, even if pre-determined, was wrong or clearly unreasonable. When asked at oral argument whether she was "suggesting that the Court should conclude that [the hearing board's result was] just wrong, and that [the Court should] deny summary judgment and submit the case to the jury on the question of whether the hearing board just got it so wrong," Cavalier's counsel responded, "No, your Honor. What we're asking you to submit to the jury is whether the *process* before getting it to the . . . hearing board was clearly unreasonable." Dkt. 76 at 55–56 (Queen). To be sure, Cavalier's counsel also stated, "What we're arguing, your Honor, is not that you conclude that the decision was more than wrong. What we're arguing, your Honor, is that you should conclude that the *process* that led to the decision was so clearly unreasonable that the *decision* was wrong." *Id.* at 53 (Queen) (emphases added)). There is a material difference, however, between maintaining that a "clearly unreasonable" *process* led to a decision that was "wrong" and arguing that the *decision itself* was "clearly unreasonable."

were not present, Dkt. 72 at 41–42, is also unpersuasive. First, there is no evidence from which a reasonable jury could find that the hearing board ignored the evidence that Cavalier claims it did—that is, Silverberg's letter memorializing her interactions with Cavalier at the hospital the morning of the alleged rape, Dkt. 47-15. To the contrary, the undisputed evidence indicates that the board *did* consider Silverberg's letter. *See, e.g.*, Dkt. 58-13 at 2 (Zeich Decl. ¶¶ 3–4) (stating that the hearing board considered "information from victim advocate Lindsey Silverberg"); Dkt. 73-4 at 9 (Sawyer Dep. 126:16–127:7) ("[The hearing board] received [Silverberg's letter] as part of their hearing packet and they reviewed it and clearly from their findings of fact it didn't factor into their findings. I suspect that's because what Ms. Silverb[e]rg witnessed two to three hours after the event does not help us understand what those that were at the event witnessed.").

Second, even if the University disallowed certain witnesses from testifying—namely Silverberg, ▮▮▮▮▮,[6] and an expert witness who could explain Cavalier's toxicology report, Dkt. 64-2 at 17—the Court cannot conclude that the University's failure to do so evinced deliberate indifference to discrimination. The hearing board considered Silverberg's written report, Dkt. 58-13 at 2 (Zeich Decl. ¶¶ 3–4); Dkt. 73-4 at 9 (Sawyer Dep. 126:16–127:7), and the University's decision to refuse her an opportunity to testify live because she was not affiliated with the University is not, in the Court's view, so "clearly unreasonable" as to specter Title IX liability. Dkt. 50-17 at 9, 15 (Torres Dep. 145:6–19, 176:14–20). The probative value of ▮▮▮▮▮'s testimony, meanwhile, was low—he never saw Cavalier the night or morning of the

---

[6] Cavalier cites no evidence directly showing that she requested the University permit ▮▮▮▮▮▮ to participate in the hearing. Dkt. 66-1 at 55 (Cavalier Dep. 261:6–11). Cavalier did testify, however, that she wanted ▮▮▮▮▮ called as a witness. *Id.* A reasonable jury could, perhaps, draw from that testimony the inference that Cavalier in fact requested the University to allow ▮▮▮▮▮ to testify at the hearing.

alleged rape, and his telephonic conversation with Cavalier was overheard by another witness who did testify.  Dkt. 73 at 21.  Finally, the University's refusal to permit Cavalier to have an expert witness explain her blood alcohol level and toxicology report was not clearly unreasonable either.  As Torres explained to Cavalier's attorney, "[t]o permit 'expert'-like testimony would [] require notice to the other party, [an] opportunity to find contrary evidence – and quickly become the quasi-trial that Title IX doesn't contemplate."  Dkt. 64-11 at 2.  Cavalier, moreover, was permitted to—and in fact did—present and explain the toxicology report to the hearing board, which considered the document in reaching its conclusion.  Dkt. 58-13 at 2 (Zeich Decl. ¶¶ 3–4).

For these reasons, the Court concludes that the University's hearing procedures were not clearly unreasonable such that they evinced deliberate indifference on the University's part.

2.   *Right to a Hearing*

Cavalier next argues that the University's Title IX process was inequitable because Doe, unlike Cavalier, "had a right to hearing, and . . . had the right to appeal any decision."  Dkt. 72 at 41.  Cavalier does not develop this argument and offers no citation to University policies or practices to substantiate her claim.  *Id.*  The University notes that "Cavalier appears to rely on the statement in the Code of Student Conduct that a formal hearing or an informal conference could be held based on the severity of the potential sanctions."  Dkt. 73 at 12–13.  But it is not at all clear, the University continues, how this policy could sustain a claim that the University was deliberately indifferent to Cavalier's alleged rape or any ongoing harassment.  *Id.* at 13.

The Court agrees with the University.  First, Cavalier has failed to develop her argument that the University's procedures were inequitable in a manner that Title IX forbids.  Second, contrary to Cavalier's claim, there was no inequity in the hearing process itself.  Cavalier and

Doe both received the same process and protections when it came to evaluating whether the alleged rape occurred; the only difference was that Doe was entitled to demand a hearing, while Cavalier could only request that one occur.  Third, even if a reasonable jury might find this aspect of the hearing process to be inequitable, Cavalier has not explained how it, either standing alone or in conjunction with the University's other purported failures, deprived her of educational opportunities or subjected or left her vulnerable to further harassment.  *Davis*, 526 U.S. at 644–45.

      3.    *Enforcing the No-Contact Order*

Cavalier also argues that the University acted with deliberate indifference in failing to enforce the August 2013 no-contact order.  In particular, she argues that "the undisputed evidence reveals that [she] reported two violations of the no-contact order to [the University], one on October 8, 2013, and the other on February 3, 2015," but that "[a] dispute remains . . . as to whether Dean Sawyer's 'investigation' of Cavalier's allegations comported with [the University's] policies concerning no-contact orders."  Dkt. 72 at 45.  According to Cavalier, when a violation of a no-contact order occurred, University policy required the Department of Public Safety "to complete an incident report" and, then, for the Office of the Dean of Students to "determine if it needed to refer the matter to the Office of Student Conduct and Ethical Development for a 'formal review.'"  Dkt. 72 at 45–46.  Cavalier maintains that Sawyer did not abide by this process.

In response, the University argues that "the 'formal review' Cavalier accuses the University of not conducting . . . would have occurred only if Sawyer [had] determined that it was necessary to refer the matter to Dean Torres' Office of Student Conduct and Ethical Development for such a review and, if appropriate, a formal student conduct hearing."  Dkt. 73 at

17. But, the University notes, "both times [Sawyer] received Cavalier's allegations, [he] was able to determine that no [no-contact-order] violation had occurred, making a formal review unnecessary." *Id.*

The Court agrees with the University.  Cavalier mischaracterizes the deposition testimony on which she relies to explain the University's policies.  According to Torres, after any student-initiated contact with the Office of the Dean of Students, a report was to be filed and the Student Conduct Office notified only if the Office of the Dean of Students thought doing so was appropriate.  Dkt. 73-5 at 12 (Torres Dep).  As Torres testified:

> Q.   [I]f there is an alleged violation of the no-contact order, where does the Complainant go to have that alleged violation remedied?
>
> A.   They will return—so the matter—we've advised parties who are—who receive a no-contact order to report to either a staff member with the Office of Residence Life or a Public Safety personnel regarding the matter so that an incident report can be generated.  And then we ask them to follow up with the Office of the Dean of Students.
>
> Q.   In the Erin Cavalier case, is it your testimony, then, that had there been a violation of the no-contact order, Erin Cavalier was to go to the Residence Life or to DPS to report the alleged violation, sir?
>
> A.   Yes, sir.
>
> Q.   And from there, she was to follow up with the Department of Safety—or the Dean of Students?
>
> A.   Yes, sir.
>
> Q.   And what, then, is next in the process of reporting an alleged violation of a no-contact order?
>
> A.   We will likely review the matter[] and determine if it needs to be referred to the Office of Student Conduct and Ethical Development for formal review.
>
> Q.   I'm sorry.  You said you'd refer to what office again?

A.    To the Office of Student Conduct and Ethical Development. That's the office that reported to me.

Q.    Okay. Once something is reviewed by the Dean of Students, and then referred to the Office of Student Conduct and Ethical Development, what happens next with an alleged violation of a no-contact order, sir?

A.    If it's determined, we normally proceed, and review it under the student conduct guidelines. And if there's enough information, we will refer the matter to a student conduct proceeding.

*Id.* (Torres Dep. 294:17–296:15).

This process was followed here. As an initial matter, no incident report was created because Cavalier reported Doe's purported violations not to the Office of Residence Life or a Public Safety officer, but instead to Sawyer, the Dean of Students, directly. And more importantly, the two times that Cavalier reported a potential violation of the no-contact order, Sawyer reviewed the allegations and "determine[d] [that] it [did not] need[] to be referred to the Office of Student Conduct and Ethical Development for formal review." *Id.* That decision was consistent with University policy, and no reasonable jury could find that it constituted deliberate indifference to discrimination. In short, Cavalier's argument that the University's enforcement of the no-contact order was clearly unreasonable is unsupported by the record.

4.    *Consideration of Cavalier's Incapacitation*

Cavalier next argues that during the winter and spring of 2013 the University made several errors in evaluating her alleged rape—such as failing adequately to train Gregory, Callis, and Sawyer, Dkt. 72 at 21–22, failing expeditiously to investigate her claims, and delaying the decision to conduct a disciplinary hearing, *id.* at 33–37. Cavalier explains her claim as follows: Because the University "did not train the staff who responded to and investigated [her] complaint that students incapacitated by alcohol could not consent to sex," *id.* at 35, the University's "investigators and Dean of Students then failed to take Cavalier's capacity to consent into

account at nearly every stage of the investigation, causing significant delay in the resolution of

her claim," *id.* at 33.  When the University "refused to hold a hearing in March 2013," for

instance, it did so in reliance on Gregory's report—but Gregory, Cavalier argues, "did not

understand the concept of incapacitation in the Title IX context" and "omitted critical evidence

from her report, including how much Cavalier reported drinking." *Id.*  Those failures then

carried over to Dean Sawyer, whose decision not to grant Cavalier a hearing was based on

Gregory's purportedly errant reports. Dkt. 50-11 at 2; Dkt. 66-18 at 4–5.  Moreover, "the fact

that the Dean never entertained the notion that Cavalier [might] have been too incapacitated to

consent, in light of the substantial evidence to the contrary, is," Cavalier contends, further

"evidence of deliberate indifference." Dkt. 72 at 33.

     Although certain aspects of Cavalier's argument fail—for example, her claim that the

University was deliberately indifferent in failing to train Callis, Gregory, and Sawyer regarding

sexual assault[7]—the Court agrees with Cavalier's bottom line: a reasonable jury could find that

---

[7] Captain Gregory was a near-thirty-year veteran of the Metropolitan Police Department, during
which she worked for at least two years in the sex-offense branch and beyond which she received
numerous trainings regarding sexual assault. Dkt. 73 at 24 & n.16; *see also* Dkt. 73-3 at 4, 14–
16 (Gregory Dep. 12:12–17; 80:11–81:9; 82:13–15, 84:2–21; 98:15–21). Captain Gregory also
testified at her deposition that she received training by the University in the fall of 2012 relating
to sexual assault and incapacitation specifically. *Id.* at 16 (Gregory Dep. 98:15–21); *see also*
Dkt. 66-19 at 5 (Wood Dep. 106:12–17) (responding, "I believe she did," when asked whether
"Captain Gregory receive[d] any training on sexual assault and sexual harassment"). Callis
meanwhile testified that he was a twenty-five-year veteran of the MPD and that, prior to 2012, he
attended two trainings, spanning five days, that dealt with Title IX and sexual assault in
particular. Dkt. 74-10 at 4–5 (Callis Dep. 11:3–18, 30:15–32:9). Finally, although the
University admits that Sawyer never "received a specific training on how to conduct a Title IX
hearing," Dkt. 73 at 24, Sawyer testified that he received training related to Title IX in 2012 and
that he helped write the University's interim sexual assault policy that dealt with incapacitation
specifically, Dkt. 73-4 at 5–6 (Sawyer Dep. 84:8–88:18). Sawyer further testified that, between
2011 and 2013, he was "heavily involved in reviewing federal legislation [related to Title IX]"
and that, during that period, he was "reviewing the literature that the national conferences were
synthesizing to help [the University] be better at management of cases in this regard." *Id.* at 14
(Sawyer Dep. 255:4–7, 257:2–4). Sawyer also participated in "a full and fundamental review of

the University's meaningful consideration of Cavalier's incapacitation was untimely, insufficient, and thus "clearly unreasonable."

To start, the Court agrees with Cavalier that a reasonable jury could find that Gregory's initial investigation into Cavalier's complaint was "clearly unreasonable" on the ground that—even though Cavalier consumed *at least* two shots of tequila, a glass of wine, and two to three shots of vodka the night of the alleged rape and, more importantly, could not remember what had happened even immediately after the alleged rape occurred, Dkt. 66-3 at 2–7; Dkt. 78 at 23 (Cavalier)—Gregory did not give serious consideration to the possibility that Cavalier was incapacitated.  To be sure, Gregory and the University approached the issue in this manner because of how Cavalier framed her initial allegations; she said that she believed she was raped because Doe did not use a condom, not because she was incapacitated and could not consent. Dkt. 45-5 at 4.  But that does not resolve the question because a reasonable jury could also find that the failure of the University to look beyond the allegations of the eighteen-year-old (initially inebriated) victim, who acknowledged that she could not even recall much of what had happened, *see* Dkt. 1 at 10 (Compl. ¶ 34), was clearly unreasonable.

---

the Dear Colleague letter and how [the University] then update[d] and revise[d] [its] policies and procedures" in keeping with that letter. *Id.* (Sawyer Dep. 255:13–22, 257:5–22).  Finally, Sawyer testified that since 2013 he has "at least twice a year" participated in online programs specific to Title IX, although it is not clear when in 2013 those trainings occurred. *Id.* at 15 (Sawyer Dep. 260:11–261:16).  On balance, the Court is persuaded that no reasonable jury could find that the University was deliberately indifferent to sexual harassment based solely on its failure to provide Gregory, Callis, and Sawyer with additional training. *Cf. Hill v. Cundiff*, 797 F.3d 948, 975 (11th Cir. 2015) (finding lack of training clearly unreasonable where teacher and "teacher's aides received no training on how to handle complaints of sexual harassment," "no records [were] kept about sexual harassment training," defendant "failed to produce any official documentation of staff training sessions," and defendant did "nothing to improve its sexual harassment policies").

Gregory's initial failure meaningfully to consider whether Cavalier was incapacitated was arguably exacerbated by her supplemental report, which Gregory issued after she was informed by Cavalier's lawyer that Cavalier may have been too inebriated to consent and after she received the toxicology report showing Cavalier's high blood alcohol content the next morning. The supplemental report stated that "there is *no evidence* presented that . . . [Cavalier's] blood alcohol level impaired her ability to give consent at the time of the incident," Dkt. 46-8 at 3 (emphasis added), despite: (1) a toxicology report showing that Cavalier's blood alcohol content was still substantially above the legal limit to drive at 8:30 a.m.—*several hours after the alleged rape*, Dkt. 66-8 at 3; (2) evidence that Cavalier may have mixed alcohol with Adderall, Dkt. 46-8 at 2; Dkt. 66-3 at 4; (3) Doe's own admission that Cavalier was "drunk," Dkt. 45-5 at 5; Dkt. 45-8 at 2; (4) evidence that Cavalier could not recall significant events even shortly after the alleged rape, such as how she got back to her room, signing Doe in as a guest, the time the alleged rape occurred, Doe's use of a condom, kicking Doe out of her room, or what she told Lieutenant Dicks that night, *see* Dkt. 66-3 at 4, 6; Dkt. 45-5 at 4; Dkt. 45-8 at 2; Dkt. 64-4 at 3–4; Dkt. 66-1 at 13 (Cavalier Dep. 38:4–20); (5) Cavalier's assertion that she "ha[d] blacked out before," Dkt. 64-5 at 4; and (6) at least some witnesses (albeit not all) who described Cavalier as "staggering," Dkt. 64-4 at 5, "drunker [along with Doe] than any of" the others at the party, *id.* at 7, and "very drunk and falling asleep" during the party, *id.* at 8. Based on this evidence, a reasonable jury could find that Gregory's conclusion that there was "no evidence" of incapacitation was clearly unreasonable.

The Court is also persuaded that a reasonable jury could find that Sawyer's decisions not to call for a hearing before August 2013, based largely on Gregory's allegedly flawed reports, was clearly unreasonable for similar reasons. Under the University's long-established practice,

Sawyer was required to initiate a disciplinary proceeding if he concluded that a "reasonable Hearing Board . . . [could make] a finding of responsibility" by Doe under a preponderance-of-the-evidence standard. Dkt. 64-10 at 19 (Sawyer Dep. 282:3–7). In other words, much like a court considering a motion for summary judgment, Sawyer was required to consider whether a reasonable hearing board could find that it was more likely than not that Doe was culpable. *Id.* In a daunting confluence of standards, then, the question for the Court is whether (1) a reasonable jury could find that (2) it was clearly unreasonable for Sawyer to conclude that (3) no reasonable hearing board could find that (4) it was more likely than not that (5) Doe had committed a disciplinary infraction.

Although Sawyer did not offer detailed reasons for his failure to refer the matter for a hearing before August 2013, he did explain that he was relying on the reports prepared by Gregory. Dkt. 50-11 at 2; Dkt. 66-18 at 4–5. The first Gregory report concluded that no rape occurred because Cavalier "consented to having sex with" Doe if he used a condom, "and a condom was used during the sexual encounter." Dkt. 64-4 at 9. To be sure, that report acknowledges that Cavalier "had been drinking," *id.*, but a reasonable jury could find that it gave no serious consideration to whether she was incapacitated. And, as explained above, a reasonable jury could find that Gregory's supplemental report was also deliberately indifferent to evidence of Cavalier's incapacitation. Given the evidence that Sawyer simply accepted the findings of the two Gregory reports, it follows *a fortiori* that a reasonable jury could find that it was clearly unreasonable for Sawyer to conclude that no reasonable hearing board could find that a sexual assault had occurred. Put more succinctly, Sawyer's conclusion that no reasonable hearing board could find that Cavalier lacked the capacity to consent is difficult to square with the evidence that she consumed an excessive amount of alcohol over a short period of time,

44

could not recall what had happened, was staggering, and was still too drunk to drive a car several hours after the alleged rape.  This is not to say that the decision that the hearing board ultimately rendered was clearly unreasonable—only that there was ample evidence that would have permitted a hearing board to agree with Cavalier that she lacked the capacity to consent and that a reasonable jury could find that Gregory, Callis, and Sawyer were deliberately indifferent to that evidence.[8]  The Court, accordingly, concludes that a reasonable jury could find that Sawyer's decision not to call for a hearing before August 2013 was the product of deliberate indifference to Cavalier's asserted incapacity to consent.

The deliberate-indifference inquiry, however, does not end the analysis.  Under *Davis*, a school's deliberate indifference is actionable under Title IX only if it "effectively 'cause[d]' the discrimination." 526 U.S. at 642–43.  Or, put differently:  "If a [university] does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment." *Id.* at 644.  Here, Cavalier does not contend that the University "engage[d] in harassment directly."  She, instead, argues that (1) had the University properly considered her capacity to consent, it would have granted her a hearing before August 2013; (2) had the University done so, then it would have also issued a no-contact order earlier than it did, Dkt. 73-5 at 11–12 (Torres Dep. 293:4–294:4) (stating that, as a matter of University policy, no-contact orders were generally issued when a hearing was granted); and (3) had the no-contact order been issued at that earlier time, then Cavalier would not have been subjected to harassment between March and August 2013.

---

[8]  Although the hearing board ultimately based its decision on the grounds that (1) Doe "would not have reasonably thought" that Cavalier "was incapacitated/unable to consent," and (2) Cavalier's "words and actions did reasonably indicate to [Doe] that consent was given," Dkt. 48-7 at 2, there is no evidence that Gregory, Callis, and (thus) Sawyer relied on Doe's reasonable belief, as opposed to Cavalier's actual capacity to consent.

45

Although the logic of Cavalier's argument has some appeal, the Court cannot decide the question based on the existing record and briefing. First, as a matter of law, the parties have not addressed whether *Davis* requires that a Title IX plaintiff prove that she was, in fact, victimized by subsequent acts of harassment or whether it is enough to show that the original act of harassment—here, the alleged rape—and the school's clearly unreasonable response left her open to the risk of subsequent acts of harassment. Second, as a matter of fact, the parties have not addressed whether Cavalier was actually harassed or left vulnerable to harassment *as a result of* the University's delay in agreeing to hold a disciplinary hearing and its corresponding delay in issuing a no-contact order.

As to the law, the circuit and district courts are split on the meaning of *Davis*'s "subsequent-harassment" requirement, and the D.C. Circuit has yet to "weigh[] in on th[e] issue." *Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 133 (D.D.C. 2019) (subsequent history omitted); *see also* Civil Rights Law—Title IX—Sixth Circuit Requires Further Harassment in Deliberate Indifference Claims—*Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613 (6th Cir. 2019), 133 Harv. L. Rev. 2611, 2614–15 (2020) (noting split). Neither party addresses this split in authority nor offers a reason to follow one or the other of the lines of precedent.

Under one line of authority, a plaintiff must establish that she suffered additional harassment as a result of the defendant's deliberate indifference. *See Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 622 (6th Cir. 2019) (subsequently history omitted) ("*Davis* requires a showing that the school's deliberate indifference subjected its students to harassment, necessarily meaning further actionable harassment. . . . But the occurrence of further harassment is not enough by itself; the response's *unreasonableness* must have caused

the further harassment." (brackets and quotation marks omitted)); *Escue v. N. Okla. Coll.*, 450
F.3d 1146, 1156 (10th Cir. 2006) ("[Plaintiff] has not shown that [defendant's] response was
clearly unreasonable nor has she shown that it led to further sexual harassment."); *K.T. v. Culver-
Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017) (dismissing Title IX claim where "the
complaint identified no causal nexus between [defendant's] inaction and [plaintiff's]
experiencing sexual harassment"); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th
Cir. 2000) ("There is no evidence that any harassment occurred after the school district learned
of the plaintiffs' allegations [of student-on-student harassment]. Thus, under *Davis*, the school
district cannot be deemed to have subjected the plaintiffs to the harassment." (quotation marks
omitted)); *Moore v. Murray State Univ.*, 2013 WL 960320, at *4–5 (W.D. Ky. Mar. 12, 2013)
("[T]he complaint contains no allegations that any further harassment occurred after the assault
. . . . The critical piece missing from [the student's] complaint is any allegation that she was
'subjected' to or experienced sexual harassment after notifying [school personnel] about the
[initial] assault . . . ."); *Blue v. District of Columbia*, 850 F. Supp. 2d 16, 35 (D.D.C. 2012)
("Finally but significantly, Plaintiff does not allege that further sexual harassment occurred as a
result of [the school's] deliberate indifference." (quotation marks omitted))).

Under the competing line of authority, a plaintiff need establish only that the university's
deliberate indifference left the plaintiff "vulnerable" to future harassment. *See Farmer v. Kan.
State Univ.*, 918 F.3d 1094, 1103 (10th Cir. 2019) ("It is sufficient for [p]laintiffs to allege that
[defendant's] deliberate indifference made them vulnerable to sexual harassment. Title IX does
not require a subsequent sexual assault before a plaintiff can sue." (quotation marks omitted));
*Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172–73 (1st Cir. 2007), *rev'd on other
grounds*, 555 U.S. 246 (2009); *Doe 1*, 396 F. Supp. 3d at 135 ("This court agrees with the Tenth

47

Circuit's conclusion that *Davis* clearly indicates that Plaintiffs can state a viable Title IX claim by alleging alternatively either that a school's deliberate indifference to their reports of rape caused Plaintiffs to undergo harassment or made them liable or vulnerable to it." (brackets and quotation marks omitted) (citing *Farmer*, 918 F.3d at 1103)); *id.* at 134 (collecting additional district court decisions endorsing the same proposition); *Wells v. Hense*, 235 F. Supp. 3d 1, 8 (D.D.C. 2017) ("Title IX does not require that a defendants' deliberate indifference lead to subsequent actionable harassment.").

This circuit split matters here because the factual evidence relevant to the subsequent-harassment inquiry is mixed. There is no evidence that Cavalier interacted with or saw Doe during the periods (1) from December 15—the date of the alleged rape—to January 14—the day Cavalier returned to campus from winter break, Dkt. 45-3 at 4–5 (Def.'s SUMF ¶¶ 19, 25); Dkt. 65-1 at 7 (Pl.'s Resp. SUMF ¶¶ 19, 25); and (2) from March—when Sawyer initially declined to initiate a disciplinary hearing—to August, when he eventually agreed to schedule a hearing and the no-contact order was imposed, Dkt. 73 at 14; *see also* Dkt. 71-7 at 3–4 (Pl.'s Resp. to Def.'s Interrogatories). But there were at least two instances when Cavalier allegedly experienced harassment by Doe or his friends: once, "in January or February 2013," when students who were with Doe approached Cavalier as she sat alone at the student center and called her a "slut" and a "whore," Dkt. 66-1 at 43–44 (Cavalier Dep. 192:1–193:21); and, second, in February 2013, when Doe attended a party where Cavalier was present and approached Cavalier and allegedly "laughed in [her] face," Dkt. 45-7 at 80–82 (Cavalier Dep. 167:4–169:15). Thus, depending on when Sawyer should have decided to initiate the disciplinary process and therefore should have issued a no-contact order, Cavalier might—or might not—be able to establish the type of subsequent act of harassment or risk of harassment that *Davis* requires.

48

The Court acknowledges that the University nevertheless believes it should not be faulted for failing to impose a no-contact order earlier because (1) in January 2013, Wainer reviewed with Cavalier various actions that "could be taken to address retaliation in its many forms," including an "order of no contact," and Cavalier merely responded that "she had a therapist at home, had not been in touch with [Doe] or his friends[,] and had followed up with the [a]dvocate [Silverberg] who met her at the SANE program following the incident," Dkt. 45-15 at 2; *see also* Dkt. 45-7 at 34 (Cavalier Dep. 62:1–15); and (2) in any event, Troy told Doe some time in February 2013 "that he should not engage in any negative behaviors/communications with" Cavalier, Dkt. 45-16 at 2–3.  At this juncture, however, the Court is not persuaded by either argument.

First, the parties have not addressed whether Cavalier's failure to pursue a no-contact order in January 2013 could absolve the University of its subsequent decision not to impose a no-contact order under its own policies, before it finally did so in August 2013. Dkt. 73-5 at 11–12 (Torres Dep. 293:4–294:4).  Indeed, Cavalier testified that, despite her failure to follow-up with Wainer in January, she requested the University impose a no-contact order in either March 2013—when Sawyer rendered his initial decision—or May 2013—when Sawyer was reconsidering that decision. Dkt. 66-1 at 18–21 (Cavalier Dep. 83:21–86:9).  Second, Troy's email memorializing his conversation with Doe in February 2013, Dkt. 45-16, is also far from clear.  Most notably, it does not explain what it meant to refrain from "negative behavior/communications with" Cavalier. *Id.*  Did this mean that it was permissible, for example, for Doe to have contact with Cavalier, so long as the contact—in Doe's view—was not "negative"?  And was this friendly advice or a directive, the violation of which would result in some form of discipline?  Most fundamentally, the email, the broader record, and the parties'

arguments fail to clarify whether Troy's admonition provided an adequate substitute for a no-contact order.  Finally, as discussed, Cavalier alleges that she was harassed by Doe (or his friends) on two occasions after the alleged rape, but the record is unclear whether either or both of those events occurred before or after Troy's conversation with Doe.  Dkt. 66-1 at 43–44 (Cavalier Dep. 192:1–193:21); Dkt. 45-7 at 80–82 (Cavalier Dep. 167:4–169:15).  In short, the existing record lacks sufficient clarity on these issues for the Court to conclude, on this basis alone, that no reasonable jury could find in Cavalier's favor.

In sum, then, on the current record, the Court cannot foreclose the possibility that a reasonable jury could find that (1) the University's investigation in the winter and spring of 2013 was clearly unreasonable because the University failed meaningfully to consider whether Cavalier was incapacitated; (2) that failure resulted in a delay in setting the hearing date; and (3) had the hearing date been set earlier, Sawyer would have issued a no-contact order months earlier than he did.  Because the parties have failed to address, however, whether—as a matter of law—the mere risk of harassment is sufficient under *Davis*, and whether—as a matter of fact—Cavalier was subject to any actual or risk of harassment during that period of time that elapsed from when Sawyer, on this theory, should have issued a no-contact order and when he subsequently did so in August 2013, the Court cannot determine whether this aspect of Cavalier's claim has sufficient merit to go to a jury.

The Court will, accordingly, deny the University's motion for summary judgment to this limited extent.[9]

---

[9] Two final notes.  First, the Court recognizes that Cavalier's claim based solely on the University's failure to impose a no-contact order earlier than August might arguably fall outside of the applicable statute of limitations.  *See* Dkt. 13 at 47–51.  Prior to today's decision, Cavalier's claims extended beyond October 2013, and based on that premise and the continuing violation theory, the Court previously rejected the University's statute of limitations defense.

### B.    Negligent Infliction of Emotional Distress

In addition to her Title IX claim, Cavalier alleges that the University negligently inflicted emotional distress upon her, in violation of D.C. common law, by failing: (1) "reasonably [to] investigate . . . her rape allegation;" (2) timely to implement the no-contact order; and (3) adequately to enforce the no-contact order.  Dkt. 72 at 46–51; *see also* Dkt. 1 at 34–36 (Compl. ¶¶ 153, 158–60).  To prove a claim for negligent infliction of emotional distress ("NIED") a plaintiff must establish that: "(1) the defendant had a relationship with the plaintiff, or had undertaken an obligation to the plaintiff, of a nature that necessarily implicate[d] the plaintiff's emotional well-being; (2) there was an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff; and (3) negligent actions or omissions of the defendant in breach of that obligation did, in fact, cause serious emotional distress to the plaintiff."  Dkt. 13 at 42 (quotation marks and brackets omitted).

The Court will first address Cavalier's contention that the University undertook a duty to conduct a reasonable investigation and will then turn to her contentions that the University had a duty to issue a no-contact order earlier than it did and had a duty vigorously to enforce the no-contact order that it eventually issued in August 2013.

---

The parties, of course, have not yet had the opportunity to address whether and how today's decision might affect that conclusion, and the Court expresses no view on that question.  Second, Cavalier relatedly argues that the University acted in a clearly unreasonable manner by: (1) deviating from its standard operating procedure of routinely issuing no-contact orders in cases of sexual assault without requiring a party to request such an order; and (2) failing to issue a no-contact order as soon as Cavalier requested one in March or May 2013.  Dkt. 72 at 18–19.  Even assuming a reasonable jury could agree with Cavalier that the University's actions were deliberately indifferent, it remains unclear whether *Davis*'s subsequent-harassment test is satisfied for the reasons stated above.  The Court will set a status conference to address how best to proceed in light of these unresolved issued.

1.    *The Investigation*

Cavalier first argues that the University "assumed the responsibility of protecting

Cavalier's emotional well-being throughout the investigative process" and that the University's

failure adequately to investigate and remedy Cavalier's alleged rape caused Cavalier serious

emotional distress. Dkt. 72 at 48.  In support of this argument, Cavalier points to the

University's interim sexual misconduct policy, which "declar[es] that the school will respond to

sexual assault by protecting the student and appointing a trained resource person to identify,

explain and navigate the available support services." *Id.* at 47 (quotation marks and alterations

omitted); *see also* Dkt. 66-15 (interim policy).  Cavalier also points to an email she received

from a University administrator promising to "provide her with information about on-campus or

community counseling resources." Dkt. 72 at 47 (quotation marks omitted); *see also* Dkt. 67-17

(email chain between Wainer and Cavalier).

The University responds by arguing that "Cavalier has not identified any instance where

the University affirmatively represent[ed] an undertaking concerning the investigation" in a

manner that would trigger the special duty upon which NIED claims hinge. Dkt. 73 at 27

(quotation marks omitted).  And it further notes that "[t]he relationship between a student and

[her] school . . . is not enough, without more, to impose the predicate duty of care for a claim of

negligent infliction of emotional distress." *Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 (D.C.

2016); *see also* Dkt. 61 at 52–53.

The Court agrees with the University.  First, Cavalier asserts that the University's emails

and policies, which largely concern the support services that the University would offer Cavalier,

established an affirmative duty to conduct the investigation in a reasonable manner.  Although

those policies and emails do not contain any specific representations as to the University's

investigation, Cavalier suggests that the University's statement that it would "protect[] the student" creates (or subsumes) the duty to conduct a reasonable investigation of the student's complaint.

There are two problems with Cavalier's argument. First, the Court has already rejected it. Dkt. 13 at 43. And second, it fails on its own terms. "Whether the defendant breached [its] obligations is to be determined by reference to the specific terms of the undertaking agreed upon by the parties or, otherwise, by an objective standard of reasonableness applicable to the underlying relationship or undertaking[.]" *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 811 (D.C. 2011). Here, the specific terms of the University's policies and emails includes no representations regarding the conduct of the University's investigation. So Cavalier is left to argue that the University's statement that it would "respond to sexual assault by protecting the student" created a relationship or undertaking related to the conduct of its investigation. But Cavalier cites no authority—nor has the Court found any—suggesting that NIED relationships or undertakings should be read at such a high level of generality. To the contrary, *Hedgepeth* tasks courts with focusing on the "specific terms" of the undertaking and opines that liability should attach only when the duty between the purported tortfeasor and victim, if not recognized as matter of law, is discrete. It follows that Cavalier's reliance on the University's declaration that it "will respond to sexual assault by protecting the student" lacks a sufficient focus on the investigation to support Cavalier's first NIED theory.

2.     *Issuing and Enforcing the No-Contact Order*

In its motion-to-dismiss opinion, the Court observed: "to the extent [Cavalier] challenges the University's failure to enforce its no-contact order, her negligence claim survives the University's motion to dismiss" because by "affirmatively representing to Cavalier that a no-

53

contact order was in place between her and Doe and that, should Cavalier report Doe's violations

of that order, it would take the necessary steps to enforce it . . . the University knew, or should

have known, that it was 'undertaking' an obligation in a 'situation[] where the emotional well-

being of [Cavalier] [wa]s at the core' of its responsibility." Dkt. 13 at 44 (quoting *Hedgepeth*, 22

A.3d at 814). In light of that holding, Cavalier now argues that the University breached its duty

with respect to the no-contact order by (1) failing to issue the order in a timely manner; and

(2) failing to adequately respond to Doe's violations of the order. Dkt. 72 at 50–51.

     In response, the University argues that it made no representation to Cavalier that a no-

contact order would issue, and thus, that it did not owe Cavalier a duty of care with respect to the

order's imposition. Dkt. 73 at 27. The University further argues that it appropriately responded

to the two purported violations of the no-contact order of which Cavalier made the University

aware. *Id.*

     The Court concludes that the University is entitled to summary judgment on Cavalier's

NIED claims based on the issuance and enforcement of the no-contact order. First, Cavalier

cites no evidence that the University represented to her—or even led her to believe—that a no-

contact order would issue before August 2013. To be sure, Wainer asked Cavalier in January

2013 whether she wanted a no-contact order, *id.*, but Cavalier merely responded that "she had a

therapist at home, had not been in touch with [Doe] or his friends[,] and had followed-up with

the [a]dvocate [Silverberg] who met her at the SANE program following the incident." Dkt. 45-

7 at 34 (Cavalier Dep. 62:1–15). The University's policy, moreover, indicated that it was up to

the Dean of Students to decide, in his discretion, whether to issue a no-contact order. Dkt. 66-15

at 3 ("When appropriate, the Dean of Students *may* issue no-contact orders to the students

involved. DPS shall be notified when an order of no contact is issued. Further steps may be

taken by the Dean of Students in his /her discretion." (emphasis added)).  For that reason, Cavalier cannot show that the University created or breached a duty to issue a no-contact order upon Cavalier's request.

Second, the University's response to Doe's alleged violations of the no-contact order were objectively reasonable.  In both instances, Sawyer reviewed the relevant information and determined that no violation of the order occurred, despite Doe and Cavalier seeing each other.  *See* Dkt. 45-3 at 18 (Def.'s SUMF ¶ 102) (explaining that, under the no contact order, Doe and Cavalier "were to have no direct, indirect or third party contact, meaning they may not speak to or contact each other in person, by phone, via email or through friends or other third parties," but not that the no contact order prohibited Doe and Cavalier attending the same social function (quotation marks omitted)); Dkt. 45-14 at 13–15 (Sawyer Dep. 194:16–196:9) ("There was no direct contact between them, [Doe] didn't make his way into the party, in fact, he was physically assaulted outside."); *id.* at 19 (Sawyer Dep. 231:9–21) ("[W]e don't put a bubble around people, it's not a stay away order, it's not a directive that says the first person there gets to say there.").  Consequently, no reasonable jury could find, on the present record, that the University owed Cavalier a duty related to the issuance of a no-contact order or that the University's enforcement of the no-contact order fell below an objective standard of reasonableness.

The University is therefore entitled to summary judgment in its favor on Cavalier's NIED claim.

## CONCLUSION

For the reasons explained above, the University's motion for summary judgment, Dkt. 61, is hereby **GRANTED** in part and **DENIED** in part, and the University's motion to strike, Dkt. 68, is hereby **DENIED** as moot.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 8, 2021