## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ERIN CAVALIER, | : | |
| *Plaintiff,* | : | |
| | : | No. 1:16-CV-02009-RDM |
| v. | : | |
| | : | |
| THE CATHOLIC UNIVERSITY OF | : | |
| AMERICA, | : | |
| *Defendant.* | : | |
| | : | |

## MEMORANDUM IN SUPPORT OF DEFENDANT THE CATHOLIC UNIVERSITY OF AMERICA'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 2

    A.    Cavalier accuses Doe of sexual assault. ................................................................. 2

    B.    The University offers support and a no-contact order .......................................... 2

    C.    The University resumes its investigation. ............................................................. 3

    D.    Claimed instances of seeing Doe. ........................................................................ 4

    E.    Dean Sawyer decides the matter should not be sent to a hearing board, but reconsiders at Cavalier's request ......................................................................... 4

    F.    The University investigates further and continues to engage with Cavalier. ....................... 5

    G.    Dean Sawyer agrees to a hearing, and a no-contact order is implemented. ..................... 6

    H.    The hearing board finds Doe not responsible ...................................................... 6

    I.    The University enforces the no-contact order ....................................................... 6

    J.    The Court's summary judgment ruling .................................................................. 7

ARGUMENT ...................................................................................................................... 8

    I.    Cavalier's remaining claims are barred by the statute of limitations ................................. 8

    II.    Cavalier's Title IX claim also fails because she has not shown that she was subjected to any further actionable harassment following notice to the University. .................................. 10

        A.    The Supreme Court's opinion in *Davis* requires further actionable harassment following actual notice ............................................................................ 10

        B.    The Circuit Courts that interpret *Davis* to require actual further harassment. ........... 13

        C.    The Circuit Court cases that arguably support the potential harassment theory. ....... 17

        D.    The Court should hold that further actual harassment is required to state a claim under Title IX ............................................................................................. 20

    III.    The Court should grant summary judgment because Cavalier cannot show that, after the University had actual notice of her alleged assault, she was subjected to any further actionable harassment ................................................................................................... 21

        A.    Cavalier did not experience actionable harassment after reporting her alleged assault to the University ............................................................................. 21

        B.    The evidence does not show that it was clearly unreasonable for the University not to have put a no-contact order in place in early 2013. ................................ 25

    IV.    The Court should grant summary judgment for the University even if it adopts the potential harassment theory. .................................................................................... 27

CONCLUSION ................................................................................................................. 28

## INTRODUCTION

In its November 30, 2020 Memorandum Opinion and Order, the Court granted summary judgment on plaintiff Erin Cavalier's only remaining tort claim and on much of her Title IX claim. The only potential claim that remained, the Court said, concerned whether defendant The Catholic University of America's (the "University") delay in instituting a no-contact order until August 2013 subjected Cavalier to discrimination under Title IX.  That remaining theory, the Court held, was subject to conflicting legal interpretations that precluded a summary judgment ruling before the parties presented further briefing to the Court.  Dkt. 79 at 46-48.

Irrespective of how those legal theories are resolved, however, Cavalier's remaining theory is barred by the statute of limitations.  *See* Dkt. 79 at 2 n.1  When it denied the University's motion to dismiss, filed early in this case, the Court concluded that Cavalier's Title IX claim survived dismissal on statute of limitations grounds solely because Cavalier alleged that the University continued to expose her to harassment up through her graduation.  However, Cavalier failed to support that allegation with any facts in discovery.  In ruling on summary judgment, the Court concluded no actionable violation by the University could have occurred  later than August 2013, *i.e.*, more than three years before Cavalier filed her complaint.  As a result, Cavalier's only remaining theory in this case is barred by the statute of limitations, and the Court should enter summary judgment.

Even were the statute of limitations not dispositive, the Court should grant summary judgment for the University because Cavalier has not demonstrated that she experienced any harassment between her alleged assault and when the University instituted and enforced a no-contact order.  As the Court noted in its memorandum opinion, authorities are divided on the question of what it means for a school to "subject" a student to discrimination under Title IX, namely, whether the school must, after having actual knowledge of peer harassment, cause or allow

the harassment to continue, or is it enough that there exists some unrealized possibility that harassment could, in theory, occur.  The cases that have required further actual harassment are correct.  They are consistent with the plain language of the test set forth in the Supreme Court's decision in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), and they reflect the principled limitations on the cause of action that *Davis* recognized and went to significant lengths to stress.  The contrary authorities rely on a single sentence from that opinion, stripped of any context, and they pay scant attention to the dramatic expansion of Title IX liability that would arise as a result.  The Court should hold that further actual harassment, not mere potential harassment, is required to state a cause of action under Title IX and that Cavalier cannot satisfy this standard.

## FACTUAL BACKGROUND

The University incorporates by reference the Statement of Material Facts as to which There is No Genuine Dispute from its prior Motion for Summary Judgment ("SOF," Dkt. 45-3).  The facts pertinent to this Motion are repeated below.

### A.    Cavalier accuses Doe of sexual assault.

Early the morning of Saturday, December 15, 2012, the University's Department of Public Safety ("DPS") received a report that Cavalier had been sexually assaulted.  SOF ¶¶ 1-2. Lieutenant Marvin Dicks of DPS went to the scene to investigate, speaking with Cavalier, the student who had allegedly assaulted Cavalier (John Doe), and others.  SOF ¶¶ 3-12.  Officers with the Metropolitan Police Department ("MPD") also investigated that morning, and Cavalier was transported to a hospital.  SOF ¶¶ 12-18.

### B.    The University offers support and a no-contact order.

Cavalier returned home to California that same day, December 15.  SOF ¶ 19.  Assistant Dean Rachel Wainer reached out to Cavalier by email on Monday, December 17, offering to connect regarding potential support services.  SOF ¶¶ 20-21.  Cavalier inquired about such services

on the day that she returned to campus, January 14, 2013, and she and Dean Wainer met that same day. SOF ¶¶ 25-26. Among other support services, Dean Wainer offered Cavalier a no-contact order, but Cavalier told her this was not necessary. SOF ¶¶ 27-29. Dean Wainer conveyed all of this information to Dean of Students Jonathan Sawyer. *See* SOF ¶ 29; Mot. Ex. 11 (Wainer Jan. 14, 2013 email to Sawyer). Cavalier never replied when Dean Wainer reached out to her several more times in January. SOF ¶¶ 31-32.

On February 5, 2013, Associate Director of Residence Life Brad Troy met with Doe and told Doe not to communicate with Cavalier. SOF ¶ 33. Troy also confirmed that Doe had not spoken to Cavalier and did not intend to do so. *Id.* Troy informed Dean Sawyer of this conversation the same day. *See id.*; Mot. Ex. 12 (Troy Feb. 5, 2013 email to Sawyer).[1]

C.    The University resumes its investigation.

Captain Kim Gregory of DPS, assisted by Investigator Charles Callis, was tasked with investigating the incident between Cavalier and Doe, and, on January 15, 2013, she reached out to Cavalier to schedule a meeting. SOF ¶¶ 34-37. Captain Gregory interviewed Cavalier the next day, then interviewed Doe and at least nine other witnesses, and gathered information collected previously by DPS Lieutenant Dicks and officers and detectives from MPD, ultimately producing a February 18, 2013 report. SOF ¶¶ 40-59. Although noting that witnesses had given mixed evidence about the extent to which Cavalier was intoxicated, Captain Gregory concluded that the sexual interaction between Cavalier and Doe was consensual based primarily on the fact that Cavalier had told Captain Gregory that the sex was consensual but for Cavalier's belief that Doe had not used a condom, coupled with evidence that Cavalier had stopped Doe and provided him

---

[1]    The University also knew, by virtue of Captain Kim Gregory's January 24, 2013 interview with Doe, that, prior to December 15, 2012, Doe "did not know Erin [Cavalier], never had a conversation with her, and that this was the first time he met her." Mot. Ex. 16 (Feb. 18, 2013 report) at CUA_002128.

with a condom, and that he had used a condom.  SOF ¶¶ 59-62; *see* Mot. Ex. 16 (Feb. 18, 2013 report) at CUA_002133.

### D.      Claimed instances of seeing Doe.

During the period the investigation was proceeding, from January 16, 2013 through February 18, 2013, Cavalier asserts that she had two interactions with Doe.  At one point in January or February 2013 (she could not recall more specifically when), Cavalier said that friends of Doe (but not Doe himself) approached her and called her a "slut" and a "whore."  SOF ¶¶ 115-16. Although Cavalier had seen Doe with those friends sometime before they approached her, she admitted that she did not know what, if anything, Doe had said to or asked of them.  SOF ¶ 116. In February 2013, Cavalier and Doe ended up at the same off-campus party, and Cavalier said that Doe "laughed in [her] face."  SOF ¶ 117.  Cavalier concedes that she never notified the University about either of these instances.  Cavalier Resp. to SOF ("Pl. SOF Resp.," Dkt. 65-1) ¶¶ 115-17.

### E.      Dean Sawyer decides the matter should not be sent to a hearing board, but reconsiders at Cavalier's request.

After reviewing Captain Gregory's report, Dean of Students Jonathan Sawyer concluded that there was not enough evidence for a hearing board to find Doe responsible for violating University policies, and he advised Cavalier at a March 14, 2013 meeting that the matter would not be sent to a hearing.  SOF ¶¶ 63-67.  Dean Sawyer did, however, offer to talk to Cavalier about her future housing and classes in order to limit potential contact between her and Doe.  SOF ¶ 68.

Cavalier submitted a letter appealing Dean Sawyer's decision on March 27, 2013, which now included a report prepared by the emergency medical technician ("EMT") who had transported Cavalier to the hospital on December 15, 2012.  SOF ¶¶ 69-74.  Cavalier did not request a no-contact order with Doe, either during her meeting with Sawyer or as part of the appeal

process.  SOF ¶ 104; *see* Mot. Ex. 24 (March 27, 2013 Cavalier appeal letter).  In response to the appeal, Dean Sawyer asked Captain Gregory to reopen her investigation.  SOF ¶¶ 75-76.

**F.    The University investigates further and continues to engage with Cavalier.**

After reviewing the EMT's report, meeting again with Cavalier and her attorney, and trying repeatedly, but unsuccessfully, to contact the EMT, Captain Gregory concluded, in an April 10, 2013 report, that the evidence did not support a finding that Cavalier was incapacitated at the time of the incident with Doe.  SOF ¶¶ 78-85.  Captain Gregory explained that, while she was aware that Cavalier had been drinking – and had been so aware when she authored her first report – only students who had themselves been drinking had suggested that Cavalier might have been intoxicated, whereas all of the sober trained law enforcement and medical professionals and University personnel who saw Cavalier over the course of the night denied that Cavalier appeared intoxicated, much less incapacitated.  SOF ¶¶ 83-85.

Dean Sawyer sought a meeting with Cavalier, which was delayed until May 10, 2013 to accommodate the schedules of Cavalier's attorneys.  SOF ¶¶ 86-88.  At the meeting, Dean Sawyer explained his determination that the matter would not go to a hearing.  SOF ¶ 88.  However, after Cavalier said that she needed a hearing to have closure, Dean Sawyer said he would give the matter further thought.  SOF ¶¶ 89-91.  Dean Sawyer later drafted a letter to Cavalier explaining his reasoning for the decision not to send the matter to a hearing, including his assessment that the evidence could not support a finding of incapacitation.  SOF ¶ 92; *see* Mot. Ex. 31 at CUA_002110.[2]  He did not send it or close the matter, however, because attorneys for Cavalier

---

[2]    Regarding incapacitation, Dean Sawyer wrote:

Although the toxicology report shows that you had an ethanol level of 97$_H$ at 8:28 a.m., responding University personal stated that you were coherent and did not appear intoxicated at the time of their initial intervention around 2:00 a.m. The DCFEMS report documented alcohol use, but also described you as alert with normal speech upon their assessment around 3:15 a.m. Several Individuals from multiple agencies had contact with you at various times on December 15 and none

and the University continued their discussions, a discourse that eventually led to a further meeting when Cavalier returned to campus in August.  SOF ¶¶ 93-97.

### G.    Dean Sawyer agrees to a hearing, and a no-contact order is implemented.

At the August 21, 2013 meeting, after Cavalier confirmed that a hearing would provide her closure, Dean Sawyer agreed to a hearing.  SOF ¶¶ 98-100.  Later that day, Dean Sawyer instructed Associate Dean Omar Torres to convene and train a hearing board.  SOF ¶¶ 124.

At the meeting, Cavalier requested a no-contact order, noting that she had recently seen Doe at a nearby dorm.[3]  SOF ¶¶ 103-07.  On August 27, 2013, Cavalier received a letter from Dean Torres indicating that the no-contact order was in place between her and Doe, and that Doe had been advised of the order.  SOF ¶ 102; *see* Ex. 36.  Cavalier was also offered alternative housing arrangements farther away from Doe's dorm, but Cavalier refused this offer.  SOF ¶ 107.  Instead, in September, the University persuaded Doe to move off campus.  SOF ¶ 108.

### H.    The hearing board finds Doe not responsible.

After the University convened and trained a hearing board, SOF ¶¶ 124-43, a hearing was held on October 3, 2013, SOF ¶¶ 144-63, and Doe was found not responsible, SOF ¶¶ 164-70.

### I.    The University enforces the no-contact order.

After the University implemented the no-contact order on August 23, 2017, the University investigated the only two alleged violations of that order reported by Cavalier and determined that

---

of them reported that you were incoherent, incapacitated or displaying symptoms of being under the influence of alcohol.  Despite your consumption of alcohol, there is insufficient evidence to establish that you were unable to consent due to incapacitation by alcohol.

Mot. Ex. 31 (May 29, 2013 Sawyer draft letter) at CUA_002110.

[3]     Dean Sawyer testified the August meeting was the first and only time that Cavalier had requested a no-contact order.  SOF ¶¶ 104-06.  Cavalier testified that she might have requested a no-contact order at the March or May meetings, but she was not sure.  SOF ¶ 106.  Cavalier had explicitly declined Dean Wainer's offer of a no contact order as soon as Cavalier returned to campus from break in January 2013.  SOF ¶¶ 25, 27, 29.

Doe had not violated the no-contact order.  SOF ¶¶ 110-14   For the remainder of Cavalier's time

at the University, she saw Doe walking on campus from time to time, but she admits he never said

anything to her, approached her, or touched her.  SOF ¶ 118.

> **J.     The Court's summary judgment ruling.**

In its November 30, 2020 Memorandum Opinion and Order ("Mem. Op." or "*Cavalier II*,"

Dkt. 79), the Court granted in part and denied in part the University's Motion for Summary

Judgment.  The Court granted summary judgment on Cavalier's negligent infliction of emotional

distress claim, Mem. Op. at 51-55, and granted summary judgment on the following aspects of

Cavalier's Title IX claim:  The October 2013 hearing was conducted appropriately, *id.* at 33-37;

Cavalier had no absolute right to a hearing under the University's policies, *id.* at 37-38; the August

27, 2013 no-contact order was appropriately enforced, *id.* at 38-40; and the University's personnel

were appropriately trained, *id.* at 41-42.  The Court found, however, that legal questions remained

as to the University's handling of the investigation and whether Cavalier was subjected to further

harassment by Doe following the incident but prior to the no-contact order being implemented.  *Id.*

at 40-50.  In addition, the Court raised, but did not consider, whether the statute of limitations

defense previously raised by the University in its Motion to Dismiss, *see Cavalier v. Catholic*

*Univ. of Am.*, 306 F. Supp. 3d 9, 42-44 (D.D.C. 2018); Dkt. 13 at 47-50 ("*Cavalier I*"), barred the

remainder of Cavalier's Title IX claim.  Mem. Op. at 50 n.9.

## STANDARD OF REVIEW

"Summary judgment is properly granted against a party who 'after adequate time for

discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial.'"  *Judicial Watch, Inc. v. Internal Revenue Serv.*, No. CV 14-1872(RMC), 2015 WL

5011335, at *2 (D.D.C. Aug. 24, 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986)).  Although the court "must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true," the "nonmoving party . . . must establish more than '[t]he mere existence of a scintilla of evidence' in support of [her] position." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986)).  A plaintiff's self-serving statements and subjective opinions are insufficient to create a genuine dispute of fact.  *See Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 76 (D.D.C. 2015), *aff'd,* No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015); *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008).

## ARGUMENT

**I.    Cavalier's remaining claims are barred by the statute of limitations.**

In ruling on the University's Motion to Dismiss, the Court concluded that Cavalier had sufficiently pled a potential "continuing violation" of Title IX because she alleged that the University had refused to enforce its no-contact order after the hearing, thereby exposing her to continual harassment by Doe up through her graduation in 2016.  *Cavalier I*, 306 F. Supp. 3d at 24, 42-45; Dkt. 13 at 31, 47-50.  After the Court's most recent ruling, however, the facts no longer support a continuing violation theory.   Because Cavalier has failed to show that any act of harassment occurred after the no-contact order was imposed in August 2013, the Court should hold that whatever remains of Cavalier's Title IX claim is barred by the statute of limitations since it arises solely from alleged events that preceded the statutory cutoff.

In determining the timeliness of a Title IX claim, this Court applies the three-year statute of limitations for personal injury actions under District of Columbia law.  *Id.* at 42; Dkt. 13 at 47; *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 238 (D.D.C. 2007) (citing *Carney v. American Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998)); *see* D.C. Code § 12-301(8).  In *Cavalier I*, this Court held that the same "continuing violations" framework that applies under Title VII can apply to claims of harassment under Title IX.  306 F. Supp. 3d at 43-44; Dkt. 13 at 48-50.

Cavalier filed her Complaint on October 7, 2016, Dkt. 1, meaning that, to be timely, an independent act constituting actionable Title IX harassment must have occurred on or after October 6, 2013.  On summary judgment, this Court concluded that no reasonable jury could find that the University's enforcement of the no-contact order, from August 27, 2013 onward, was deliberately indifferent.  *Cavalier II*, Mem. Op. at 38-40.[4]

Because Cavalier cannot prove "any 'acts' under the *Morgan* standard within the limitations period that contributed to a hostile environment," she cannot show "that the University caused her to undergo, or be vulnerable to, any harassment during the limitations period . . . ." *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1136-37 (9th Cir. 2006) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118-19 (2002)); *see id.* at 1136-37 (affirming dismissal of Title IX claim where last alleged act of harassment occurred outside limitations period).  *See also Beasley v. Alabama State Univ.*, 3 F. Supp. 2d 1325, 1336-37 (M.D. Ala. 1998) (granting summary judgment on Title IX harassment claim, after having allowed claim to proceed at motion to dismiss stage, where plaintiff was not able to adduce evidence that the alleged continuing violation extended into the limitations period); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (reversing summary judgment ruling for defendant on Title IX claim because plaintiff was able to show evidence that exposure to harassment continued within the limitations period).  In light of the foregoing, the Court must now conclude that Cavalier's remaining claims are barred by the statute of limitations.

---

[4]     As discussed below, to state a claim under Title IX, Cavalier would need to show that she experienced actual harassment after the incident of which the University had actual notice, her alleged assault.  *See* Section II, *infra*.  Thus, Cavalier's claim would have accrued no later than February 2013, the last time that she had any interaction with Doe (beyond merely seeing him on campus) while the no-contact order was not yet in effect.  SOF ¶¶ 115-18; *see also* Section III, *infra* (explaining why early 2013 incidents were *not* actionable harassment).  But, even if the standard is merely the risk of exposure to possible harassment, it is undisputed that any such risk terminated in August 2013.

II.   **Cavalier's Title IX claim also fails because she has not shown that she was subjected to any further actionable harassment following notice to the University.**

The Supreme Court's opinion in *Davis* requires a showing that a defendant school's response, or lack thereof, to a report of sexual harassment caused a plaintiff to suffer further actual harassment. This conclusion is most in keeping with the text of *Davis* and the framework within which the Supreme Court created a limited cause of action arising out of peer harassment. The alternate interpretation – that exposure to merely the possibility of harassment suffices – does not comport with the *Davis* opinion read as a whole and would expand the cause of action far beyond the limits stressed by the Supreme Court.

A.   **The Supreme Court's opinion in *Davis* requires further actionable harassment following actual notice.**

Both lines of authority that this Court identified in its Memorandum Opinion raising this issue of law trace their arguments to the Supreme Court's statement in *Davis* that "the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (alteration in original, quoting various dictionaries). The line of cases that does not require post-notice actionable harassment reads that sentence out of context. The full context for the rule is:

> If a funding recipient does not engage in harassment directly, it may not be liable for damages ***unless its deliberate indifference "subject[s]" its students to harassment***. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it.

*Id.* at 644-45 (emphasis added); *see also* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex . . . be subjected to discrimination . . . ."). The predicate of the pronoun "it" to close that passage is quite clearly actual "harassment" to which a student has been "subjected." The sentences that follow likewise refer uniformly to harassment that actually

occurred, not the possibility of harassment.  *See Davis*, 526 U.S. at 645 ("Moreover, because *the harassment must occur* under the operations of a funding recipient, *the harassment must take place* in a context subject to the school district's control.") (emphasis added, internal quotation omitted). These repeated neighboring references to actual harassment, without any mention of possible, theoretical harassment, show that the Court took it as a given that post-notice harassment had, in fact, occurred, and this subsequent harassment was the "it" to which the school had "ma[d]e [students] liable or vulnerable."

This comes back to the essential question that the Supreme Court was answering in *Davis*: What does it mean to "subject[]" a student to harassment as set forth in Title IX's statutory text? *See* § 1681(a).  Common sense leads to the same result as the textual analysis above:  When the Court defined "subjects" in part as making students vulnerable, it did not mean in the potential sense.  Whether one is subjected to ridicule, abuse, or any other harm, it is accurate to say that one has been made "vulnerable" to the condition to which one has been subjected but, in each of those examples, the speaker would be understood to mean that the condition actually happened, not merely that it could have happened.[5]

Instead, the Supreme Court explained that there are two ways that a school can "subject" a student to harassment.  A school could either cause the harassment directly by itself harassing the student or, in a broader theory of liability, a school could subject its students to harassment – and thereby violate Title IX – by allowing the conditions to exist for *ongoing*, actual harassment.

---

[5]    *See Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 628–29 (6th Cir. 2019) (Thapar, J., concurring) ("To be 'subjected' to a harm, as a matter of ordinary English, requires that you experience that harm. And that holds true whether someone directly causes the harm or simply makes you vulnerable to it."); *Is Vulnerability Enough? Analyzing the Jurisdictional Divide on the Requirement for Post-Notice Harassment in Title IX Litigation*, 29 Yale J.L. & Feminism 1, 24 (2017) ("[I]t would not be typical for someone to say that that they were 'subjected' to an action that had not yet happened."  . . .  The point is that 'subjected' connotes a past experience with or exposure to a concrete action or event.").

In the latter situation, the school both subjects the student to, and is a proximate cause of, the harassment because it has made the student vulnerable to actual harassment of which it had notice was occurring. Indeed, this was the situation at issue in *Davis*: Despite multiple reports to the school by a mother that her fifth-grade daughter was being sexually harassed by another student, the school allegedly did nothing and thus allowed the harassment to continue for a period of several months. *Davis*, 526 U.S. at 633-34. As another example of conduct that could violate Title IX in the peer harassment context, the Court cited "a case in which male students physically threaten their female peers every day . . . . District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource." *Id.* at 650-51. This concept of ongoing harassment – to which the school either responds inadequately or not at all – was at the heart of what Congress intended Title IX to remedy. *Id.*

This construction is also reflected in the Court's discussion of the remedial measures taken by the school. The *Davis* majority rejected the dissent's characterization that the Court was providing "victims of peer harassment . . . a Title IX right to make particular remedial demands." *Id.* at 648. However, if a student had a Title IX claim as long as the school's chosen measures made the student feel subjectively vulnerable, then the student *would* effectively have the right to choose her remedial measures, making that interpretation of *Davis* irreconcilable with the Court's holding.[6] Further, the Court explicitly empowered district courts, "[i]n an appropriate case," to identify the response made by a school "as not 'clearly unreasonable' as a matter of law." *Id.* at

---

[6]    The Court actually went further, rejecting the notion that its standard "require[s] funding recipients to 'remedy' peer harassment," *Davis*, 526 U.S. at 648, thereby suggesting that a school would not necessarily be liable even if some subsequent actual harassment did occur, so long as the school "respond[ed] to known peer harassment in a manner that [was] not clearly unreasonable." *Id.* at 649.

649. This holding would make no sense if a plaintiff were only required to show that a reasonable jury could find that some further harassment were *possible* despite a school's efforts.

Finally, the idea that a school, once it has actual knowledge of an actionable instance of sexual harassment, could be liable merely because there remained an unrealized possibility that further harassment could occur, represents exactly the type of expansion of Title IX that the dissent lambasted and that the majority took pains to foreclose. *See id.* at 652 (stressing the "very real limitations on a funding recipient's liability under Title IX" discussed by the Court and stating, "We trust that the dissent's characterization of our opinion will not mislead courts to impose more sweeping liability than we read Title IX to require."). The paragraph that discusses causing or making students vulnerable to harassment begins with the observation that "[t]he language of Title IX itself . . . cabins the range of misconduct that the statute proscribes." *Id.* at 644. The following paragraph begins with a similar emphasis on the limited nature of the claim. *See id.* at 645.

Concluding that a plaintiff can prove a violation of Title IX based only on possible harassment – as opposed to a deliberately indifferent response to ongoing actionable sexual harassment that the Court spent the entire opinion discussing – requires plucking a single clause of a single sentence from *Davis* and divorcing it from all surrounding context, and is accordingly unsupported by the Supreme Court's opinion.

**B.       The Circuit Courts that interpret *Davis* to require actual further harassment.**

Several Circuit Courts of Appeals have expressly embraced this view of *Davis*, holding that, for a school to subject a student to discrimination under Title IX, the school's "clearly unreasonable" response must have caused the student to suffer further actionable harassment. *See, e.g.*, *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 622-25 (6th Cir. 2019), *cert. denied*, No. 20-10, 2020 WL 6037223 (U.S. Oct. 13, 2020); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017) (quoting *Davis*, 526 U.S. at 644) (plaintiff failed to "allege

13

that [defendant's] purported indifference 'subject[ed] [her] to harassment'" where plaintiff alleged no post-assault harassment and thus "identified no causal nexus between [defendant's] inaction and K.T.'s experiencing sexual harassment"); *Escue v. N. OK Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006) (affirming grant of summary judgment where the plaintiff did not "allege that [defendant's] response to her allegations was ineffective such that she was further harassed"); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (affirming grant of summary judgment where there was "no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations," and thus "the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment").[7]

In *Kollaritsch*, four students alleged that they had been sexually assaulted and that the university had investigated their claims, but that the university's response had been inadequate in their view and had caused further distress. 944 F.3d at 618. None of the four plaintiffs alleged that, subsequent to making the university aware of their assaults, they suffered any further actionable harassment from their attackers. *Id.* at 624-25. The Court of Appeals for the Sixth Circuit found this defect fatal to their ability to bring a Title IX claim. *Id.*

Discussing *Davis*'s causation requirement, the Sixth Circuit observed that "*Davis* does not link the deliberate indifference directly to the injury (*i.e.*, it does not speak of subjecting students to *injury*[[8]]); Davis requires a showing that the school's 'deliberate indifference 'subject[ed]' its students to *harassment*,' necessarily meaning further actionable harassment." *Id.* at 622 (quoting

---

[7]     At least one decision from this Court has followed this line of authority. *See Blue v. District of Columbia*, 850 F. Supp. 2d 16, 35 (D.D.C. 2012), *aff'd*, 811 F.3d 14 (D.C. Cir. 2015) (citing *Escue*, 450 F.3d at 1155) (plaintiff failed to plead Title IX claim where did not allege that further sexual harassment resulted from school's deliberate indifference).

[8]     The "injury" element "means the deprivation of 'access to the educational opportunities or benefits provided by the school.'" *Kollaritsch*, 944 F.3d at 622 (quoting *Davis*, 526 U.S. at 650).

*Davis*, 526 U.S. at 644) (emphasis in *Kollaritsch*).  Thus, "the critical point is that the response must bring about or fail to protect against the further harassment . . . ."  *Id.*

Addressing the *Davis* Court's statement that the "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it," *id.* (quoting *Davis*, 526 U.S. at 645), the Sixth Circuit found that reading the reference to vulnerability as a stand-alone means of satisfying the causation element "is predicated on a faulty unstated premise:  that the two alternatives are necessarily between further harassment and no further harassment."  *Id.* at 623 (citing *Is Vulnerability Enough? Analyzing the Jurisdictional Divide on the Requirement for Post-Notice Harassment in Title IX Litigation*, 29 Yale J.L. & Feminism 1, 23 (2017)).  Instead, the Court explained:

> A plain and correct reading of that two-part causation statement, particularly when read in conformity with the overall opinion, reveals that the two alternatives are actually two possible ways that the school's "clearly unreasonable" response could lead to further harassment: that response might (1) be a detrimental action, thus fomenting or instigating further harassment, or it might (2) be an insufficient action (or no action at all), thus making the victim vulnerable to, meaning unprotected from, further harassment.

*Id.*  In other words, the Court found that the reference to vulnerability was "an effort to ensure that a student who experiences post-notice harassment may obtain damages regardless of whether the harassment resulted from the institution *placing* the student in a position to experience that harassment or *leaving* the student vulnerable to it."  *Id.* (emphasis in original, quotation omitted).  This reading gave meaning to the Supreme Court's reference to leaving a student vulnerable without reaching a conclusion that flies in the face of *Davis*'s stated purpose, namely, to describe a "high standard" for a private right of action against a school for peer harassment that applies only "in certain limited circumstances."  *Id.* at 619 (quoting *Davis*, 526 U.S. at 643).

The concurrence in *Kollaritsch* expanded upon this reasoning, framing the question, as the *Davis* Court did*, as whether the university had met Title IX's causation requirement by having

"'subjected' the plaintiffs to 'discrimination.'" *Id.* at 628 (Thapar, J., concurring). Judge Thapar noted that the Supreme Court had, in the context of many other statutes, construed the phrase "subjected to discrimination," but in none of those other cases had anyone "questioned whether the plaintiff must prove some discriminatory *effect*." *Id.* at 629 (emphasis in original). Similarly, each of the other operative phrases from Title IX denotes actually experiencing some condition, not just making it more likely to occur: "[T]o be 'excluded from participation' means that something blocked your participation—not just that something made it more likely that you wouldn't be able to participate. . . . [T]o be 'denied [ ] benefits' means that something held the benefits back—not just that something made it more likely that you wouldn't be able to receive them." *Id.* (quoting § 1681(a)).

Echoing a point noted by *Davis*, *see* 526 U.S. at 640, Judge Thapar further reasoned that, because Congress enacted Title IX under its Spending Clause authority – providing funding to recipients in return for adherence to Congressionally mandated rules – any conditions within Title IX must be spelled out "unambiguously." *Kollaritsch*, 944 F.3d at 629 (Thapar, J., concurring) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)); *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("Our central concern . . . is with ensuring that the receiving entity of federal funds has notice that it will be liable for a monetary award.") (quotation omitted). Thus, even were there an ambiguity as to whether the causation element could be satisfied by vulnerability to the mere possibility of harassment, "that very ambiguity would require us to adopt the less expansive reading of Title IX." *Kollaritsch*, 944 F.3d at 629 (Thapar, J., concurring). Such caution is also in keeping with the *Davis* Court's having gone to "great lengths to emphasize the narrowness of its decision" and its admonition against "'impos[ing] more sweeping liability' than Title IX requires." *Id.* (quoting *Davis*, 526 U.S. at 652); *see also id.* at

16

629-30 (listing a "wide range of decisions" for which schools could be responsible under Title IX if they are made "liable for any act or omission that makes students 'vulnerable to' harassment").

In a subsequent case, the Sixth Circuit, sitting *en banc*, implicitly recognized another problem with the potential harassment theory:  Even the fact that harassment *does* occur after a school has actual notice of prior harassment does not, by itself, permit a reasonable jury to find that the school was deliberately indifferent.  *See Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 968 (6th Cir. 2020) (*en banc*).  The deliberate indifference standard imposes liability when schools "refuse to take action to bring the recipient into compliance," *id.* (quoting *Gebser*, 524 U.S. at 290, "not when they take action that ultimately fails to 'purg[e] their schools of actionable peer harassment,'" *id.* (quoting *Davis*, 526 U.S. at 648).  Put another way, the question is "not whether the school's efforts were ineffective but whether they amounted to 'an official decision . . . not to remedy the violation.'"  *Id.* (quoting *Davis*, 526 U.S. at 642).  To hold otherwise would "call[] to mind strict liability, not deliberate indifference."  *Id.*; *see id.* at 968-71 (affirming grant of summary judgment for school where imposition of escalating series of punishments in response to each of several instances of harassing behavior by respondent was not clearly unreasonable).  If, as *Foster* and *Davis* explain, the *actual* failure of a school's chosen remedial measure is not enough on its own to impose Title IX liability, then it follows that it cannot possibly be the case that a school's decision to respond in a way that *might* fail could ever be sufficient for liability on its own (*i.e.*, without further actual harassment).

C.     **The Circuit Court cases that arguably support the potential harassment theory.**

The contrast between the Sixth Circuit's detailed analysis of *Davis* and other circuits' abbreviated conclusions to the contrary is stark.  For example, in reaching a different conclusion, the Tenth Circuit Court of Appeals focused entirely on the single sentence in *Davis* which states

that "the deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it," engaging in no analysis of the statement's context or the opinion's narrow holding.   *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1103 (10th Cir. 2019) (quoting *Davis*, 526 U.S. at 645); *id.* at 1104 ("We must give effect to each part of that sentence."). The Court gave no consideration to whether, as described above, the "make them liable or vulnerable" phrase could have some other meaning beyond the mere possibility of harassment. *See id.* at 1103-04.  The Tenth Circuit also did not discuss the broader statutory framework *Davis* described or the limited nature of the remedy provided by Title IX.  *See id.*[9]

The First Circuit Court of Appeals performed a similarly abbreviated analysis of *Davis* in a case cited for support by *Farmer.  See Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009).[10]  But *Fitzgerald* offers only limited support for the view that no further actual harassment is necessary.  It stated that such a claim was "theoretically" possible only under the model where "a single instance of peer-on-peer harassment" was sufficiently "systemic" to state a Title IX claim, *id.* at 172-73, a

---

[9]      Although not addressed by *Farmer* or any other court, another problem with the potential harassment theory is that it would lead to absurd results in practice.  For example, under this theory, it is not clear when the statute of limitations would ever begin to run.  As long as there remained some possibility that the plaintiff might be exposed to harassment – presumably, as long as the plaintiff remained on campus or enrolled – the claim would accrue continuously.  One could imagine a student who is allegedly harassed during her freshman year and thereafter feels "vulnerable" to further harassment, but nonetheless finishes her undergraduate degree, returns to the school for a graduate degree, and stays to complete post-doctoral work.  During that entire multi-year period, the statute of limitations would have yet to run.  This type of absurd result presents another reason that the potential harassment theory should be discarded.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[In]terpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Even this issue does not help Cavalier with her statute of limitations problem because the Court previously ruled that there was no deliberate indifference after August 2013.  *See* Section I, *supra*.

[10]      The Supreme Court did not consider the First Circuit's construction of Title IX.  Instead it reversed the separate holding that Title IX did not preclude a parallel claim brought 42 U.S.C. § 1983.  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 246-48 (2009).

scenario it said "[w]e do not mean to imply . . . will occur frequently, *id.* at 173 n.3 (citing *Davis*,

526 U.S. at 652-53), and which is, in any case, not the situation Cavalier has alleged.[11]

Further, the Court cited the fact that "post-notice interactions between the victim and the

harasser have been alleged." *Id.* at 173. Thus, *Fitzgerald* appears to have relied to some degree

on further actual harassment in stating that the plaintiff could theoretically state a claim. Moreover,

the Court went on to affirm the grant of summary judgment for the school on the basis that, while

the school's responses had not been perfect, they were not clearly unreasonable in light of what

the school actually knew at the time, including subsequent information provided by the plaintiff

that caused the school to revise the measures it took or offered. *Id.* at 174-75. Thus, even accepting

this theory, the mere potential for further harassment does not obviate the need to ask whether the

school's actions were clearly unreasonable based on its actual knowledge at the time.

A case from the Eleventh Circuit provides even less support for the potential harassment

theory. In *Williams*, the Court concluded that "a Title IX plaintiff at the motion to dismiss stage

must allege that the Title IX recipient's deliberate indifference to the initial discrimination

subjected the plaintiff to further discrimination." *Williams v. Bd. of Regents of Univ. Sys. of

Georgia*, 477 F.3d 1282, 1295-96 (11th Cir. 2007). Despite this statement, the Eleventh Circuit

held that plaintiff had stated a claim, even though she withdrew from classes, because the

university thoroughly failed to respond and "failed to take any precautions that would prevent

---

[11]     *Davis* stated that it was "unlikely" that Congress intended single instances of peer harassment would usually rise to this level both because of "the inevitability of student misconduct" and "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." *Davis*, 526 U.S. at 653.

future attacks" by the attacker and his conspirators.  *Id.* at 1297.[12]  The Court's discussion offers

no reason to conclude that it was relying on the "make liable or vulnerable" provision of *Davis*.

*See id.* at 1297-98.[13]

> **D.**     **The Court should hold that further actual harassment is required to state a claim under Title IX.**

The Court should follow *Kollaritsch* and the other authorities indicating that, to state a Title

IX claim under *Davis* based on peer harassment, the plaintiff must show that she suffered further

actionable harassment after the school had actual knowledge of harassment and an opportunity to

address that harassment.  This reading is most consistent with the plain language of *Davis*, which

repeatedly referred to a school's exposing a student to further actual harassment (as reflected in

the facts of *Davis*).  It is also more consistent with the structure and tone of *Davis*, which went out

of its way to stress the limits on the new private right of action the Court created and the statutory

framework in which that claim existed.  *Kollaritsch* explains this reasoning plainly and logically,

demonstrating that the vulnerability was a means of causing harassment, not an injury in and of

itself, and illustrating how the alternative interpretation would inappropriately expand the potential

cause of action far beyond the statutory and constitutional limitations that the *Davis* Court took

pains to set.  By contrast, cases such as *Farmer* gave no consideration to any aspect of *Davis*

beyond a single sentence taken out of context or any analysis of why an unrealized possibility of

harassment is enough to satisfy *Davis'* causation requirement.

---

[12]     The Eleventh Circuit noted that "the facts alleged in this case are extreme" and "[w]e do not decide . . . whether a valid Title IX claim would have been stated if the facts alleged had been less severe." *Williams*, 477 F.3d at 1299.

[13]     Two decisions from this Court have followed this potential harassment line of authority. *See Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 135 (D.D.C. 2019) (citing *Farmer*, 918 F.3d at 1103) (plaintiff may allege either that school caused harassment or made plaintiff vulnerable to it) (subsequent history omitted); *Wells v. Hense*, 235 F. Supp. 3d 1, 8 (D.D.C. 2017) (citing *Fitzgerald*, 504 F.3d at 172-73) (same).

**III.    The Court should grant summary judgment because Cavalier cannot show that, after the University had actual notice of her alleged assault, she was subjected to any <u>further actionable harassment.</u>**

Cavalier has not demonstrated that she experienced any actionable harassment between her alleged assault and when the University instituted and enforced a no-contact order.  On the basis of the authorities above, the Court should hold that Cavalier must prove subsequent harassment to state a claim under Title IX, and that her failure to do so entitles the University to summary judgment.

**A.    Cavalier did not experience actionable harassment after reporting her alleged assault to the University.**

The record contains evidence of only two instances of contact between Cavalier and Doe from the December 2012 alleged assault to when the no-contact order was instituted in August 2013:  an off-campus party in February 2013 at which Cavalier saw Doe and Doe allegedly laughed in her face, but they had no further verbal or physical interaction, SOF ¶ 117; and an incident in January or February 2013 (Cavalier could not remember) when Cavalier was approached by friends of Doe – but not Doe himself – at the campus student center, and these students allegedly called her a "slut" and "whore," SOF ¶¶ 115-16.  Cavalier stated that, although these friends had been sitting with Doe before they approached her, she did not know whether Doe had asked or encouraged them to confront her.  SOF ¶ 116.  Other than these two instances, Cavalier admits that she merely saw Doe on campus from time to time.  SOF ¶ 118.

None of these incidents constitutes actionable harassment under *Davis*.[14]  To state a claim under Title IX, Cavalier must show that she experienced "ongoing harassment [that] was 'so

---

[14]    The Court's prior ruling reflected this conclusion implicitly.  Had these facts demonstrated that Cavalier had suffered actionable harassment, the Court would not have needed to raise the legal question of whether her Title IX claim could survive as long as she demonstrated the mere possibility of harassment.  *See* Mem. Op. at 46-48.

severe, pervasive, and objectively offensive that it effectively bar[red Cavalier's] access to an educational opportunity or benefit.'" *Cavalier I*, 306 F. Supp. 3d at 33 (quoting *Davis*, 526 U.S. at 633).  To be actionable, this harassment must have a "systemic effect" on the plaintiff's access to education.  *Raihan v. George Washington Univ.*, 324 F. Supp. 3d 102, 115 (D.D.C. 2018) (quoting *Davis*, 526 U.S. at 633, 652).  The harassment must also be objectively offensive, meaning it "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quotation omitted); *see Davis*, 526 U.S. at 651 (citing *Oncale*).

As to the encounter at the off-campus party, the mere fact of seeing Doe does not, as this Court has recognized, raise the encounter to the level of harassment.  *See Cavalier I*, 306 F. Supp. 3d at 33 n.2; Dkt. 13 at 32 n.2 (observing that if Doe were "simply passing Cavalier on the way to class, Cavalier will need to add substance to this allegation on summary judgment" in order to show harassment); *Raihan*, 324 F. Supp. 3d at 114-15 (seeing plaintiff at campus gym after assault was not actionable);  *Frazer v. Temple Univ.*, 25 F. Supp.3d 598, 614 (E.D. Pa. 2014) (respondent's post-assault conduct, including sitting outside plaintiff's dormitory, following her, standing beside her, and staring at her, was not "sufficiently 'severe, pervasive, and objectively offensive' for liability to attach under *Davis*"); *Yoona Ha v. Nw. Univ.*, No. 14 C 895, 2014 WL 5893292, at *2 (N.D. Ill. Nov. 13, 2014) (taking an "occasional glimpse" of the respondent, even where it causes the plaintiff "considerable grief," is not actionable).  Doe's laughter, even construed as directed at Cavalier, was not a sex-based comment.  *See Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)) ("Sexual harassment occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate.").

22

The harassment analysis also requires taking into account the school's "degree of control over the harasser and the environment in which the harassment occurs" and must occur "'under' an 'operation' of the funding recipient." *Id.* at 644-46.  Cavalier's reliance on an off-campus party is problematic on both fronts.  It is well recognized that, whatever control universities have over their students on campus, that control lessens considerably when the students leave campus for non-university-sponsored events, and particularly parties. *See Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (noting that "there was no evidence that the University had control over the student conduct at the off campus party"); *cf. Williams v. Pennridge Sch. Dist.*, No. CV 15-4163, 2016 WL 6432906, at *5, 7 (E.D. Pa. Oct. 31, 2016) (phone calls that took place off-campus and on the weekend were of "diminished relevance" to plaintiff's claim and were found not to be "harassment that rises to the level of severe or pervasive").  Cavalier has not in any case demonstrated here that the off-campus party was "under" the University's "operation" or that the University exercised any control over the environment in which the laugh occurred. *See Davis*, 526 U.S. at 646 (observing that where "the misconduct occurs during school hours and on school grounds . . . the misconduct is taking place 'under' an 'operation' of the funding recipient").

The alleged incident at the student center with Doe's friends occurred on campus and was obviously sex-based, but there is no support for the notion that a single instance of sex-based comments can rise to the level of being "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650; *see id.* at 651-52 (name-calling, even when comments target gender, will not usually rise to level of harassment); *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006) (name-calling in the context of reported rape could potentially constitute actionable harassment where the 14-year-old victim was "*persistently subjected* by other students

23

to verbal abuse") (emphasis added); *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 227 (D. Conn. 2006) (harassment was sufficiently "pervasive" when it constituted "not a single act of teasing, or even a few incidents spanning only a short time period," but plaintiff was instead "targeted nearly every school day, in class, in-between classes, and at lunch"). So that incident alone cannot satisfy the severe and pervasive prongs of the *Davis* test.

Moreover, even if the incident with Doe's friends could rise to the level of actionable harassment, there remains a problem of causation: the University's actions or omissions must have effectively caused the harassment to be actionable. *See Davis*, 526 U.S. at 644 (to be liable, school must "subject[] its students to harassment") (quotation omitted). However, Cavalier has not shown, and a reasonable jury could not conclude, that imposing a no-contact order against Doe at an earlier date would have prevented this incident from occurring. The University's no-contact order applied only to the complainant and respondent, not to their friends or to the University community at large. SOF ¶ 102; *see* Mot. Ex. 36 (Omar Torres Aug. 27, 2013 letter to Cavalier with terms of no-contact order). Although such an order does prohibit one party from contacting the other indirectly through his or her friends, SOF ¶ 102, Cavalier admitted that she had no idea whether Doe had anything to do with his friends coming over to her. SOF ¶ 116. As there is no reason to believe that this incident would have been prevented even had a no-contact order been in effect at the time, Cavalier has not demonstrated that the University's failure to impose a no-contact order against Doe was the act that "subjected" Cavalier to the name-calling, even if it were actionable harassment.

For all of these reasons, the Court should hold that Cavalier cannot show that she was subjected to further actionable peer harassment following her alleged assault and that, as such, the University is entitled to summary judgment.

**B.      The evidence does not show that it was clearly unreasonable for the University not to have put a no-contact order in place in early 2013.**

Even assuming that one or both of the January or February 2013 incidents could rise to the level of actionable harassment, Cavalier cannot show that it was clearly unreasonable for the University not to have put a no-contact order in effect upon her return to campus in January 2013 based on what the University actually knew at the time. *See Davis*, 526 U.S. at 648.

Assistant Dean Rachel Wainer offered a no-contact order to Cavalier on January 14, 2013, and Cavalier declined that remedial measure.  SOF ¶¶ 27, 29.  For Cavalier to have told the University at the time that the resource that it had offered was unnecessary, only to later claim that the University was in fact *required* to have implemented this measure over her declination to avoid liability, is the very "second-guessing the disciplinary decisions made by school administrators" while denying them "the flexibility they require" that *Davis* cautioned against.  *Davis*, 526 U.S. at 648.

Moreover, Cavalier also gave Dean Wainer reassuring information:  Cavalier had not been in touch with Doe or his friends (*i.e.*, no one was attempting to intimidate or otherwise contact her a full month after the incident), and she had also gotten in touch with the advocate who met her at the hospital on the night of the alleged assault.  SOF ¶ 29.  Significantly, when Dean Wainer reached out to Cavalier twice more in January to follow up, Cavalier never responded.  SOF ¶ 31.

Add to this what the University learned from Associate Director of Residence Life Brad Troy's report of his February 5, 2013 conversation with Doe:  Doe said "he hasn't spoken to the woman involved since the night of the incident and does not intend to;" and that Troy had told Doe "that he should not engage in any negative behaviors/communication with [Cavalier]."  SOF ¶ 33.  Thus, no later than early February, what the University knew was that:  Cavalier had declined a no-contact order; Cavalier had reported no contact with Doe; Cavalier had not responded to Dean

25

Wainer's follow-up attempts; Doe had reported no contact with Cavalier; and Doe had been, at the very least, encouraged by a University administrator not to contact Cavalier.[15]

It is well-settled that "victims of peer harassment" do not "have a Title IX right to make particular demands." *Davis*, 526 U.S. at 648; *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1124 (10th Cir. 2008) (response was not clearly unreasonable where school offered remedial measures, but plaintiff rejected them); *Roe*, 746 F.3d at 883 (deliberate indifference not established where, *inter alia*, victim declined to accept resources offered). Cavalier's mistaken theory is that she was entitled to a remedy that she not only did *not* ask for, but that she explicitly refused. As a matter of law, the Court should hold that the University's decision not to put a no-contact order in place prior to August 2013 was not clearly unreasonable in light of Cavalier's refusal of the University's offer. *See id.* at 649. A contrary holding sets an impossible standard for schools, which could only respond by forcing every conceivable responsive measure on complainants who did not want them merely to avoid liability.

On these facts, and given the Supreme Court's clear emphasis on the limited nature of the Title IX cause of action – not to "remedy peer harassment" but to "merely respond to known peer harassment in a manner that is not clearly unreasonable," *Davis*, 526 U.S. 648-49, the University's decision not to put a no-contact order into effect in early 2013 was not deliberately indifferent and the Court should enter summary judgment for the University under any standard.

---

[15]     Moreover, Doe told Captain Gregory on January 24, 2013 that he and Cavalier had never met before the night of the alleged assault. Mot. Ex. 16 (Feb. 18, 2013 report) at CUA_002128. There was not, in other words, any sort of prior relationship which might suggest that one party would continue to try to contact the other.

## IV.    The Court should grant summary judgment for the University even if it adopts the potential harassment theory.

Although the University believes that the *Farmer* line of cases was wrongly decided, even were the Court to follow those cases, it should still grant summary judgment for the University. To the extent these cases stand for the proposition that an insufficient response to a single severe instance of sexual harassment, standing alone, could suffice for liability – which the University disputes for the reasons discussed above – these cases nonetheless hold that a school's actions must still be judged based on its actual knowledge at the time, and its response can only be deliberately indifferent if those actions were clearly unreasonable.  *Farmer*, 918 F.3d at 1104; *Fitzgerald*, 504 F.3d at 173-75; *Williams*, 477 F.3d at 1294-95.  For all the reasons described in the previous section, there is no basis to conclude that it was clearly unreasonable for the University to have respected Cavalier's express instructions and not put a no-contact order in place in early 2013.  *See* Section III.B, *supra*.

Moreover, in the relative contexts of the potential harassment cases, the facts place this case much closer to *Fitzgerald*, where summary judgment was granted to the school, than to either *Farmer* or *Williams*, where motions to dismiss were denied.  As is the case here, in *Fitzgerald*, the school had both commenced an investigation – which did not clearly suggest that the respondent was responsible – and offered remedial measures, just not those wanted by the plaintiff's parents, leading the First Circuit to observe that "a claim that the school system could or should have done more is insufficient to establish deliberate indifference."  504 F.3d at 174-75.[16]

---

[16]      The *Fitzgerald* Court also noted that the school "responded reasonably each time the Fitzgeralds notified it of new developments," in keeping with the requirement that although "an educational institution must act reasonably to prevent future harassment; it need not succeed in doing so."  *Id.* (citing Davis, 526 U.S. at 648).  By not reporting either of the early 2013 alleged incidents, Cavalier never gave the University this opportunity to respond.

The alleged facts in *Farmer*, by contrast, bear no resemblance to Cavalier's case:  both *Farmer* plaintiffs alleged that, after they were raped at fraternity events, the university took no steps to investigate their allegations, offered no measures designed to protect them, and, in one of their cases, released sensitive information about the plaintiff to her attackers.  918 F.3d at 1099-1101.  Similarly, in *Williams*, not only did the school know about the dangers posed by plaintiff's attacker before the assault, but, despite having a full investigative report that squarely laid blame with the attacker and his conspirators, the school took no action for nearly a year.  477 F.3d at 1297-98.

Thus, even if the law permitted Cavalier to state a claim where she suffered no further actionable harassment – and it should not – it was not clearly unreasonable for the University, based on what it knew at the time, to heed her express instruction and not put in place a measure she only requested eight months after the event (and which was provided promptly once it was requested).

## CONCLUSION

For the reasons stated above, defendant The Catholic University of America respectfully requests that the Court enter summary judgment on plaintiff Erin Cavalier's remaining claims, dismiss this case with prejudice, and grant such other relief as is appropriate.

Date:  January 22, 2021

Respectfully submitted,

*/s/ Joshua W.B. Richards*
Joshua W.B. Richards (DC Fed. Bar #1002821)
Saul Ewing Arnstein & Lehr LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Tel: (215) 972-7737

28

Fax: (215) 972-7725
joshua.richards@saul.com

Aaron J. Kornblith (D.C. Bar No. 1024077)
Saul Ewing Arnstein & Lehr LLP
1919 Pennsylvania Ave., NW, Suite 550
Washington, DC 20006
Tel: (202) 295-6619
Fax: (202) 337-6065
aj.kornblith@saul.com

*Counsel for Defendant*
*The Catholic University of America*

29